Matthew Rihtar                              August 3, 2017

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

Case No. A-16-CA-1170-SS

---

RULE 30(b)(6) DEPOSITION OF:
MATTHEW RIHTAR - August 3, 2017
Bankrate, Inc.
(CONFIDENTIAL AND NONCONFIDENTIAL TRANSCRIPT)

---

NEUTRON DEPOT, LLC; and DEPOWEB, INC.,

Plaintiffs,

v.

BANKRATE, INC.; MAXIM METALNIKOV; and
SUNTI PROMPUN,

Defendants.

---

          PURSUANT TO NOTICE, the Rule 30(b)(6)
deposition of MATTHEW RIHTAR, Bankrate, Inc., was taken
on behalf of the Plaintiffs at 1801 California Street,
Suite 4400, Denver, Colorado 80202, on August 3, 2017,
at 9:16 a.m., before Gail Obermeyer, Registered
Professional Reporter and Notary Public within
Colorado.

Matthew Rihtar                                    August 3, 2017

```
                                                      Page 2
    1                  A P P E A R A N C E S

    2    For the Plaintiffs:

    3            AARON P. PEACOCK, ESQ.
                 Gagnon, Peacock & Vereeke, P.C.
    4            1349 Empire Central Drive, Suite 500
                 Dallas, Texas 75247
    5

    6    For the Defendants:

    7            AMANDA G. HYLAND, ESQ.
                 SETH TRIMBLE, ESQ.
    8            Taylor English Duma, LLP
                 1600 Parkwood Circle, Suite 400
    9            Atlanta, Georgia 30339

   10

   11

   12

   13

   14

   15

   16

   17

   18

   19

   20

   21

   22

   23

   24

   25
```

Matthew Rihtar                                          August 3, 2017

```
 1                         I N D E X

 2    EXAMINATION OF MATTHEW RIHTAR:                    PAGE
      August 3, 2017
 3
      By Mr. Peacock                                       6
 4
      By Ms. Hyland                                      180
 5

 6    *  CONFIDENTIAL EXCERPT
         Pages 202 through 204
 7

 8                                                   INITIAL
      DEPOSITION EXHIBITS:                         REFERENCE
 9
      Exhibit 1   First Amended Notice of                13
10                Deposition of Defendant
                  Bankrate, Inc., Pursuant to
11                Fed.R.Civ.P. 30(b()6), 7/11/17

12    Exhibit 2   Insertion Order between Trouve         37
                  Media, Inc. and Sunti Prompun,
13                with attachment

14    Exhibit 3   Bankrate, Inc., PowerPoint             54
                  presentation, with attachments
15
      Exhibit 4   Agreement pertaining to               147
16                InsureMe's Affiliate Program

17    Exhibit 5   First Amended Notice of               170
                  Deposition of Defendant
18                Bankrate, Inc., Pursuant to
                  Fed.R.Civ.P. 30(b)(6),
19                two pages, with handwritten
                  notes on page 1
20
      Exhibit 6   Corsearch information                 179
21                pertaining to Insurance Depot

22    Exhibit 7   Bing information pertaining            186
                  to Insurance Depot, 1/3/17
23

24

25
```

ABC COURT REPORTERS                    214.303.0ABC   (0222)

Matthew Rihtar                                    August 3, 2017

                                                            Page 4

```
 1   Exhibit 8    Spreadsheet, Bankrate                  187
                  insurance division
 2                owned-and-operated paid search
                  accounts, listed by year,
 3                7/1/2000 through 12/31/14

 4   Exhibit 9    Spreadsheet, Bankrate campaigns         190
                  with the term "Depot Auto
 5                Insurance," 7/1/2000 through
                  12/31/14
 6
     Exhibit 10   (Confidential document -               201
 7                Attorneys' Eyes Only)

 8   Exhibit 11   E-mail to Prompun from Mak,             205
                  6/26/14, Subject:  RE:
 9                Keyword bidding, with
                  e-mails attached
10
     Exhibit 12   E-mail to Fung from Prompun,           205
11                6/27/14, Subject:  RE:
                  Bankrate - Request for
12                Information and Litigation
                  Preservation of Documents,
13                with e-mail attached

14   Exhibit 13   E-mail to Prompun from Fung,           205
                  6/30/14, Subject:  Bankrate -
15                Request for Information and
                  Litigation Preservation of
16                Documents - Part 2

17   Exhibit 14   E-mail to Fung from Prompun,           205
                  7/11/14, Subject:  Re:
18                Request for further
                  information, with e-mails
19                attached

20   Exhibit 15   E-mail to Metalnikov from              205
                  Rihtar, 7/1/14, Subject:
21                RE: Trademark, with e-mail
                  attached
22
     Exhibit 16   E-mail to Rihtar from                  212
23                Metalnikov, 7/1/14, Subject:
                  Re: Trademark, with e-mails
24                attached

25
```

Matthew Rihtar                                    August 3, 2017

Page 5

| 1 | Exhibit 17 | E-mail to Metalnikov from Rihtar, 7/2/14, Subject: | 212 |
| 2 | | RE:  Trademark, with e-mails attached | |
| 3 | | | |
| 4 | Exhibit 18 | E-mail to Rihtar from Metalnikov, 7/20/14, Subject: Re:  Trademark, with e-mails | 212 |
| 5 | | attached | |
| 6 | Exhibit 19 | E-mail to Wong from Garcia, 9/3/14, Subject:  RE: Traffic | 212 |
| 7 | | reports WE 8.30.14, with e-mails attached | |
| 8 | | | |
| 9 | * | Confidential material is filed under separate cover | |

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Matthew Rihtar                                    August 3, 2017

```
                                                    Page 6
 1                WHEREUPON, the following proceedings
 2      were taken pursuant to the Federal Rules of Civil
 3      Procedure.
 4                    *      *      *      *      *
 5                     MATTHEW RIHTAR,
 6      having been first duly sworn to state the whole truth,
 7      testified as follows:
 8                (Deponent's reply to oath:  "I do.")
 9                      EXAMINATION
10      BY MR. PEACOCK:
11           Q.   Good morning.
12           A.   Good morning.
13           Q.   My name is Aaron Peacock.  And what is
14      your name, for the record?
15           A.   Full name, Matthew Stanley Rihtar.
16           Q.   Okay.  And have you ever taken a
17      deposition before?
18           A.   I have.
19           Q.   Okay.  How many depositions have you
20      taken?
21           A.   One.
22           Q.   Roughly, when was that?
23           A.   Approximately three years ago.
24                MS. HYLAND:  Just for the record, you mean
25      he's given a deposition, not taken one?
```

Matthew Rihtar                                      August 3, 2017

Page 7

1               MR. PEACOCK:  That is true.  Good point.

2    Thank you, Counsel.

3          Q.   (BY MR. PEACOCK)  Let me -- since you've

4    taken (sic) one deposition, you probably already know

5    some of this stuff, but I'll just kind of go through

6    this as a routine.  We have a court reporter here.

7    She's taking down everything that is said.  It's as if

8    you were in court.  And so when I ask you a question,

9    if you would say yes or no, instead of uh-huh or huh-uh

10   or shaking your head, because she can't properly record

11   that.  Do we have that agreement?

12         A.   Sure, yes.

13         Q.   Good.  Just as -- before we begin, I'd

14   like to just learn a little bit about you.  It's my

15   understanding that you're not with Bankrate anymore,

16   correct?

17         A.   That is correct.

18         Q.   Where are you employed right now?

19         A.   I am not.

20         Q.   Okay.  Where were you employed,

21   previously?

22         A.   Before Bankrate?

23         Q.   Well, when was your last employment?

24         A.   Bankrate.

25         Q.   Okay.  How long were you with Bankrate?

Matthew Rihtar                                    August 3, 2017

Page 8

```
 1          A.   I started in 2009, and we sold the company
 2    in 2015.
 3          Q.   What were your positions at Bankrate?
 4          A.   Oh, if memory serves, it started as
 5    director of business development; and then it moved to
 6    vice president of business development; and then
 7    finally, at the end, senior vice president of business
 8    involvement.
 9          Q.   So you've had three positions with
10    Bankrate?
11          A.   I think that's right.
12          Q.   And -- I'm sorry.  Go ahead.
13          A.   No.
14          Q.   So you became employed with Bankrate in
15    2009?
16          A.   Correct.
17          Q.   And where were you employed before
18    Bankrate?
19          A.   A company called Insurance.com.
20          Q.   Okay.  What did you do for Insurance.com?
21          A.   It was in affiliate management.
22          Q.   Okay.  And how long were you employed with
23    that company?
24          A.   Roughly two years.
25          Q.   And what posts did you have with that
```

Matthew Rihtar                                    August 3, 2017

Page 9

1    company?  What did -- what were your positions?

2            A.    It was the one.  It was -- it was -- I

3    think affiliate manager was the title.

4            Q.    And where were you employed before that?

5            A.    Before Insurance.com was -- it was more of

6    a consulting agreement with a local TV station, in

7    their accounting department.

8            Q.    A local TV station here in Denver?

9            A.    In Cleveland, Ohio.

10           Q.    Okay.  In Ohio.  And how long were you

11   employed with that company?

12           A.    Less than a year.

13           Q.    Now, you say "consulting."  So were you an

14   employee, or were you an independent contractor?

15           A.    I was not an employee.

16           Q.    So you were working on your own as a

17   proprietor?

18           A.    They had brought me in to do a project,

19   asset -- I don't even remember what it was -- sort of

20   an asset classification project for them.

21           Q.    Do you remember the name of the television

22   station?

23           A.    It was -- I don't.  It was Channel 5 in

24   Cleveland, Ohio.  I know that.

25           Q.    And how long were you performing services

Matthew Rihtar                                    August 3, 2017

Page 10

 1   for that station?

 2        A.   I think we said less than a year.  I can't

 3   remember specifics.

 4        Q.   And at that time, were you performing

 5   services only for them, or were you also performing

 6   services for other companies as well?

 7        A.    I believe it was only for them at that

 8   time.

 9        Q.   And that was, roughly, in what year?

10        A.   Roughly, 2006.

11        Q.   Do you remember where you were employed or

12   what you -- where you employed before you were working

13   for that company -- or working with that company?

14        A.   Before that, it was a point in time I was

15   putting myself through college, so it was a bunch of

16   odds-and-ends jobs, that type of stuff.

17        Q.   So you went to work for that television

18   station shortly after college?

19        A.   Correct.

20        Q.   What college did you attend?

21        A.   Kent State University.

22        Q.   And what degree -- I assume that you

23   graduated; is that correct?

24        A.   I did.

25        Q.   What degree did you obtain?

Matthew Rihtar                                      August 3, 2017

Page 11

1          A.    It was a bachelor's of -- it's business

2     management, and then went on to get an MBA.

3          Q.    Where did you obtain your MBA?

4          A.    Same, Kent State.

5          Q.    Okay.  And before that -- before that,

6     were you employed anywhere?

7          A.    Before --

8          Q.    Let me ask it a little bit different.

9     When you went to Kent State, about how old were you

10    when you enrolled at Kent State, roughly speaking?

11         A.    18.

12         Q.    18.  Okay.  All right.  So after high

13    school -- so you graduated high school and then went to

14    Kent State; is that correct?

15         A.    Correct.

16         Q.    All right.  Sounds good.  When you were at

17    Bankrate -- well, let me back up and ask you, you said

18    you were there from 2009 until 2015, when you sold --

19    when the company was sold; is that correct?

20         A.    Correct.  And then there was a short

21    transition period with All Web Leads, who was the

22    purchaser of the company, into -- early 2016, and then

23    I exited All Web.

24         Q.    So you exited -- so was that part of the

25    deal with All Web Leads, is they would take on -- you

Matthew Rihtar                                    August 3, 2017

Page 12

1    would become employed by All Web Leads as a part of the

2    deal that occurred between the two companies?

3              A.    That is correct.

4              Q.    Okay.  And what -- were you terminated

5    from All Web Leads?

6              A.    I was terminated.

7              Q.    Okay.  Was there a reason given for your

8    termination?

9              A.    They are located in Austin, Texas, the All

10   Web Leads division.  And they had said from the

11   beginning they were looking to consolidate everything

12   into Austin, Texas and all the Denver folks would be

13   transitionary.

14             Q.    I see.  So it wasn't anything that had to

15   do with your performance or anything like that?

16             A.    No.

17             Q.    Did you wish to continue working with All

18   Web Leads and they decided not to, or did you --

19             A.    I did not.  In fact, they asked if I'd

20   like to stay, and I declined.

21             Q.    And after you stopped working for All Web

22   Leads, you haven't worked anywhere else; is that

23   correct?

24             A.    That is correct.  I've done a couple of

25   consulting arrangements, but I have not worked

Matthew Rihtar                                      August 3, 2017

                                                    Page 13

 1    full-time.

 2          Q.   Is that by choice, or because you just

 3    can't find the work that you would like to do?

 4          A.   It's by choice.

 5          Q.   All right.  I wish I could do that.

 6               Well, as you probably know, we're here in

 7    regard -- or about the Neutron Depot, et al., versus

 8    Bankrate, et al., case.  Are you aware of that?

 9          A.   Yes.

10          Q.   Okay.  Good.  Let's see.  I'd like to mark

11    this.

12               MR. PEACOCK:  And, Counsel, I'm sorry.

13    This is one of the only documents that I didn't bring

14    copies of this for you guys.  But it's just the

15    notice.

16               (Deposition Exhibit 1 was marked.)

17          Q.   (BY MR. PEACOCK)  This is the notice that

18    was sent to your attorney.  Let me hand you what has

19    been marked as Exhibit 1 and ask you if you recognize

20    that document?

21               MR. PEACOCK:  And I apologize, Counsel.

22          A.   I do recognize the document.

23          Q.   (BY MR. PEACOCK)  Okay.  If you will -- if

24    you will flip -- I think it's the second or third page,

25    where it has at the top -- it has notice or -- yeah,

Matthew Rihtar                               August 3, 2017

Page 14

1    Attachment A, right there.  So it's your testimony that

2    you went through that document and you became aware of

3    all the topics listed in there, except for the issues

4    that deal with the financial aspects of this case,

5    correct?

6            A.    Correct.  For the most part, I'd agree

7    with that, yes.

8            Q.    Thank you very much.

9                  MR. TRIMBLE:  Just keep it.

10                 MR. PEACOCK:  Yes, you can keep that

11   there.  That's fine.

12           Q.    (BY MR. PEACOCK)  I'd like to talk a

13   little bit about Bankrate.  Now, tell me, what was the

14   core competency of Bankrate?

15           A.    Can we be more specific?  Bankrate had

16   multiple entities.

17           Q.    Well, please explain.

18           A.    So Bankrate, publicly traded company, the

19   core Bankrate business, historically, was deposits,

20   rate tables, mortgages, those types of shopping tools

21   for consumers.  And they manage that.  And then they

22   acquired their way into credit cards, right around the

23   same time they acquired their way into insurance, and

24   so then there were three divisions.  And then later

25   they acquired their way into senior care.  So there

Matthew Rihtar                                    August 3, 2017

Page 15

1    were four divisions, total.

2         Q.    Okay.  You said the credit card and the

3    insurance happened about the same time, when they

4    entered into that market; is that correct?

5         A.    Correct.

6         Q.    Do you remember what year that was that

7    Bankrate entered into that market?

8         A.    Approximately 2007.

9         Q.    Okay.  With respect to the insurance

10   division, what specifically was Bankrate doing in that

11   market?

12        A.    So the company, Bankrate, acquired their

13   first asset around 2007.  And that was a lead

14   generation company and distribution company, whereby

15   the company would acquire in-market consumers who were

16   shopping for insurance quotes; whether it be home,

17   health, life, auto.  And the company had a network of

18   agents and carriers who were purchasing those consumers

19   with the intent to write a policy for them or at least

20   give them an insurance quote.  That was the business

21   model.

22        Q.    Now, you mentioned a carrier.  Are you

23   referring to an insurance carrier?

24        A.    Correct.

25        Q.    Okay.  So in 2007, who did they -- I think

Matthew Rihtar                                    August 3, 2017

Page 16

1    you just mentioned this, but who did they acquire?

2    What company did they acquire?

3          A.    Bankrate acquired InsureMe, a company

4    called InsureMe.

5          Q.    InsureMe.  Okay.  And before they acquired

6    that company, Bankrate was not in the lead business --

7    the insurance lead business at all; is that correct?

8          A.    That's correct.

9          Q.    So they entered that market in 2007.  Now,

10   when they did and they purchased InsureMe, when they

11   did that, what was the business operation?  What did

12   InsureMe do?

13         A.    Very similar to what I just explained.

14   They were acquiring consumers shopping for insurance.

15   And they would -- they had a network of agents and

16   insurance carriers to fulfill those consumers shopping

17   in their particular area.

18         Q.    At that time, how many employees were in

19   that division with InsureMe, when Bankrate acquired

20   that business?

21         A.    I'm not specifically sure.  I wasn't part

22   of the company at that time.  Around a hundred, I would

23   say.

24         Q.    Okay.  And the business -- that division

25   of the business at Bankrate continued to grow; is that

Matthew Rihtar                                    August 3, 2017

Page 17

 1    correct?

 2          A.    It continued to grow through --

 3    organically, as well as through acquisition.

 4          Q.    In that division, what other acquisitions

 5    were made?

 6          A.    I'm going to be probably leaving some out,

 7    because there were many.  But after InsureMe was a

 8    company called NetQuote, which happened around 2010.

 9    In 2011, approximately, a company called Trouve Media

10    was acquired by Bankrate.  I'm going -- I don't know

11    the specific year, but another company called Insurance

12    Agents, located in Columbus, Ohio, was acquired maybe

13    around 2012, 2013.  Around that time, too, we acquired,

14    around 2012, a company called InsWeb.

15                Testing the memory here.  I think those

16    were the -- oh, and then in approximately 2013, I

17    think, a company called LeadKarma, in Boston.

18          Q.    Okay.  Now, there are -- in the document

19    production that your lawyers served on the plaintiff,

20    there's a lot of e-mails from LeadKarma.  What did

21    LeadKarma -- did LeadKarma do pretty much the same

22    thing that InsureMe did?  Did all these companies

23    pretty much do the exact same thing?

24          A.    That would be a correct sort of thought on

25    that.  They all had a little different takes, a little

Matthew Rihtar                                    August 3, 2017

Page 18

1    different models.

2            Q.    But they were all involved in lead

3    generation, correct?

4            A.    In insurance.

5            Q.    In insurance.   Okay.

6            A.    Correct.

7            Q.    All right.   Explain to the court what a

8    lead is.

9            A.    A lead is a -- a piece of consumer data --

10   name, address, location -- and depending on the

11   insurance type, what type of insurance they were

12   looking for.

13           Q.    Okay.   So why is that valuable?

14           A.    To whom?

15           Q.    Well, who is it -- good question.   To whom

16   is it valuable?

17           A.    Well, I think a couple of answers.   One is

18   the consumer is putting in this information -- putting

19   in their information, because they are in-market,

20   they're shopping.   They either want a quote or they

21   want to change insurance companies or they want to see

22   if they can save money.   So it's valuable to the

23   consumer.

24                 And to the sort of Bankrates of the world,

25   it was valuable, because we were acquiring that

Matthew Rihtar                                    August 3, 2017

Page 19

1    particular lead or consumer, and we had places or

2    distribution where we could sell that.  And it was

3    valuable to the carrier, because the carriers always

4    want to write new business.  And so it was valuable

5    along the entire chain.

6         Q.    Okay.  So Bankrate -- so how did Bankrate

7    go about getting leads?

8         A.    There were several ways.  We had what we

9    called "owned and operated," where Bankrate, itself,

10   would have -- would go out and market to consumers

11   through various means.  We did some direct mail.  At

12   one point, we might have -- I think we tested a

13   little TV.  We had PR.  So we were out in some media

14   outlets doing interviews, doing surveys.  We had paid

15   search; so Google, Yahoo.  E-mail campaigns, we had

16   e-mail campaigns, et cetera.  So that was owned and

17   operated.

18              And then we also had third-party, what we

19   called affiliates.  And they were third-party

20   affiliations we had with entities who would do very

21   similar things.  They all had their businesses, and

22   they would go out and acquire in-market consumers, and

23   then we would form a partnership to purchase those from

24   that third party.

25         Q.    All right.  In this lead business that

Matthew Rihtar                                          August 3, 2017

Page 20

1    Bankrate was in, who did Bankrate consider their

2    customer?

3              A.    Customer would have been our agents, our

4    insurance agents, and our insurance carriers.

5              Q.    Okay.  What do you -- what did Bankrate

6    call the person who was providing the information;

7    i.e., the lead?

8              A.    It was our consumer or shopper or traffic.

9              Q.    So for purposes of our discussion, so you

10   would -- you would -- Bankrate would identify the

11   person on the street that they're trying to get a lead

12   from as a -- just a consumer?

13             A.    Consumer or shopper.

14             Q.    Or shopper.  Okay.  And then the entity or

15   organization or party that Bankrate was selling the

16   lead to was, for purposes of our discussion, called

17   what?

18             A.    Typically, a customer or client.

19             Q.    Okay.  So the -- so Bankrate would call

20   the insurance agents the client or the customer, and

21   then the ordinary person on the street who's providing

22   the lead a -- what did you say, a customer?  No, no.

23   You said, I'm sorry, a client?  What did you say?

24             A.    Consumer or shopper.

25             Q.    Consumer or shopper.  All right.  Around

Matthew Rihtar                                    August 3, 2017

                                                      Page 21

1    2007 when Bankrate entered this market, how many

2    employees did it have in this particular market?

3              A.   In?

4              Q.   The insurance lead business.

5              A.   Again, I wasn't part of the company in

6    2007.  Are you referring to InsureMe?

7              Q.   Right.  Well -- right.  I think you

8    testified a moment ago how many employees InsureMe had.

9    But did Bankrate have any additional employees in this

10   particular marketplace for lead business generation?

11             A.   In insurance?

12             Q.   Right, in insurance.

13             A.   In 2007?

14             Q.   Correct.

15             A.   2007 was the year that they acquired their

16   way into it.  So InsureMe me would have been, at that

17   point in time, their only insurance employees.

18             Q.   Okay.  So now let's fast-forward to 2015,

19   right before the sale.  How many employees did Bankrate

20   have in this particular market?

21             A.   In the insurance division?

22             Q.   Correct.

23             A.   Approximately 230.

24             Q.   Did that account for the different

25   entities that it had acquired, or was that the entities

Matthew Rihtar                                    August 3, 2017

Page 22

1    plus some employees that Bankrate had as well?

2           A.    It was -- it included acquisitions.

3           Q.    Okay.  Now, you touched on this just a few

4    moments ago, in terms of you referred to owned and

5    operated, I believe.  I guess you call it O&O; is that

6    correct?

7           A.    That's correct.

8           Q.    Let's talk a little bit about that in

9    terms of what you mentioned.  How did Bankrate

10   advertise their services in this particular market?

11   When I say "market," because you've asked me several

12   times, I'm referring to the insurance division.

13          A.    Okay.  It was, as we stated before,

14   various different ways of owned and operated; through

15   e-mail, through PR, through a little bit of TV at one

16   point, through some direct mail, and paid search, as

17   well as third-party affiliates.

18          Q.    Okay.  When you say "e-mail," how did you

19   advertise by e-mail?  Did you send out just a burst of

20   e-mails to individuals and corporations or

21   organizations, or how did that work?

22          A.    Typically -- you know, I don't know,

23   specifically; but typically, what we did was you could

24   buy lists out there.  Companies would have lists of

25   folks that have opted in to receive different offers,

Matthew Rihtar                                    August 3, 2017

Page 23

1    and you could buy those consumers and send out an

2    e-mail, "Hey, heard you might be shopping for

3    insurance," those types of things.

4                We also, throughout the years, accumulated

5    our own list of consumers, throughout the years, that

6    every so often we would e-mail to, our own shopper

7    base.  And we would e-mail them periodically.  So those

8    are typically how the e-mails worked.

9           Q.   Okay.  Now, it's my understanding that

10   Bankrate would -- well, let me back up and ask the

11   question like this:  How would Bankrate go about

12   attracting consumers to provide leads, the information

13   that would provide the lead that then Bankrate would

14   turn around and sell?

15          A.   So maybe I'm not understanding the -- can

16   you be more specific?  Because we kind of just walked

17   through the different ways we acquired.

18          Q.   Right.  I understand that.  Okay.  So

19   like, take, for example, the Internet.  You said, I

20   guess, Google search engines; for example, Google and

21   Yahoo and Bing.  How did Bankrate utilize search

22   engines to attract customers?

23          A.   Okay.  Search engines, in a couple of

24   different ways.  There's two classifications for the

25   search engine.  One is through paid search, where you

Matthew Rihtar                                    August 3, 2017

Page 24

1    buy keywords.  The second is through organic -- what's

2    called "organic listings," where you build content --

3    you build relevant content in your particular market.

4    And the Google or Bing or search engine algorithm will

5    rank you based on relevancy.  And those ads are --

6    those are free, in terms of where you -- on the search

7    page.

8            Q.    Okay.  Now, would it be a correct

9    statement to say that in regard to the organic results

10   in a search engine, that it's also -- the ranking is --

11   there's many different factors that Google and Yahoo

12   utilize in the ranking, but one of them is the words

13   that are used on a web page, correct?

14           A.    There are -- I don't think anyone knows

15   exactly what -- the algorithms of these search engines;

16   otherwise, we would be billionaires, if we knew that.

17   There are many thousands of factors.  I can't speak

18   specifically to which ones, but there are many.

19           Q.    But wouldn't you agree with me that it's a

20   good practice, if you want to increase your rankings in

21   a search engine, to use certain keywords on a web page

22   that consumers would enter in a search engine, in the

23   search field?

24           A.    You know, I don't know, specifically.  I

25   know, generally, that the algorithms, specifically

Matthew Rihtar                                    August 3, 2017

Page 25

1    Google, look for relevancy; so relevancy of what the

2    consumer searched for, through to the page.

3            Q.    And wouldn't it -- part of the relevancy

4    is determined by what the content of that page states,

5    correct?

6            A.    That is likely true, yes.

7            Q.    Okay.  Now, when you -- when Bankrate

8    did -- when they advertised using organic -- what did

9    you call it?  Organic --

10           A.    Organic; organic listing, yeah.

11           Q.    Okay.  When Bankrate did just the organic

12   advertising, what -- how did it determine the keywords

13   that it used?

14           A.    Well, I think, you know, in general, the

15   strategy was you build content on your pages.  You

16   write -- we wrote -- I don't even know the number --

17   thousands and thousands of articles relating to

18   insurance.  And so you build -- you build your organic

19   presence by having relevant pages to what was searched

20   for.  And it's something you -- that takes a long time.

21   You know, it's not something that you just do or hope

22   for.  You have to build towards it.

23           Q.    So Bankrate -- and when I say "you"

24   --unless I specifically say I'm directing my question

25   to you, Mr. Rihtar, when I say "you," I'm referring to

Matthew Rihtar                                    August 3, 2017

Page 26

1    Bankrate.  I just want to make sure that we're clear on

2    that.

3            A.    Okay.

4            Q.    So when you would create these thousands

5    of pages that you just referred to, did -- and I

6    apologize for sometimes going back and forth between

7    you and Bankrate.  But is that okay with you?

8            A.    That's fine.

9            Q.    I don't want to confuse you.  I'll confuse

10   myself, too.  So when you created these thousands of

11   pages that you referred to, did you use different

12   keywords, or what -- what went into the process of

13   creating these thousands of pages?

14           A.    You know, specifically, I don't know the

15   specifics.  But I know that, in general, there was --

16   you wanted to have -- build your pages to relevancy.

17   So there was a lot of articles, a lot of content based

18   around auto insurance, home insurance, health

19   insurance, life insurance, right; whether it be

20   surveys, whether it be just helpful articles, whether

21   it be the different PR interviews we did over the

22   years.  Those were how you -- is what, in general, the

23   strategy was.

24           Q.    Okay.  And when all these pages were

25   created, these thousands of pages that you referred to,

Matthew Rihtar                                    August 3, 2017

Page 27

 1    I assume that they used different variations of what

 2    you were trying to sell or what -- you were trying to

 3    attract these consumers, so you would use different

 4    terms, like different insurance terms and so forth; is

 5    that correct?  That question may not have been very

 6    clear, and I apologize.

 7            A.    Yeah.  I don't --

 8            Q.    Okay.  I'll rephrase.  How did -- well, I

 9    think I've already kind of asked this question.  Since

10    thousands of pages were created that dealt with

11    insurance, how did Bankrate make sure that they were

12    not infringing on any trademark rights of third

13    parties?

14            MS. HYLAND:  Object to form.

15            Q.    (BY MR. PEACOCK)  By the way, when she

16    objects, you can still answer the question.  If she

17    instructs you not to answer, I'll turn to her -- now,

18    she will likely do that if I ask you something that has

19    to do with attorney-client privilege -- but I'll turn

20    to her, and I'll start talking to her about it.  But

21    when she makes an objection, she's doing that for the

22    record, and you can still go ahead and answer the

23    question.  So you can go ahead and answer.

24            A.    Would you please repeat it, please?

25            Q.    Right.  When Bankrate created these

Matthew Rihtar                                    August 3, 2017

Page 28

1    thousands of pages that you testified to just a moment

2    ago, in the insurance industry, how did Bankrate --

3    what procedures were in place so that -- to make sure

4    that Bankrate was not infringing on any third-party

5    trademark rights?

6            MS. HYLAND:  Same objection.

7        A.    I think, in general, we -- the use of --

8    we didn't feel that there was anything wrong with the

9    use or display of trademarks on pages, as you put it.

10   However, if at any point in time the company was

11   notified by the owner of a particular trademark,

12   service mark, we would work very diligently and quickly

13   to have that removed or have that addressed.

14       Q.    (BY MR. PEACOCK)  So it's my

15   understanding, then, that trademark rights, initially,

16   for Bankrate, was not an issue, unless the owner of the

17   trademark reached out to Bankrate and said, "Please

18   remove the trademark.  I own this trademark, so please

19   remove it from your pages"; is that correct?

20       A.    That's -- that's generally correct, yes.

21   I think it was a widely accepted and used industry

22   practice to do that.

23       Q.    So it's your testimony, then, that

24   Bankrate -- I'll give you some names of common

25   insurance companies that we would probably all

Matthew Rihtar                                    August 3, 2017

Page 29

1    recognize:  Allstate, Prudential.  So insurance

2    companies like that, Bankrate would routinely use their

3    marks, and then if Allstate or Prudential, for example,

4    reached out to Bankrate and said, "Stop using our

5    mark," then Bankrate would do so?

6              A.   That's, at a high level, correct.

7    Although, you know, typically, precedent had been set

8    much, much earlier in early days in the company, where

9    we knew there were certain -- folks had reached out,

10   and so there were certain ones that, over time, we knew

11   that we would -- we would abide and agree not to use

12   those on a page.

13             Q.   All right.  What was -- so when you had a

14   trademark owner reach out to you and say, "Hey, stop

15   using my mark," what was the process that occurred at

16   that time at Bankrate?

17             A.   At that time?

18             Q.   So let's say either by phone or e-mail or

19   a letter you have a trademark owner or the trademark

20   owner's attorney reach out to you, reach out to

21   Bankrate, and say, "Stop using my mark."  In the legal

22   field, we would call that, like, a cease and desist

23   letter.  So when Bankrate received that, what would

24   Bankrate typically do?  What is the process that

25   Bankrate would go through?  Would they just immediately

ABC COURT REPORTERS                    214.303.0ABC    (0222)

Matthew Rihtar                                        August 3, 2017

Page 30

1    stop using it, or would they check to see if this mark

2    is actually a mark, or what would be the process?

3              A.    And so we're clear, you're referring to

4    just on Bankrate's owned-and-operated sites?

5              Q.    As opposed to?

6              A.    Third-party affiliates.

7              Q.    Okay.  For right now, let's talk about

8    Bankrate's owned-and-operated websites.

9              A.    So if we received any sort of notice, we

10   would certainly make sure that our legal was aware of

11   whatever notice we had received.  Secondly, we would

12   research the claim and figure out where it was coming

13   from, where it was displaying, et cetera.  And third,

14   we would quickly remove it.  We had no -- you know, we

15   just didn't -- it wasn't that important to us to not

16   remove it, any one particular trademark.

17             Q.    So it was Bankrate's established policy,

18   then, that they would use whatever trademarks they

19   wanted, and then once they got a letter in from someone

20   who objected -- i.e., the trademark owner -- then they

21   would remove that mark; no arguments, no pushback from

22   Bankrate, we'll just remove it, since the trademark

23   owner says he owns it -- or says he or she or it owns

24   the trademark.  So we are just going to remove the

25   trademark.  We're not going to fight back.  Is that --

Matthew Rihtar                                    August 3, 2017

Page 31

1                 MS. HYLAND:  Object to form.

2           Q.   (BY MR. PEACOCK)  Was that Bankrate's

3     policy?

4           A.   In general, yes.

5           Q.   All right.  Did Bankrate own any

6     trademarks itself?

7           A.   You know, I don't know, specifically.  I

8     would say yes, but I don't know which ones.

9           Q.   If another -- if a competitor of Bankrate

10    had used Bankrate's trademarks, would that be okay with

11    Bankrate?

12                MS. HYLAND:  Object to form.

13          A.   If Bankrate had not given consent?

14          Q.   (BY MR. PEACOCK)  Sure, yeah.

15          A.   Yes.

16          Q.   If Bankrate had not given consent, would

17    Bankrate object to a competitor using Bankrate's

18    trademark?

19                MS. HYLAND:  I object to form, again.  It

20    calls for a legal conclusion.

21          A.   Likely, yes.

22          Q.   (BY MR. PEACOCK)  Okay.  Why would

23    Bankrate object?

24                MS. HYLAND:  Object to form, calls for a

25    legal conclusion.

Matthew Rihtar                                    August 3, 2017

Page 32

1          A.    Are you asking me or just in general?

2          Q.    (BY MR. PEACOCK)  So I'm asking you, yeah.

3          A.    So, in general, I think without -- without

4     consent, we -- the company didn't want whatever

5     trademark they owned to be used out there.

6          Q.    So Bankrate didn't want others to do to

7     its trademark what Bankrate was doing to others'

8     trademark; is that correct?

9               MS. HYLAND:  Object to form.

10         Q.    (BY MR. PEACOCK)  Strike that.  That's

11    fine.

12              Now, you mentioned -- you were talking

13    about the procedures on Bankrate's owned-and-operated

14    websites.  What was the procedure if Bankrate got a

15    cease and desist letter and the material, the content,

16    was on an affiliate's website?

17         A.    It would have been almost the identical

18    process.  We would have made sure legal had a copy of

19    it, and we would have -- we would have researched what

20    affiliate, where it was showing up, and we would have

21    asked or demanded the trademark be removed.

22         Q.    If the affiliate did not remove the

23    trademark, what would happen?

24         A.    They would have likely -- in general, they

25    would have likely been terminated.

Matthew Rihtar                                    August 3, 2017

                                                        Page 33

1           Q.    You say "in general."   What -- why do you

2     say "in general"?

3           A.    Typically, there's some cure; where if

4     we're notified and we go out, we want to work with our

5     partners.   If there's some amount of time that has gone

6     by whereby it hasn't been removed, they would be

7     terminated.   But it wouldn't be an immediate -- an

8     immediate thing.

9           Q.    So if you had an affiliate that was using

10    a third party's trademark, and Bankrate received a

11    cease and desist from the trademark owner, and you

12    contacted the affiliate and said, "Take it down, take

13    the trademark down," and the affiliate said, "No

14    problem.   It's being taken down as we speak," would

15    Bankrate continue to use that affiliate?

16          A.    We would verify -- we would trust but

17    verify that that was removed.   And if it, in fact, was

18    removed, we would continue to work with that affiliate.

19          Q.    I like that phrase "trust but verify."

20    Ronald Reagan made that famous.   So you would continue

21    to use that affiliate, then?

22          A.    If they had removed the trademark,

23    correct.

24          Q.    Was there any policy in place in regard to

25    the affiliates that if they -- if you had an affiliate

Matthew Rihtar                                    August 3, 2017

Page 34

1    that continuously abused trademarks and you had to

2    continuously tell that affiliate, "Take that content

3    down," the infringing content, and they would do it,

4    and they would do it right away, but yet later on in

5    another instance there would be another infringement,

6    was there any policy in place to stop -- to terminate

7    the connections with that affiliate?

8              MS. HYLAND:  Object to form.

9         A.   Typically, it was on a case-by-case basis.

10   And if there was an affiliate that continued to not

11   remove a trademark when asked, we would -- we would

12   terminate them.

13        Q.   (BY MR. PEACOCK)  Right.  But I'm not

14   talking about one specific trademark.  My question has

15   to do with the behavior of an affiliate.  For example,

16   the affiliate complies with your demand right away, but

17   then in another -- with another trademark that had

18   nothing to do with the initial demand, the affiliate is

19   using someone else's trademark, and there's been a

20   cease and desist letter that's been sent to Bankrate,

21   my question is, would that affiliate keep its

22   connections with Bankrate?

23        A.   It would, so long as with that additional

24   or new cease and -- or notice to remove, that notice

25   was removed.

Matthew Rihtar                                    August 3, 2017

                                                      Page 35

1          Q.   Okay.  What is an affiliate?

2               MS. HYLAND:  Object to form.

3          A.   An affiliate in context of Bankrate

4     insurance?

5          Q.   (BY MR. PEACOCK)  Yes.

6          A.   An affiliate is a third party -- we would

7     contract with a third-party organization, and they

8     would market to or go out and acquire very similar

9     in-market consumers, looking for insurance.  And we

10    would then purchase those leads or those consumers from

11    the affiliate as a way to supplement our owned-and-

12    operated lead volume.

13         Q.   About 2000 -- let's say in 2011 -- no.

14    Let's say 2010, let's start there, roughly speaking,

15    how many affiliates did Bankrate have?

16         A.   2011?

17         Q.   Well, let's start at 2010.  Let me ask it

18    this way:  If you can give me -- and I know you don't

19    have an exact answer, but roughly speaking, between --

20    let's start at 2008 and go to 2015.  Roughly speaking,

21    in those years, how many affiliates did Bankrate have;

22    2008, 2009, et cetera?

23         A.    It was always generally, roughly, a few

24    hundred affiliates, total.

25         Q.   Okay.  So in 2008, it would have been a

ABC COURT REPORTERS              214.303.0ABC    (0222)

Matthew Rihtar                                        August 3, 2017

Page 36

1    few hundred.  And in 2015, same, a few hundred?

2            A.    Approximately, yes.

3            Q.    Where are the majority of the affiliates?

4    Are they here in the United States, or are they in

5    different countries around the world?

6            A.    The majority, correct, are in the United

7    States, but there are certainly ones that are outside

8    of the United States.

9            Q.    Why did Bankrate choose to use affiliates?

10           A.    It was a way for the company to supplement

11   its owned-and-operated marketing efforts.  It was a way

12   to -- it was a way to, you know, increase your lead

13   volume.  Because these folks were out there and

14   marketing insurance products, and so it was a way to

15   enter into an agreement to increase your lead volume.

16           Q.    Okay.  Did Bankrate supervise any of the

17   affiliates?

18                 MS. HYLAND:  Object to form.

19           Q.    (BY MR. PEACOCK)  I'll ask it a different

20   way.  Did Bankrate supervise any of the content the

21   affiliates created and published?

22                 MS. HYLAND:  Object to form.

23           A.    Generally, no.

24           Q.    (BY MR. PEACOCK)  Why is that?

25           A.    They -- affiliates were third parties.

Matthew Rihtar                                    August 3, 2017

Page 37

1    They weren't employees.  They were only -- you know,

2    they were under contract with Bankrate for leads.  And

3    we didn't -- we didn't control them.  They were their

4    own entities, they were their own business.

5            Q.    Did Bankrate sign contracts with the

6    affiliates?

7            A.    Yes.

8            Q.    In this case, I'm sure you're aware there

9    are two affiliates that are the subject of this

10   lawsuit, in addition to the actions of Bankrate.  Are

11   you aware of that?

12           A.    I am.

13           Q.    Okay.  And you're aware that one of them

14   is named -- and I apologize if I butcher these names --

15   was Mr. Prompun, who lived in Thailand.  Are you aware

16   of that person?

17           A.    Yes.

18           Q.    Okay.  And the other one was Metalnikov,

19   who lived in Ukraine.  Are you aware of that?

20           A.    Yes.

21           Q.    Okay.  Let's see here.

22                 (Deposition Exhibit 2 was marked.)

23           Q.    I'm going to hand you what's been marked

24   as Exhibit 2.  Do you recognize this document?

25           A.    Yes.

1          Q.    Okay.  What is this document?

2          A.    This document is an agreement, a contract,

3    between Trouve Media and the publisher, Mr. Sunti

4    Prompun, dated -- looks like January 2010.

5          Q.    Okay.  Thank you.  Now, as you mentioned,

6    it's -- is it pronounced Trouve (pronouncing) Media?

7          A.    Trouve.

8          Q.    Trouve.  Okay.

9                MS. HYLAND:  It's Trouve (pronouncing).

10               MR. PEACOCK:  Trouve.

11               MS. HYLAND:  It's French.  It means found.

12               MR. PEACOCK:  Okay.  Cool.  Trouve.

13         Q.    (BY MR. PEACOCK)  All right.  So it's

14   between Trouve Media and Mr. Prompun.  Now, Trouve

15   Media, you mentioned earlier in your testimony that

16   that was an organization that Bankrate acquired,

17   correct?

18         A.    That's correct.

19         Q.    Now, let's look at the first page.  And

20   when I say "the first page," everything should be

21   Bates-labeled, except for, I think, Exhibit 1, which is

22   not.  But everything else I present to you should be

23   Bates-labeled.  And it will have "BR" and then several

24   zeros and then the actual number.  I'm -- for purposes

25   of this deposition, when I refer to a Bates number, if

Matthew Rihtar                                    August 3, 2017

Page 39

1   it's okay with you and we have an agreement, I'm not

2   going to say "BR zero, zero, zero."  I'll just say the

3   actual digits there at the end.  Do we have that

4   agreement?

5          A.    Okay.

6          Q.    So looking at Bates No. 11, there's some

7   entries that I'd like to ask you about.  Do you see in

8   the middle of the page where it has "Campaign Details"

9   and then it has a box?  Do you see that?

10         A.    I do.

11         Q.    And then it has -- in the box right below

12  where it says "Campaign Details," it has "Campaign

13  Name," and then to the right it has "GuideTo.com/

14  Insurance CoBrand - Insurance-SaveQuotes.com."  Do you

15  see that?

16         A.    I do.

17         Q.    What is that?

18         A.    That would have been the name of this

19  particular publisher's landing page, so -- meaning this

20  Insurance-SaveQuotes.  In general, what this typically

21  means is that this is the page issued to where this

22  affiliate could market their consumers to.

23         Q.    Now, you said "landing page."  Explain

24  what a landing page is.

25         A.    A landing page, typically, is where --

Matthew Rihtar                                    August 3, 2017

Page 40

1    it's the destination -- the first page a consumer will

2    see or land on from a particular ad.

3            Q.   How will they land on a landing page?

4    What -- from where would they be going from, to the

5    landing page?

6            A.   Various places.

7            Q.   Please explain.

8            A.   It could be an ad in a search engine.  It

9    could be a link in an e-mail.  It could be a link from

10   another web page.

11           Q.   All right.  So that was Mr. Prompun's

12   landing page.  Now, was that page created by him, or

13   was that -- the content on that page created by

14   Bankrate?

15           A.   Specific to this, I don't know.  In

16   general, with a lot of the Trouve campaigns, it was

17   a -- it was a landing page that Trouve, in part, would

18   have created; although, there could have been some

19   content from the affiliate.

20           Q.   Right below that -- that field, there

21   is -- or column, there is a "Start/End Date."  And then

22   to the right of that: 1, dash, 28, dash, 10.  I'm

23   sorry, not dash -- 1, forward slash, 28, forward slash,

24   dash, "Termination."  Do you see that?

25           A.   Yes.

Matthew Rihtar                                    August 3, 2017

                                                        Page 41

 1          Q.    When -- I'm trying to figure out, when did

 2   this campaign start and when did it end.  Because I

 3   just see one date there.  Because it says "Start/End

 4   Date," so when was the start date and when was the end

 5   date?

 6          A.    I don't know.

 7          Q.    Why would it be phrased in -- what does

 8   this entry tell you when it says "1/28/2010 -

 9   Termination"?

10          A.    It looks to me like the start of it was

11   January 28, 2010.  And the end date was, presumably,

12   until terminated.

13          Q.    And then it has Trouve -- and then if you

14   go down a little bit further, down a little bit

15   further, "Trouve Properties."

16               MS. HYLAND:  Trouve (pronouncing).

17               MR. PEACOCK:  What did I say?

18               MS. HYLAND:  Trouve (pronouncing).

19               MR. PEACOCK:  Let me write this down

20   somewhere so I don't keep butchering it.  Trouve.

21               (Discussion off the record.)

22               MR. PEACOCK:  I wrote it down as Trouve,

23   so hopefully I won't butcher it anymore.

24          Q.    (BY MR. PEACOCK)  So you see "Trouve

25   Properties," and then to the right of that it's got an

Matthew Rihtar                                    August 3, 2017

Page 42

1    HTML entry.  Do you see that?

2            A.    I do.

3            Q.    Or it's HTTP.  What is that?  Was that to

4    another landing page?  Where did that take -- I'll just

5    ask you, where did that go?

6            A.    I don't know, specifically; but I think,

7    if memory serves, that -- that would have been the

8    actual link to the landing page.

9            Q.    Okay.  So both the -- up there where it

10   had "Insurance-SaveQuotes.com" and then this other link

11   that we're now talking about, where it has affiliate --

12   I won't say the whole thing -- but

13   "affiliate.tvmtracker.com" and the rest of that, those

14   are both landing pages?

15           A.    Yeah.  I think the campaign is just the

16   name, the title of it.  The Trouve Properties box is

17   actually the link.

18           Q.    Okay.  But you do see up where it has

19   "Insurance-SaveQuotes.com"?  So if at the time that

20   this contract was written, if you went to

21   "Insurance-SaveQuotes.com," would that not be the same

22   as the landing page?

23           A.    I don't know.  I can't speak to this point

24   in time.  But, in general, it would have been the same

25   landing page, but without attribution.  So these

Matthew Rihtar                                    August 3, 2017

                                                        Page 43

1    numbers here are attribution, which identifies the

2    affiliate.

3              Q.    Then if you go down to the next table

4    where it has "Fees," do you see that?

5              A.    Yes.

6              Q.    And then it has "$13.50 per valid auto

7    insurance lead."  Did I read that correctly?

8              A.    Yes.

9              Q.    Explain what that meant.

10             A.    So this was -- you know, in general, the

11   typical fee structure would be a per valid lead;

12   meaning, the consumer was a real consumer.  The name

13   was right, the address was right, there was a phone

14   number.  It wasn't Mickey Mouse or Donald Duck or

15   something like that as a name.

16             Q.    So if the lead was correct and it had

17   legitimate information with it, then Mr. Prompun would

18   get -- would receive $13.50 for that lead; is that

19   correct?

20             A.    That is correct.

21             Q.    He would receive that money even if

22   Bankrate could not sell that lead to a carrier; is that

23   correct?

24             A.    That is -- generally, that is correct.

25             Q.    When you say "generally," why do you say

Matthew Rihtar                                    August 3, 2017

Page 44

1    "generally"?

2         A.    There have been some cases where -- and

3    typically, we price these things because we know

4    there's some percent that will be sent in an area where

5    we don't particularly have coverage.  But there's been

6    some instances where -- and I don't recall any

7    specifics -- but where pockets have showed up of leads

8    where we didn't have distribution, and we went back and

9    worked out a deal with the affiliate for payment.

10        Q.    All right.  Then if you go down to the

11   next box that has -- right above it it has "Additional

12   Terms," and then it states "No Trademark Search

13   Bidding.  Trouve negative match list must be used for

14   any ppc campaigns."  What does that mean?

15        A.    So this was in 2010.  It was before

16   Bankrate was involved, so I can't answer specifically,

17   because we didn't -- the company didn't own this.  But,

18   in general, what this would mean is that there would

19   have been some list Trouve would have likely had of

20   search terms that an affiliate couldn't bid on.  And

21   that was likely a result of Trouve, itself, going back

22   to common industry practice to be -- to bid on search

23   trademark terms.  But under the notification to stop,

24   there was probably some list that Trouve had,

25   over time, that they were asked to stop.  And that's

Matthew Rihtar                                    August 3, 2017

Page 45

1    likely what this is.

2          Q.    When Bankrate acquired Trouve, did

3    Bankrate not continue that procedure?  You're talking

4    about this list.  In your testimony just now you said

5    this apparently all happened before Bankrate acquired

6    Trouve.  Is that your testimony?

7          A.    That's --

8                MS. HYLAND:  Object to form.

9          A.    If we're talking about 2010, and Bankrate

10   bought the company in 2011, then that would have been

11   before Bankrate bought the company, correct.

12         Q.    (BY MR. PEACOCK)  Did Bankrate continue

13   that process -- let me rephrase that.  Did Trouve

14   continue that process once Bankrate purchased or

15   acquired Trouve?

16         A.    Correct.

17         Q.    So -- but yet -- so even though it

18   continued that process, you're not sure if -- so you

19   don't know if this process continued, is that what

20   you're saying, once Bankrate acquired the company?

21               MS. HYLAND:  Object.  I think he answered

22   that already.

23         A.    What was the question again?  I'm sorry.

24         Q.    (BY MR. PEACOCK)  Okay.  So you're saying

25   that this phrase likely means that there was a list

ABC COURT REPORTERS                    214.303.0ABC   (0222)

Matthew Rihtar                                    August 3, 2017

Page 46

1   that was created, whereby the publisher -- in this

2   case, Mr. Prompun -- agreed not to use words, phrases,

3   or trademarks that were on that list, in his

4   advertising?

5           A.   What was the question?

6           Q.   Is it your testimony that there was a list

7   that was created by Trouve, whereby Mr. Prompun agreed

8   not to use entries in that list as content -- in his

9   content when he advertised?

10          A.   If we're talking specifically to this

11  point in time, I can't know specifically, because we

12  didn't own the company.  But reading that additional

13  "Terms" box, that would appear to be the case.

14          Q.   And did Trouve continue that process and

15  procedure when Bankrate purchased and acquired Trouve?

16          A.   I believe so, yes.

17          Q.   So when it -- when it would sign an

18  agreement with an affiliate, after Bankrate purchased

19  Trouve, Trouve would then send the affiliate a list of

20  trademarks not to use?

21          A.   I believe so, yes.

22          Q.   Okay.  Let's go to the next page, which is

23  Bates No. 12.  We've already established that

24  Mr. Prompun was the publisher.  That was what you just

25  testified to.  If you go down to paragraph 1.2, the

Matthew Rihtar                                    August 3, 2017

Page 47

1    heading of the paragraph, it's underlined, it's

2    "Provision of Advertisement Materials."  Do you see

3    that?

4            A.   I do.

5            Q.   Okay.  I'm going to read the first

6    sentence:  "Trouve shall provide Advertisements to

7    Publisher no later than ten days prior to the Campaign

8    start date."  Did I read that correctly?

9            A.   Yes.

10           Q.   So from that, we know that Trouve was

11   supposed to provide advertising content and material to

12   Mr. Prompun, correct?

13               MS. HYLAND:  Object to form.

14           A.   I can't speak, specifically.  That appears

15   to be what they're saying in the contract.

16           Q.   (BY MR. PEACOCK)  And did that -- did that

17   happen with Mr. Prompun after Bankrate acquired Trouve?

18           A.   I don't know.

19           Q.   Then if you go down, it's the same clause,

20   1.2, but it's on the fourth line.  The sentence starts

21   right after the word "Advertisements."  The sentence

22   starts, "Trouve shall provide Publisher a coded Link to

23   identify Leads generated by Publisher for each

24   Campaign."  Do you see that?

25           A.   I do.

Matthew Rihtar                                    August 3, 2017

Page 48

1          Q.    What does that mean?  A "coded link," what

2    is that referring to?

3          A.    Generally, it's a link, much like what we

4    saw on the first page, which had all those numbers and

5    letters to identify the particular affiliate.

6          Q.    To identify them why, how?  I mean, I

7    don't understand.  What would be the purpose of

8    identifying the affiliate?

9          A.    So that the leads that were sent by that

10   particular affiliate could be tracked, we could count

11   them.

12         Q.    So Bankrate can track all the leads coming

13   from a certain affiliate, correct?

14         A.    Correct.

15         Q.    But Bankrate doesn't know -- is it your

16   testimony that Bankrate doesn't know what landing pages

17   those leads come from, just that it comes from a

18   certain affiliate?

19         A.    We know what leads came from what

20   affiliate.

21         Q.    Right.  But my question is:  Well, you've

22   testified earlier that an affiliate does -- employs

23   similar methods as Bankrate, in terms of advertising;

24   so e-mails, e-mail lists, landing pages, PPC.  That was

25   your testimony just a few minutes ago.  So is it your

Matthew Rihtar                                    August 3, 2017

Page 49

1   testimony that Bankrate can't track a lead coming from

2   a specific advertisement, it only can track coming from

3   an affiliate, in general?  Do you understand my

4   question?

5           A.    I think I do, yes.

6           Q.    Is that a correct statement?

7           A.    That is -- yes, that's correct.

8           Q.    And if you go down to the next sentence --

9   the sentence we just read, the following sentence says,

10  "Publisher shall not change or modify Advertisements at

11  any time without Trouve's prior written approval."  Do

12  you see that?

13          A.    I do.

14          Q.    So what this agreement states is that

15  Trouve was supposed to provide advertisements to

16  Mr. Prompun, and Mr. Prompun was not supposed to make

17  any changes to that, unless it got approval from

18  Trouve, correct?

19          A.    That -- again, I can't speak specifically

20  to this particular agreement, because we didn't own the

21  company.  But reading that sentence, I would agree.

22          Q.    Well, you keep saying that Bankrate didn't

23  own the company.  But this contract continued -- this

24  arrangement with Prompun continued, even after Bankrate

25  acquired Trouve, correct?

Matthew Rihtar                                    August 3, 2017

Page 50

1          A.    I believe so.  I would have to look at --

2          Q.    So you don't know if -- either you -- I

3    mean, what is your testimony?  Did this arrangement

4    with Mr. Prompun continue, even after Bankrate acquired

5    Trouve?

6          A.    This exact agreement, I can't testify,

7    exactly.

8          Q.    I'm asking you if this arrangement

9    continued with Mr. Prompun, even after Bankrate

10   purchased Trouve?

11         A.    I don't know.

12         Q.    If you go to clause No. 1.4, its heading,

13   and it's underlined, "Monitoring."  It states -- well,

14   do you see that clause?

15         A.    I do.

16         Q.    I'm going to read the first sentence in

17   that clause.  It says, "Publisher shall, at its

18   expense, arrange for third party email compliance

19   monitoring services by Lashback (or such other provider

20   reasonably acceptable to Trouve) for Advertisements

21   sent by email on behalf of Trouve under this

22   Agreement."  Did I read that correctly?

23         A.    Yes.

24         Q.    Okay.  Did Trouve do any monitoring?

25         A.    At this point in time, in 2010?

Matthew Rihtar                                    August 3, 2017

Page 51

1          Q.   At any time.

2          A.   Monitoring specifically of what, so I'm

3     clear?

4          Q.   Well, you tell me.  It says shall -- that

5     paragraph says, "Publisher shall, at its expense,

6     arrange for third party email compliance monitoring

7     services . . ."  What was it supposed to be monitoring?

8               MS. HYLAND:  Just for clarification here,

9     we keep talking about the publisher.  And you're saying

10    that's Trouve, but publisher is defined here as the

11    affiliate.

12              MR. PEACOCK:  Point taken.  Thank you,

13    Counsel.  But it still -- I agree with you, Counsel.

14         Q.   (BY MR. PEACOCK)  But it says, "Publisher

15    shall" -- so in this case it's Mr. Prompun -- "shall

16    arrange for third party email compliance monitoring

17    services by Lashback . . ."  Did that ever occur at any

18    time?

19         A.   I don't know.

20         Q.   And so who was going to be doing the

21    monitoring?

22         A.   I don't -- so, in general, what I can say

23    is typically with e-mails you have a service to capture

24    your opt-outs; so folks say, "I do not want to receive

25    e-mails anymore."  It's part of canned spam, again;

Matthew Rihtar                                    August 3, 2017

Page 52

1    just, in general, high level.  You have to record those

2    e-mails so that you don't continue to market those

3    folks if they opted -- if they do not want to receive

4    those e-mails.  I believe that that's what this section

5    of the agreement is saying, that Trouve is not

6    responsible for keeping e-mail opt-outs, but that

7    particular publisher is.

8                Q.   I appreciate that.  I'm going to object to

9    the non-responsiveness of the answer.  My question is:

10   Who was supposed to be doing the monitoring?

11               A.   In this case, it looks like the publisher.

12               Q.   Well, it does say, ". . . monitoring

13   services by a Lashback . . ."  Well, who is Lashback --

14   what is Lashback?

15               A.   I don't know.

16               Q.   You don't know.  Okay.  So apparently

17   Lashback was going to provide the services, but we

18   don't know who's going to be -- well, your testimony is

19   you think it was the publisher, but you just don't

20   know?

21               A.   Correct.

22               Q.   Then -- well, okay.  If you go to Bates

23   No. 15 in this agreement, on the bottom of this

24   agreement it's got some signatures.  Do you see that?

25               A.   I do.

Matthew Rihtar                                    August 3, 2017

1          Q.    And for Trouve Media, Inc., it looks like

2    a gentleman named -- well, I don't know.  It looks like

3    Matt -- do you know who that person is?

4          A.    Matt Schnuck.

5          Q.    What was his position with Trouve?

6          A.    He was the founder of the company.

7          Q.    Is he still with Bankrate today?

8          A.    No.

9          Q.    And, of course, you see where it says

10   "Publisher:  Mr. Sunti Prompun."  And then it looks

11   like he signed it.  Do you see that?

12         A.    Yes.

13         Q.    How many insertion orders did Bankrate

14   have -- well, Trouve Media have with -- well, let me

15   back up.  Did Bankrate ever have any agreements with

16   Mr. Prompun, or was it always through Trouve Media?

17         A.    I don't know.

18         Q.    Do you know how many insertion orders that

19   Trouve Media had with Mr. Prompun?

20         A.    I do not.

21         Q.    So there could have been more than one,

22   correct?

23         A.    There could have been more than one.

24               MS. HYLAND:  Aaron, I'm going to need a

25   break in a minute.  I mean, we don't have to break

Matthew Rihtar                                          August 3, 2017

Page 54

 1    right this minute, but --

 2              MR. PEACOCK:  We can.  Let's go ahead and

 3    go off the record.

 4              (Recess taken, 10:29 a.m. to 10:49 a.m.)

 5              MR. PEACOCK:  We're back on the record

 6    now.

 7         Q.   (BY MR. PEACOCK)  Before we move on,

 8    Mr. Rihtar, I did want to ask you a few questions in

 9    regard to Bankrate and its business.  Isn't it true

10    that Bankrate's competitors are some insurance

11    companies?

12         A.   I don't ever think -- I mean, generally, I

13    don't think we ever looked at them as competitors.

14         Q.   Okay.  How did you look at them, then,

15    insurance companies?

16         A.   Well, we had this term "coopetition"; so a

17    little bit of cooperating, a little bit of competing,

18    you know.

19              MR. PEACOCK:  All right.  I'd like to get

20    this marked, ma'am, please.

21              (Deposition Exhibit 3 was marked.)

22         Q.   (BY MR. PEACOCK)  Mr. Rihtar, I'm going to

23    hand you what's been marked as Exhibit 3.  Do you

24    recognize this document?

25         A.   I do not.

Matthew Rihtar                                        August 3, 2017

                                                      Page 55

     1          Q.   Well, I'll represent to you that this is a
          document that your attorneys produced in the case.  And
     2
          it appears to be either -- it looks like a PowerPoint
     3
          presentation of some sort.  Would you disagree with
     4
          that?
     5
     6          A.   It looks to be a PowerPoint presentation.
     7          Q.   Okay.  If you go to page 2 of the exhibit,
     8    which is Bates-numbered 133376, you'll see at the top
     9    where it has "Network & Competition."  Do you see that?
    10          A.   I do.
    11          Q.   On the right-hand column of that
    12    PowerPoint page -- presentation page, do you see where
    13    it has -- and it's kind of hard to make out, the
    14    wording is kind of grainy -- but I think it's clear
    15    enough where we can make it out.  It has "allstate.com,
    16    carinsurance.com, esurance.com, geico.com,
    17    insurance.com, insurancequotes.org."  I think that next
    18    one is "insure.com, nationwide.com, progressive.com,"
    19    and "statefarm.com."  Did I read all those correctly?
    20          A.   Yes.
    21          Q.   And in the PowerPoint presentation that
    22    Bankrate produced, Bankrate acknowledges that those are
    23    their competitors, correct?
    24          A.   It appears to be correct.
    25          Q.   Okay.  To the left of that, on that same

Matthew Rihtar                                    August 3, 2017

Page 56

1    page, it has "O&O Sites."  I think you testified

2    earlier that O&O means owned and operated, right?

3            A.    Correct.

4            Q.    Okay.  And then it's got

5    "insurancequotes," "netQuote."  The third one I think

6    is "insureMe."  And then the fourth one is "insweb,

7    Simplifying Your Insurance Decisions."  And then the

8    last one is "CarInsuranceQuotes.com."  Do you see that?

9            A.    I do.

10           Q.    What are all those -- what is all that?

11   What are those different entries there?

12           A.    The O&O sites?

13           Q.    Right.

14           A.    Those are all the companies that -- well,

15   not all, but those are companies that Bankrate acquired

16   in the insurance division.

17           Q.    Okay.  Now, some of them I recognize,

18   based upon your previous testimony.  Some of them I

19   don't.  Like, for example, LeadKarma is not listed.

20   And there's some others that are not listed as well.

21   So are these brands that Bankrate had -- or you say

22   these are divisions, but were these also brands?

23           A.    These were -- these appear to be the list

24   of domains that -- where we would send consumers to.

25           Q.    And in regard to Bankrate, not the other

Matthew Rihtar                                    August 3, 2017

Page 57

1    defendants in this case, Mr. Metalnikov and

2    Mr. Prompun, but in regard to just Bankrate, which of

3    these brands or websites that you just alluded to did

4    Bankrate utilize in using the plaintiff's mark that

5    we're here about today, "Insurance Depot"?

6              MS. HYLAND:  Object to form.

7         Q.  (BY MR. PEACOCK)  And if it's not listed

8    here, I mean, we just agreed a moment ago that not

9    everyone is listed.  So if it's not listed here, then

10   what other ones?

11        A.   Well, in looking through the Complaint

12   that was provided and looking at the ads that were

13   provided, it was -- "Auto Insurance Quotes" was the

14   domain.

15        Q.   And that one is not the one listed on this

16   PowerPoint slide here, correct?

17        A.   I don't see it listed on this slide.

18        Q.   If you go to page -- Bates-labeled

19   page 133379, you'll see where it says "Top Keywords &

20   Ranking."  Do you see that page?

21        A.   Yes.

22        Q.   And then it's got a table.  And at the top

23   of the table, in several different columns, it's got

24   "NetQuote, insuranceQuotes, InsWeb, InsureMe,

25   CarInsuranceQuotes."  Apparently these are the top

Matthew Rihtar                                    August 3, 2017

Page 58

1  keywords for each one of those brands, correct?

2        A.   It -- in general, it looks like that's

3  what this is suggesting.

4        Q.   How did Bankrate determine that these were

5  the top keywords?

6        A.   It's likely that they would have done a --

7  they would have looked at -- they probably would have

8  looked at a database to see --

9        Q.   What database?

10        A.   A database.

11        Q.   A database.  What databases would Bankrate

12  normally look at to determine --

13        A.   I don't know.  I'm not in technology.  But

14  we had many of them, much like any other company does.

15  And I'm assuming from this that -- it looks like they

16  would have looked at volume reports.

17        Q.   Thank you.  Now, you mentioned the

18  Complaint.  And I guess this is a good time to look at

19  the Complaint, specifically the Exhibit C that was

20  attached to the Complaint.  If you need to refer to the

21  Complaint, you can, but I'd like -- and I'll provide

22  that to you, if you need to review it for any reason --

23  but I'd like to review Exhibit C that was attached to

24  the Complaint.

25            And it's quite voluminous here, so since

Matthew Rihtar                                    August 3, 2017

Page 59

1    it's attached to the Complaint, I don't think I need to

2    attach it as an exhibit here.  I can just refer to it

3    as Exhibit C of the current, live Complaint.  And I'll

4    hand it to you here.  And you'll notice at the top, as

5    well, it also has the -- it also has the time stamp and

6    the page stamp from the filing when it was filed with

7    the court as well.  So if there's any confusion, we can

8    just refer to the time stamp up there and the page --

9    not the time stamp, but the page stamp.

10                   All right.  Also, in reference to that,

11   I'd like to show you as well -- and I don't think we

12   need to mark this as an exhibit, because this is also

13   attached to the Complaint -- this document, which is

14   Bates-numbered 382622.  Do you recognize this document

15   that I just handed you, that one right there, the

16   382622 document?

17           A.   I haven't seen it, but it appears to be a

18   Service Mark Register.

19           Q.   So before today, you have not seen the

20   certificate of the registration of the plaintiff in

21   this case?

22           A.   I did not.

23           Q.   Okay.  You'll agree with me that in --

24   toward the top middle of the page, you see the word

25   "Insurance Depot," correct?

Matthew Rihtar                                    August 3, 2017

Page 60

 1          A.    Where, specifically, again?

 2                MS. HYLAND:  What page are we talking

 3     about?

 4                MR. PEACOCK:  We're talking about the

 5     document which is page 382622.

 6          Q.    (BY MR. PEACOCK)  And you see -- okay.

 7     You see in big letters "United States Patent and

 8     Trademark Office," correct?

 9          A.    Yes.

10          Q.    And then you see under that "Service Mark

11     Principal Register," correct?

12          A.    Yes.

13          Q.    And then right under that you see the

14     words "Insurance Depot," correct?

15          A.    Yes.

16          Q.    I'll represent to you that this is a copy

17     of a certification of registration that was issued by

18     United States Patent and Trademark Office for the mark

19     "Insurance Depot."  Now, if you go down to the left

20     side of the page where it says -- do you see where it

21     says "CSI Agency Services, Inc."?

22          A.    Yes.

23          Q.    Okay.  I'll represent to you that that was

24     the registrant, but now the plaintiff in this case is

25     currently the owner of the mark.  Now, what I'd like to

Matthew Rihtar                                August 3, 2017

Page 61

 1   do is when we go through the Exhibit C that I handed
 2   you, which is Exhibit C of the Complaint, we'll be
 3   referencing this document as well, the document that's
 4   Bates-numbered 382622.  So we'll be going back and
 5   forth between that document and the Exhibit C.
 6              So let's start off with Exhibit C.  Now,
 7   it's my understanding that Bankrate has asserted in
 8   this litigation that some of the content was produced
 9   by affiliates, and some of the content that we're
10   alleging is the infringement was produced by Bankrate.
11   Is that your understanding as well?
12        A.   Yes.
13        Q.   Okay.  With that understanding, let's go
14   through this document and you -- let's look at the
15   different contents in this document, and you tell me if
16   this is something that was published -- written and
17   published by Bankrate or one of the affiliates.  And if
18   it was one of the affiliates, you can let me know which
19   affiliate it was.
20              So let's go to the first page.  And for
21   purposes of keeping this straight, we'll use the
22   stamped number here that the court gave it.  It says
23   page 2.  Even though this is the first page of this
24   document, it's shown here as page 2.  And then we'll go
25   on from there; page 3, et cetera.

ABC COURT REPORTERS                    214.303.0ABC   (0222)

Matthew Rihtar                                August 3, 2017

                                                        Page 62
1              So on page 2 of Exhibit C, do you see
2      where it has "insurancedepot.com" and it looks like
3      someone drew a box around it?
4              A.   Yes.
5              Q.   What -- you'll agree with me that this
6      appears to be a copy of a Bing search page, a page
7      produced by Bing, correct?
8              A.   Yes.
9              Q.   And what is that in the box?  Is that a
10     PPC advertisement?
11             A.   Yeah, appears to be.
12             Q.   Before we go any further, explain what a
13     PPC advertisement is.
14             A.   It is a paid component of search, where
15     you would -- one would pay for certain keywords.  And
16     you were ranked based on many factors, but one of them
17     is if you're paying for it or not.
18             Q.   Okay.  It is an advertisement, correct?
19             A.   It is an ad, yes.
20             Q.   All right.  And you'll notice that in this
21     particular ad, it has, right at the top,
22     "insurancedepot.com," correct?
23             A.   Yes.
24             Q.   Who created this particular ad?  I know
25     that it's shown on Bing, but who set into motion that

Matthew Rihtar                                        August 3, 2017

Page 63

1    Bing would publish this ad in a PPC campaign?  Was it

2    Bankrate, or was it one of the affiliates?

3              A.   It's an affiliate.  I'd have to refresh my

4    memory on which one it was.

5              Q.   Well, for purposes of this litigation, I

6    think Bankrate has acknowledged that the affiliate --

7    for Exhibit C, there's only two affiliates that created

8    the ads in this campaign.  Do you agree?

9              A.   Yes.

10             Q.   One was Mr. Prompun and the other one was

11   Mr. Metalnikov, correct?

12             A.   Correct.

13             Q.   So do you know which of those two

14   affiliates created this ad?

15             A.   I'd have to refresh my memory.  I believe

16   it's Suni -- or Sunti.

17             Q.   So -- well, for purposes of our discussion

18   right now, we'll leave aside -- let's put aside the

19   fact that we don't have certainty as to which affiliate

20   it was.  But your testimony is that this one was an

21   affiliate, correct?

22             A.   Correct.

23             Q.   So I'll write affiliate here.  We'll come

24   back to this in a little while.  You will agree with me

25   that if you look at Bates-numbered 382662, which is the

Matthew Rihtar                                    August 3, 2017

Page 64

1    certificate of registration, that Insurance Depot is

2    shown in an identical fashion as the one that's shown

3    in this advertisement, correct?

4          A.   It's not -- I wouldn't say it's identical.

5    It's "insurancedepot," one word, ".com," and the

6    service mark is "Insurance," space, "Depot."

7          Q.   You're talking about -- okay.  So are

8    there any other differences that you see, besides the

9    one that you just mentioned?

10         A.   No.

11         Q.   And you'll agree with me that

12   insurancedepot.com, in this ad, is more prominent than

13   the rest of the ad, correct?

14         A.   Yeah.

15         Q.   Let's go on to -- well, before -- well,

16   since you say this is an affiliate, we'll stop there.

17   Let's go on to the next one.  Now, let's go to what, at

18   the top, is stated page 8 of Exhibit C.  It's dated --

19   or stamped by the court when it was filed.  Do you see

20   that page?

21         A.   Yes.

22         Q.   Okay.  Do you see some brackets on this

23   page?

24         A.   Yes.

25         Q.   What is -- at the top, do you see where it

Matthew Rihtar                                         August 3, 2017

Page 65

1   says "www.insurancedepot.com," dash, and it has some

2   language -- some words after that dash?  Do you see

3   that?

4           A.    Yes.

5           Q.    Do you know who purchased this ad?  Was it

6   one of the affiliates or Bankrate?

7           A.    Affiliate.

8           Q.    And as we did in the previous ad, if you

9   look at the service mark that is shown in Bates

10  No. 382622 -- for purposes of our discussion, instead

11  of me just continuing saying the number, what I'll just

12  do, if it's okay with you, I'll refer to this as the

13  certificate of registration.

14          A.    Okay.

15          Q.    So if you look at the certificate of

16  registration and look at the ad, what -- in regards to

17  Insurance Depot in the certificate and Insurance Depot

18  in the affiliate ad, do you see any differences between

19  the two?

20          A.    Yes.

21          Q.    What are the differences that you see?

22          A.    In the ad there's a "www." before the

23  Insurance Depot, and there is also no space between

24  Insurance -- between the word "Insurance" and the word

25  "Depot."  And there's also, at the end, a ".com."

Matthew Rihtar                                    August 3, 2017

Page 66

1            Q.    You will agree with me, though, that

2    Insurance Depot is more prominently displayed than the

3    rest of the ad, correct?

4            A.    I think that's subject to opinion.  I

5    think there's also a tag line there, "Save as much as

6    you can on," and then dot, dot, dot.  That's also very

7    prominent.

8            Q.    Anything else?

9            A.    No.

10           Q.    Let's move on.  We'll go to the next one,

11   which is page stamped 10 of 69.  Do you see that page?

12           A.    Yes.

13           Q.    Is this -- and toward the middle of the

14   page, do you see where it has

15   "### www.insurancedepot.com," dash, and then some

16   wording, "Save as," et cetera?

17           A.    Yes.

18           Q.    Was this an advertisement by Bankrate or

19   by one of the affiliates?

20           A.    Affiliate.

21           Q.    And you -- did you don't recall which

22   affiliate, do you?

23           A.    Off the top of memory, no.  I believe it's

24   Sunti, though.

25           Q.    Similar to our discussion with the

Matthew Rihtar                                      August 3, 2017

Page 67

1    previous ad, if you refer to the certificate of

2    registration and you refer to this ad, do you see any

3    differences between the mark, as shown in the

4    certificate, which is "Insurance Depot," and the

5    "Insurance Depot" that is used in the ad?

6          A.    On this page right here?

7          Q.    Right.

8          A.    There are -- again, it's -- there's three

9    pound signs at the beginning.  There's a "www." before

10   the word "insurancedepot."  There is no space between

11   "Insurance" and the word "Depot," and there is a ".com"

12   at the end.

13         Q.    You will agree with me that

14   insurancedepot.com, as well as the rest of that line,

15   "Save as much as you can on auto insurance," and right

16   under that, "Compare quotes now," is not used in any

17   paragraph, correct?  Because there's several paragraphs

18   below that, correct?  Do you see that?

19         A.    I do see the paragraphs.

20         Q.    So you would agree that it's more

21   prominent than what is shown in the paragraphs of that

22   ad, correct?

23         A.    Correct.

24         Q.    And it's set apart from the paragraphs,

25   correct?

Matthew Rihtar                                   August 3, 2017

Page 68

1          A.    It is.

2          Q.    Let's move on to the next one, which is

3    page 12 of 69 of Exhibit C.  Do you see on that page

4    where it looks like someone drew almost a rectangle on

5    that page?

6          A.    Yes.

7          Q.    And in that rectangle, do you see where it

8    has the ad "Insurance Depot"?

9          A.    Yes.

10         Q.    Do you recall whether this is a Bankrate

11   ad or an affiliate ad?

12         A.    Bankrate.

13         Q.    Now, when was this ad created by Bankrate?

14         A.    When was this ad created by Bankrate?  I

15   don't know if anyone can know that.

16         Q.    Was it 2008, 2010?  Give me a ballpark

17   figure.  I mean, I don't need a specific month and

18   date -- day, but give me an approximate.  Do you know

19   an approximate month, an approximate year?

20         A.    I don't.  And I don't know if anyone can

21   know the answer to that.

22         Q.    So it's possible that this could have been

23   created in 2008?

24         A.    It's possible.

25         Q.    And how long was this ad up?  How long did

Matthew Rihtar                                    August 3, 2017

Page 69

1    Bankrate advertise this?

2            A.    Although, I believe the domain,

3    autoinsurancequotes.com, was a domain that was owned by

4    Trouve.  And so Bankrate would have inquired that in

5    post-2011 -- or whenever the acquisition of Trouve

6    happened, which was 2011.

7            Q.    When did Bankrate take this ad down --

8    well, let me back up.  Did Bankrate ever take this ad

9    down?

10           A.    I don't know the answer to that.

11           Q.    Okay.  And if you don't know if it was

12   ever taken down, you don't know when?

13           A.    Well, look, when we were served with the

14   lawsuit, whenever that was, we would have taken this

15   down; consistent with my prior testimony of when we

16   receive trademark notices, we will take it down.

17           Q.    Okay.  But you'll agree with me that this

18   could have been up for several years, correct?

19           A.    It's possible.  Although, there is data to

20   show that in the reports how -- I don't know timing,

21   specifically, but how minuscule the traffic was to this

22   page.

23           Q.    But that's not my question.  My question

24   was:  This ad could have been up for many years,

25   correct?

Matthew Rihtar                                    August 3, 2017

                                                      Page 70

 1              MS. HYLAND:  Object to form.

 2         A.    It could have been up for many years, but

 3    I don't think many people saw it.

 4         Q.    (BY MR. PEACOCK)  Well, okay.  How do you

 5    come to that conclusion?

 6         A.    I think if you look at the reports that we

 7    have and the traffic, it was -- of these, of this mark,

 8    we can trace back a total of, from 2010, I believe is

 9    what the report says, through 2014, a total of 73 leads

10    generated to Bankrate from this mark, out of 7. --

11    almost 7.6 million leads.  So there's a lot of decimal

12    points in that percentage of how little traffic this

13    generated.

14         Q.    When you say -- when you gave these

15    figures, are you including -- are those figures

16    including numbers from your affiliates, or is that just

17    Bankrate itself under the owned and operated?

18         A.    This is -- we're talking about the

19    Bankrate ads, and I'm talking about Bankrate numbers.

20         Q.    But my question is:  When you provided the

21    numbers that you did, you said the -- I think you said

22    7 million.  You said it was a minuscule amount.

23         A.    Yes.

24         Q.    Are you also including data -- whatever

25    data you obtained from your affiliates, when you make

Matthew Rihtar                                    August 3, 2017

                                                    Page 71

1    that statement?

2          A.    I am not.  We do not control those

3    affiliates.

4          Q.    I'm not asking you if you control the

5    affiliates.  I'm asking you if that number includes

6    data from your affiliates?

7          A.    It does not.  But we were talking about a

8    Bankrate ad, so I just wanted to be clear.

9          Q.    Correct.  Okay.  Now, as we did with the

10   previous advertisements, looking at the certificate of

11   registration and looking at the ad, are there any

12   differences between the mark, as shown in the

13   certificate, and the way that it is used in the ad?

14   Any differences in the way the two are displayed?

15         A.    There is -- the term "Insurance Depot" in

16   the ad is underlined.  And in terms of that specific,

17   there is no difference.  Although, underneath that

18   in -- where the domain is, it's

19   "Depot.AutoInsuranceQuotes.com."

20         Q.    And wouldn't you agree with me that since

21   it's underlined, it gives it additional prominence?

22         A.    Sure.

23         Q.    And wouldn't you also agree with me that

24   the wording "Insurance Depot" is more -- it's -- the

25   font is bigger than the rest of the ad?

Matthew Rihtar                                    August 3, 2017

Page 72

1          A.    That is correct, but that's a function of

2    the -- again, just so we're clear, it's a function of

3    this particular search page.  It's a Yahoo search

4    result.  All of the top lines are underlined in larger

5    font, not just this ad.

6          Q.    All right.  Now, underneath that -- when I

7    say "underneath that," I mean underneath the "Insurance

8    Depot," I guess that would be a link, because it's

9    underlined, right?  When you click on Insurance Depot,

10   I assume the consumer goes somewhere on the web?

11         A.    Correct.  You would -- they would have

12   gone to this "AutoInsuranceQuotes.com" domain.

13         Q.    Okay.  And once the consumer goes to that

14   "AutoInsuranceQuotes.com," what happens?

15         A.    You would have been -- the consumer would

16   have been -- would have linked to the

17   "AutoInsuranceQuotes.com" landing page.

18         Q.    And what is displayed on that page?  What

19   was displayed on that page?

20         A.    It would have been a --

21         MS. HYLAND:  I'm just going to object to

22   you that you've got it right here, so we can talk about

23   it, instead of asking him to guess.

24         MR. PEACOCK:  Sure.  That's fine.  What

25   page are you referring to?

Matthew Rihtar                                    August 3, 2017

Page 73

1              MS. HYLAND:  I believe it's starting on

2    page 15.  And I believe that's how your exhibit is

3    supposed to work, correct, that you've got the --

4              MR. PEACOCK:  Well, you want him to refer

5    to a page, so I'm asking you which page you want him to

6    refer to.

7              MS. HYLAND:  Well, assuming that -- my

8    assumption of this exhibit always has been that you had

9    the links on the search engine page and then where the

10   link went.  And assuming that's correct, if you're

11   asking him where it went, it would make sense to go to

12   that page.

13             MR. PEACOCK:  Well, you know, I say this

14   with all politeness.  But if that's your understanding,

15   that's fine.  In a deposition with my client, you could

16   have clarified that to make sure you weren't making any

17   assumptions, but --

18             MS. HYLAND:  Well, if I'm incorrect, let

19   me know.  I thought that was the case.

20             MR. PEACOCK:  I'd like to continue on.  I

21   mean, if you'd like him to refer to that page, that's

22   fine, but I'd like to go on with my questioning.  I'll

23   just ask him.

24        Q.   (BY MR. PEACOCK)  Is this page that

25   Ms. Hyland referred to, which is page 15 of 69 of

Matthew Rihtar                                    August 3, 2017

                                                            Page 74

1    Exhibit C, is that the "AutoInsuranceQuotes.com"

2    landing page that you were just referring to?

3            A.    If this is what -- if this is what the

4    Complaint had, in terms of what page was clicked on

5    from this ad --

6            Q.    I'm not asking you about what the

7    Complaint shows.  I'm asking you if, per your attorney,

8    who stated that she believes that this is the landing

9    page, I'm asking you --

10               MS. HYLAND:  I believe that's your

11   representation in the Complaint.  That's not my

12   personal opinion.

13               MR. PEACOCK:  Okay.  Well, he can either

14   say that's true or incorrect.  That's why we're here,

15   so we can learn about the case.  So I'm asking him, is

16   that the landing page or not?

17           A.    I think it's a landing page in a snapshot

18   of time.

19           Q.    (BY MR. PEACOCK)  I know it might be some

20   landing page.

21           A.    I want to clarify, because you say "a

22   landing page."  A landing page could change from day to

23   day.  And that is not the landing page that existed in

24   later years.  This appears to be a landing page --

25   well, it shows 2012; November 12, 2012.  I don't know

ABC COURT REPORTERS                    214.303.0ABC    (0222)

Matthew Rihtar                                    August 3, 2017

Page 75

1    if that's the date, but this could be a potential

2    landing page of that domain at this point in time.

3           Q.    So it could be, but you don't -- you're

4    not certain that it was?

5           A.    From 2012?  We're talking about, now, five

6    years ago.

7           Q.    I'm asking you if when someone in this

8    advertisement clicked on "Insurance Depot," and you

9    said they were taken to a landing page, which is shown

10   here, "Depot.AutoInsuranceQuotes.com," is this the page

11   that they were taken to?  I understand you're saying

12   the content might have varied from time to time, but is

13   this the page that they were taken to?

14          A.    How could I know that if I don't know when

15   this was --

16          Q.    I'm not -- your attorney seemed to suggest

17   that this was the page, and so I was just following up

18   on that.  If you don't know, you don't know.  And I'm

19   not going to press you on it.

20          A.    I don't know.  I don't know if anyone

21   could know based -- where this could take you, based

22   off of a sheet of paper, is my point.

23          Q.    Okay.  So -- thank you.  We will continue,

24   then.  Going back to page 12 of 69, which we were

25   looking at, you were telling me that they went to a

Matthew Rihtar                                      August 3, 2017

Page 76

 1   landing page.  And I think I was in the process of

 2   asking you what happens next.

 3          A.   Generally, what happens next is from a

 4   paid search ad, like this one, the consumer would have

 5   landed on a landing page where there would have been

 6   what we called a quote start page.  It would be an

 7   experience where there would be a quote start, where it

 8   would be asking what type of insurance they were

 9   looking for, and you start the process of filling out

10   that application or that quote form.

11          Q.   Okay.  Was that form created by Bankrate

12   or was that -- and I'm kind of jumping ahead of myself

13   when I say this, but did everyone use that same form --

14   affiliates and also O&O, Bankrate owned-and-operated

15   sites -- or did the affiliates create their own forms

16   and Bankrate had its forms?  How did that work?

17          A.   There were many ways.  Bankrate certainly

18   had its own forms on Bankrate owned-and-operated pages.

19   Depending on the point in time, affiliates could use a

20   Bankrate form.  And they could put it on their site and

21   sort of frame it in the context of their own domain.

22   They could link off of the affiliate site to a Bankrate

23   site where the form would be; or, in some cases, the

24   affiliate -- not in the cases of these, it appears --

25   but they could have their own form.

Matthew Rihtar                                    August 3, 2017

Page 77

1          Q.    Okay.  So in this particular situation

2    where we have page 12 of 69 of Exhibit C, we've got

3    this ad that's going to a landing page, which you

4    testified to a moment ago.  And then that landing page

5    has a form, and then the consumer fills out that form.

6    Then what happens next?

7                So the consumer would go through the form,

8    and at the end of the form it would be some call to

9    action; a "Submit" button or a "Find Quotes" button or

10   a "Get Quotes" button.  That would be the sort of

11   catalyst that the lead would be created, and it would

12   go into the Bankrate system and be routed to insurance

13   agents or carriers.  And then the consumer would be

14   landed on, typically, what we called an "Exit" or a

15   "Thank You" page, where, "Hey, thank you for shopping,"

16   and we would give them some link off to some other

17   shopping offers or whatever.

18         Q.    When it went through Bankrate's system --

19   I believe that you just mentioned -- when it goes

20   through Bankrate's system, how did Bankrate determine

21   where it was going to send that lead?

22         A.    There were many factors.  There was an

23   algorithm in place, typically, based off of the

24   criteria that the agent or carrier had in place on

25   their account, so primarily driven by geo -- so region,

Matthew Rihtar                                    August 3, 2017

Page 78

 1    location -- sometimes based off of demographic data of

 2    that particular consumer.

 3            Q.   So if a consumer entered a zip code, for

 4    example, a Texas zip code, it would likely be routed to

 5    an insurance company in Texas, correct?

 6            A.   It's likely it would be routed to an

 7    insurance agent in Texas.  Now, there are some carriers

 8    that write nationally, and they may be not in Texas,

 9    but they write in Texas.  And so there may be a case

10    where that happens.

11            Q.   Okay.  I guess we can move on to the next

12    ad.  That gets us to the ad of page 15.  I'll ask

13    you -- I know we were talking about this a moment ago,

14    but this appears to be an ad, so I'd like to ask you

15    what ad is it and who created it?  Well, I'll start

16    with, who created -- do you know who created this ad,

17    page 15?

18            A.   This -- I believe this is the landing

19    page.  This would have been on -- well, the header is

20    "AutoInsuranceQuotes.com."  And there's a date on there

21    of 2012.  And keeping in mind that this is a Trouve

22    domain and an acquisition that, according to this time

23    stamp, would have just recently been made, there was a

24    group of Trouve employees, all long gone, and one of

25    them would have likely created this.  I don't know if

Matthew Rihtar                                    August 3, 2017

Page 79

1    there's any way to know who would have created this or

2    why they would have created this.

3            Q.   And you don't know why this ad was

4    created?

5            A.   I do not.

6            Q.   So it wasn't for lead generation purposes?

7            A.   I think it's -- it's -- it's likely for

8    lead gen purposes.  I think it's also extremely

9    generic.  There's Health Insurance Depot, American

10   Insurance Depot.  It seems to be that there isn't one

11   specific -- there's no target to this.  It's very

12   generic.

13           Q.   Now, in the document production that we

14   received from your -- we received from Bankrate, we

15   received no documents about what liability Bankrate has

16   or had in terms of when it acquired Trouve.  Do you

17   know if Bankrate agreed to any -- to -- what is the --

18   to accept liability for any actions on behalf of Trouve

19   when it acquired Trouve?

20               MS. HYLAND:  Objection to form.

21           Q.   (BY MR. PEACOCK)  It's probably a bad

22   question, I know.  But you can answer, if you

23   understand the question.

24           A.   I haven't personally seen a document that

25   shows it.

Matthew Rihtar                                    August 3, 2017

Page 80

1          Q.    Right.  But it is your understanding that

2    Bankrate --

3          A.    In general, when, I think, companies

4    acquire other companies, that the acquiring company

5    would assume liability.

6          Q.    Right.  And I understand you haven't seen

7    the document, and neither have I.  All right.  So going

8    back to what we were discussing a moment ago, you're

9    not sure why this ad was created, then.  You don't even

10   know if it was created for lead generation purposes.

11   Is that your testimony?

12         A.    That's correct.

13         Q.    How long did this ad stay up?  How long

14   was it displayed for?

15         A.    You know, generally, again, I think we're

16   talking about a company that was just acquired, had a

17   handful of folks doing things, and I don't know if

18   anyone would know the answer to that.

19         Q.    So when Bankrate acquired Trouve, you

20   don't know how long this ad was up?  Is it still up

21   today?

22         A.    This could potentially be one page of

23   hundreds of thousands of pages.  There's no way of

24   knowing.  I think, again, I'll go back to what I

25   testified to, is that when we receive -- "we" being the

Matthew Rihtar                                    August 3, 2017

Page 81

1    company of Bankrate -- receive the complaint on a

2    trademark, we remove it.

3              Q.    Did you remove this ad?

4              A.    Again, generally, I'm going to say that

5    when we receive a complaint --

6              Q.    I understand.  And I object to the

7    non-responsiveness.  My question is:  Was this ad

8    removed?

9              A.    I don't know.

10             Q.    So it's possible this could still be up?

11             A.    I doubt it.

12             Q.    Why do you doubt it?

13             A.    Well, it's possible there's a lot of

14   things in this world.  We're talking about

15   possibilities.

16             Q.    But as we sit here today, you don't know

17   if this ad was removed or not, correct?  You think it

18   might have been removed, but as we sit here today, you

19   do not know, correct?

20             A.    That's correct.

21             Q.    Okay.  Now, before we move on from this

22   ad, you'll agree with me that "Insurance Depot," as is

23   shown in the ad, is prominently displayed, correct?

24             A.    I think that's, again, an opinion.  My

25   eyes are drawn to the savings message.

Matthew Rihtar                                    August 3, 2017

Page 82

    1          Q.    Where is the savings message?  I don't see

    2    it.

    3          A.    Oh, really?

    4          Q.    Where -- point that out to me.

    5          A.    Right there underneath the first

    6    paragraph, "I saved $532 and a ton of time shopping for

    7    auto insurance."

    8          Q.    Okay.  That little --

    9          A.    That's where my eyes go to.

   10          Q.    So your eyes don't go to the

   11    "Insurance" --

   12          A.    They do not.

   13          Q.    Okay.  All right.  But you will agree with

   14    me that it's bigger -- the font size is bigger than the

   15    rest of the paragraphs, correct?

   16          A.    Sure.

   17          Q.    And it's bolder -- the font is bolder than

   18    the font that is used in the paragraphs, correct?

   19          A.    Correct.

   20          Q.    I'd notice it says up on the left,

   21    "AutoInsuranceQuotes.com.," a Bankrate company.  That

   22    was the specific division, correct?

   23    AutoInsuranceQuotes -- we were talking about Trouve.

   24    Bankrate acquired Trouve.  How does

   25    AutoInsuranceQuotes.com. come in?  Is that a website

Matthew Rihtar                                    August 3, 2017

Page 83

1   that Trouve used?

2           A.   It's a website that Trouve owned.

3           Q.   And used?

4           A.   And used.

5           A.   Okay.

6           Q.   Let's go to the next ad, which is shown on

7   page 17 of 69 of Exhibit C.  Do you see the ad that is

8   in a rectangle box?

9           A.   Yes.

10          Q.   And is that a Bankrate ad, or is that an

11  affiliate ad?

12          A.   That is a Bankrate ad.

13          Q.   When was this ad created by Bankrate?

14          A.   I don't know.

15          Q.   When was it taken down?

16          A.   I think I'll defer to what I've said

17  before; is when we are served with a complaint, we will

18  take it down.

19          Q.   But --

20          A.   That's a -- you'll hear me say that.

21  That's a process that the company of Bankrate had.

22          Q.   And I appreciate that.  I know we like to

23  talk in generalities, but my question relates to this

24  specific ad.  As we sit here today, you do not know if

25  this ad was taken down or not, correct?

Matthew Rihtar                                    August 3, 2017

Page 84

 1          A.    I do not.

 2          Q.    Moving on to the next ad on page 19 of 69

 3    of Exhibit C, do you see the words -- the bold and big

 4    words "Insurance Depot" on the top of that page, toward

 5    the top of that page?

 6          A.    Yes.

 7          Q.    Was this a Bankrate ad or an affiliate ad?

 8          A.    I don't think it's an ad.

 9          Q.    What is it?

10          A.    I think it's a page,

11    AutoInsuranceQuotes.com..

12          Q.    So it's a page, correct, on a website?

13          A.    It appears to be a page, correct.

14          Q.    Well, what is the page for?

15          A.    It appears to be an identical, although

16    blown-up version, of the page we just reviewed.

17                MR. PEACOCK:  Objection, non-responsive.

18          Q.    (BY MR. PEACOCK)  What is this page for?

19    What did Bankrate use this page for?

20                MS. HYLAND:  Object to form.

21          A.    You know, again, it appears to be a

22    landing page.  And the use, I'm not sure.  It's very --

23    it's very general.  There's no real content here.  It's

24    very generalized copy.

25          Q.    (BY MR. PEACOCK)  So if a consumer landed

Matthew Rihtar                                    August 3, 2017

Page 85

1    on this page, on this landing page, what would happen

2    next, in terms of what the consumer would see on their

3    computer screen?

4         A.    I think, you know, again, typically, we

5    would have landed the consumer on a quote start page.

6    So you are seeing on the page what I'm seeing on the

7    page, and I don't know where the consumer would have

8    gone from here.

9         Q.    So you don't know if from this page a

10   consumer was provided one of those quotes that we

11   talked about earlier, where they then input information

12   and a lead is generated from it; is that correct?

13        A.    From what I'm seeing on this document,

14   that is correct.

15        Q.    So then this is a document, are you

16   saying, that -- not document -- let's say this was an

17   ad that was not used for lead generation purposes.

18        A.    It could have been.

19        Q.    So it could have been used for lead

20   generation purposes?

21        A.    It could have been.

22        Q.    And do you know when this ad was created?

23        A.    I don't -- I don't know, and I don't even

24   know if that's knowable.

25        Q.    Okay.  Do you know when the ad was taken

Matthew Rihtar                                    August 3, 2017

Page 86

 1   down?

 2         A.    So --

 3               MS. HYLAND:  I'm just going to object.

 4   You keep characterizing it as an ad.

 5               MR. PEACOCK:  I would ask that the witness

 6   be allowed to testify.  I don't need testimony from

 7   counsel.  I appreciate it, but --

 8               THE DEPONENT:  I agree.  I don't think

 9   this is an ad at all.  This is --

10               MR. PEACOCK:  See.  This is why lawyers

11   are not supposed to --

12               THE DEPONENT:  Well, I've corrected you,

13   though, on several occasions.

14               MR. PEACOCK:  And I try to let you finish

15   speaking and --

16               THE DEPONENT:  Fair enough.

17               MR. PEACOCK:  -- I'd appreciate if you let

18   me as well.

19               MS. HYLAND:  I'm just objecting to form.

20               MR. PEACOCK:  No, you can't -- the local

21   rules in the Western District say you can only object

22   to form.  What you're doing now is testifying.  And

23   what you did is you're trying to signal to him what his

24   testimony should be.  So I object to that.  If you want

25   to make an objection, that's fine, you can do so.  But

Matthew Rihtar                                    August 3, 2017

Page 87

1   don't correct him -- don't correct his testimony while

2   we're taking the deposition.

3              MS. HYLAND:  I was attempting to correct

4   your question.  You're referring to it as an ad.

5              MR. PEACOCK:  You cannot correct my

6   question.  You can only object to my question.  If I

7   ask a bad question, you have the right to object, and

8   then we can go see the judge about it.  We can show the

9   transcript to the judge, and the judge can decide.  But

10  you don't get to reinterpret my questions, so that way

11  he can, quote, unquote, better understand them or you

12  want to clarify my questions.  That's against the

13  rules.

14             The local rules in the Western District

15  specifically say objections are to be made to form

16  only.  A little while ago, you made an objection to

17  form, and then you went on to say it's a legal

18  conclusion.  That is also improper.  You can't do that.

19  Objection to form, that's it, according to the local

20  rules.

21        Q.   (BY MR. PEACOCK) So let's see.  My

22  question, I think, before we got interrupted there,

23  was, as we sit here today, you don't know if this ad

24  was taken down?

25             MS. HYLAND:  Object to form.

Matthew Rihtar                                    August 3, 2017

Page 88

1          A.   Again, I think -- as I'm on the record

2     probably stating before, this isn't an ad.  If we look

3     at paid search ads, I would say this is a page, a

4     landing page --

5                    THE REPORTER:  Excuse me.  Can you slow

6     down, please.

7                    THE DEPONENT:  Okay.  I'm sorry.  I

8     just -- it's the second or third time now.

9                    MR. PEACOCK:  I object to that response.

10         Q.   (BY MR. PEACOCK)  I'm having to ask you so

11    many questions, because your company continued to

12    infringe many times.  There's so many ads that your

13    company infringed, that we have to go ad by ad.  So I

14    appreciate you --

15                   MS. HYLAND:  I'm going to have to object.

16    This is harassment at this point.  Just ask your

17    questions.

18                   MR. PEACOCK:  We're going through each ad.

19    And I understand the lawyer, you, Ms. Hyland, you don't

20    like it.  But there are so many ads, so that means we

21    have to go through them all.  I mean, if there was one

22    ad --

23                   MS. HYLAND:  I'm just objecting to form,

24    period.

25                   MR. PEACOCK:  Okay.

Matthew Rihtar                                    August 3, 2017

Page 89

1              MS. HYLAND:  You characterizing anything

2      as trademark infringement or massive trademark

3      infringement to him, at this point, is unproductive and

4      inappropriate.  So just ask your questions.

5              MR. PEACOCK:  Well, I'll certainly do

6      that.  But there's so many ads.  And I understand that

7      everyone is getting tired of going through these ads,

8      but there are a lot of them, and we've got to go

9      through them.  And I'm entitled to do so in this

10     deposition.

11             MS. HYLAND:  Sure.  Go for it.

12         Q.   (BY MR. PEACOCK)  All right.  So back to

13     my original question.  As we sit here today, you don't

14     know if this ad was -- when I say "this ad," the ad an

15     page 19 of 69 in Exhibit C, you don't know if this ad

16     was taken down or not, correct?

17             MS. HYLAND:  Object to form.

18         A.   This is a web page.  We're looking at a

19     web page, in my opinion.  When Bankrate receives a

20     complaint from the owner of a trademark, as I've

21     testified, that trademark will be removed.

22         Q.   (BY MR. PEACOCK)  Object to the

23     non-responsiveness of your answer.  My question is --

24     let me back up.  Let's back up.  Okay.  Is this an ad

25     or not?

Matthew Rihtar                                        August 3, 2017

Page 90

1          A.    This appears to be copy on a landing -- in

2     a web page.

3          Q.    I understand.  If there's a billboard

4     outside, okay, and it's got a restaurant name, and I

5     ask you if that's an ad, and your response is, "No.

6     It's a billboard," well, we all know it's a billboard,

7     but it's being used for a certain purpose.  That's my

8     question here.  We all know that this is a web page.

9     We all know it's a landing page.

10               MR. PEACOCK:  I'm sorry if I'm going too

11     fast.  I'll slow down.  I'm sorry.

12          Q.    (BY MR. PEACOCK)  We all know it's a

13     landing page.  My question to you is:  Is it being used

14     for advertisement purposes?

15               MS. HYLAND:  Object to form.

16          A.    So now we're talking about if this is

17     being used for advertisement purposes; is that correct?

18          Q.    (BY MR. PEACOCK)  That's my question.

19     Page 19 of 69, the document -- or the contents shown

20     therein.

21          A.    Well, I guess it depends on your

22     definition of an ad.

23          Q.    What is your definition of an ad?

24          A.    When there's -- you know, my definition of

25     an ad would be when there's some clear, non-generic,

Matthew Rihtar                                    August 3, 2017

Page 91

1  more specific representation of a service or a product.

2  And this is -- this is very light.

3          Q.   So I have no idea what you mean by

4  "light," but let's go on.

5          A.   There's not a lot of content here.

6  There's words, but there's not a lot -- it's very

7  generic.  And I think you may agree.

8          Q.   I would agree with you that there's not a

9  lot of content.  But what we do know is that there are

10 bold, big words here, "Insurance Depot," correct?

11         A.   There's -- well, there's one bold word,

12 "Insurance Depot."  There's "Health insurance depot,"

13 "American insurance depot," "All insurance depot."

14         Q.   What -- go ahead.  I'm sorry.

15         A.   You had mentioned bold words.  I was just

16 reading some of the bold words.

17         Q.   What is the biggest font -- which word --

18 two words -- or which words, at all, are the two

19 biggest -- let me rephrase that.  How do I say this?

20 Of the words that you see on this advertisement,

21 landing page, however you want to characterize it, what

22 words have the biggest font?

23         A.   "Insurance Depot."

24         Q.   And what is your definition of an

25 advertisement?

Matthew Rihtar                                              August 3, 2017

1          A.    Can we read that back?  Do I have to

2    repeat it?  Do I have to repeat myself?

3          Q.    Yes, because you didn't answer my

4    question.

5          A.    I said a very specific description of a

6    product or service.

7          Q.    So do you characterize this as an ad?

8          A.    I suppose, very loosely.  It's more

9    informative.

10         Q.    So what was -- so what was the purpose of

11   Bankrate creating this landing page, then?  Just to be

12   nice and just provide information to the public?  What

13   was the purpose?

14         A.    Again, I think -- I don't know if that's

15   knowable.

16         Q.    So you don't know why Bankrate created

17   this?

18         A.    I don't know why it was created.

19         Q.    So it wasn't to help generate leads?

20         A.    That's likely -- that is likely the reason

21   it was created, but I don't know who -- to your point,

22   I don't know who created it, when it was created, or

23   why it was created.

24         Q.    Okay.  But you and I agree that it was

25   likely created to help generate leads.  We'll move on.

Matthew Rihtar                                    August 3, 2017

Page 93

1              You mentioned -- well, before we move on,

2     let's go back to page 19 of 69.  We agreed, I think,

3     that this was a Bankrate ad, correct?  It wasn't an

4     affiliate ad?

5              A.   Right.

6                   MS. HYLAND:  Object to form.

7              Q.   (BY MR. PEACOCK)  Page 19?

8              A.   Oh, correct.

9              Q.   That's Bankrate.  All right.  And we'll

10    move on to page 21 of 69 of Exhibit C.  And you know

11    what?  Before we do, one other quick question about the

12    content on page 19.  I'd like for you to compare what's

13    shown in the certificate of registration to what's

14    shown in the ad under "Insurance Depot."  You tell me

15    if you see any differences between "Insurance Depot,"

16    as shown in the certificate, and "Insurance Depot" as

17    shown on this page, page 19.

18             A.   There's none.

19             Q.   Okay.  Thank you.  We'll move on.

20    Page 21, do you see where it has brackets toward the

21    middle of that page?

22             A.   Yes.

23             Q.   Is this a Bankrate ad or is this -- what's

24    shown in the bracket, is that a Bankrate ad or an

25    affiliate ad?

Matthew Rihtar                                    August 3, 2017

Page 94

1          A.    Affiliate.

2          Q.    Okay.  And was this an organic, or was

3    this a pay-per-click ad?

4          A.    It appears to be an organic ad.

5          Q.    And we can move on to page 23.  Do you see

6    in the middle of page where it has "### insurance

7    depot," and a dash, and then it has -- it looks like a

8    sentence after that?

9          A.    Yes.

10          Q.    Was this a Bankrate ad or an affiliate ad?

11          A.    Affiliate.

12          Q.    So would this be, like, a landing page

13    that -- for one of the affiliates?

14          A.    It appears to be a landing page.

15          Q.    And from this landing page, the consumer

16    would fill out a form, correct?

17          A.    It appears to be the case.

18          Q.    Let's move on.  We'll go to the next one,

19    which, I believe, is on page 27.  On page 27 of 69, do

20    you see where it has the brackets?

21          A.    Yes.

22          Q.    Is that ad in the brackets an affiliate ad

23    or a Bankrate ad?

24          A.    Affiliate ad.

25          Q.    All right.  And this one appears to be an

Matthew Rihtar                                        August 3, 2017

Page 95

1    organic ad, correct, from organic search results?

2            A.    It looks to be organic.

3            Q.    Now, I notice -- well, never mind.  Strike

4    that.

5                  Going on to the next one, page 29, in the

6    middle of the page it has "insurance depot.com."  Do

7    you see that?

8            A.    I do.

9            Q.    Is this a Bankrate ad or affiliate?

10           A.    Affiliate.

11           Q.    Is this also a landing page?

12           A.    Appears to be a landing page.

13           Q.    Let's move on -- well, yeah, let's move

14   on.  Next one, page 32 of 69, you see in the rectangle

15   where it has "insurancedepot.com"?

16           A.    Yes.

17           Q.    Is this an affiliate ad or Bankrate ad?

18           A.    Affiliate.

19           Q.    Let's move on.  Page 34 of 69, Exhibit C,

20   do you see where it has three dollar signs and then

21   "insurancedepot.com"?

22           A.    Yes.

23           Q.    Is this a Bankrate ad or an affiliate ad?

24           A.    Affiliate.

25           Q.    And it would likely be a landing page,

Matthew Rihtar                                          August 3, 2017

Page 96

1    correct?

2            A.    Yes.

3            Q.    Moving on, it would be page 35 of 69, do

4    you see where, again, three dollar signs,

5    "insurancedepot.com"?  Is this an affiliate or Bankrate

6    ad?

7                  MS. HYLAND:  Object to form.

8            A.    This is an affiliate ad.

9            Q.    (BY MR. PEACOCK)  Then going to page 36,

10   is this -- do you see where it says "insurance.com

11   (sic) in the usa," on page 36 of 69?  It's toward the

12   top middle of the page.  Do you see that,

13   "insurancedepot.com in the usa"?

14           A.    I do not see that.

15           Q.    It's page 36.

16           A.    Page 36, yup.

17           Q.    Right here (indicating).

18           A.    Oh, right there, yes.

19           Q.    Is this a Bankrate ad or an affiliate ad?

20           A.    For context, this is -- it's the same

21   domain as on page 35, correct?  I'm just trying to be

22   clear.

23           Q.    So your testimony is it's the same ad as

24   the one we saw on 35?

25                 MS. HYLAND:  Object to form.

Matthew Rihtar                                    August 3, 2017

Page 97

 1          A.    I'm trying to get context.

 2          Q.    (BY MR. PEACOCK)  No, I know.  I'm trying

 3    to figure out what you're saying.

 4          A.    I don't know what this page is, what we're

 5    looking at.

 6          Q.    On page 35 or 36?

 7          A.    On 36.  I mean, 35 was -- it had the

 8    domain.

 9          Q.    So you don't know, looking at this page,

10    if this was -- if this comes from Bankrate or one of

11    the affiliates?

12          A.    Well, now that I'm seeing at the bottom of

13    page 36, "insurancesmartcompare.com," that's an

14    affiliate ad.

15          Q.    How do you know -- by looking at that, how

16    do you know -- what tipped you off as to know --

17          A.    That is not a Bankrate domain.

18          Q.    What would be the Bankrate domains in this

19    case that relate to this market that we're here about,

20    that would signify to you that it's coming from either

21    Bankrate or one of the affiliates?  I assume that

22    Bankrate had certain domains that they would use to

23    display their content.  Am I correct?

24          A.    Correct.

25          Q.    And that's one way you can tell if it's a

Matthew Rihtar                                    August 3, 2017

Page 98

1    Bankrate ad or an affiliate ad, correct?

2          A.   Correct.

3          Q.   And what were the Bankrate -- if you know,

4    offhand, what were the Bankrate domain names?  Were

5    there -- I'm not asking for the full HTML line.  For

6    example, I don't know -- I forget the wording that is

7    used, but for the beginning part, there's a term of art

8    for that, and I forgot the word.  But you know what I'm

9    talking about, where you have insurance -- like, here

10   we have "insurancesmartcompare.com," and then it has

11   additional language -- not language, but information

12   after that?

13         A.   Yes.

14              MS. HYLAND:  Object to form.

15              MR. PEACOCK:  I know.  I'm trying to

16   figure out what my question is.  I sustain your

17   objection.

18         Q.   (BY MR. PEACOCK)  But anyway, do you know

19   what I'm talking about when I say the first portion of

20   that HTML?  Do you know what I'm talking about?

21         A.   The domain.

22         Q.   Right.  Okay.  The domain, there we go.

23   Do you happen to know what the domain is for the

24   Bankrate ads that relate to this case, where we're here

25   talking about the mark versus the domains the

Matthew Rihtar                                    August 3, 2017

Page 99

 1    affiliates used?

 2                MS. HYLAND:  Object to form.

 3          A.    There's one domain.

 4          Q.    (BY MR. PEACOCK)  Okay.  It's just one; is

 5    that correct?

 6          A.    Right.  That's correct.

 7          Q.    So any Bankrate advertisement that used

 8    the mark would come just from one domain, in this case?

 9                MS. HYLAND:  Object to form.

10          A.    From what I saw in the Complaint, yes.

11          Q.    (BY MR. PEACOCK)  I'm not trying to --

12    this is not a "gotcha" question.  I'm trying to figure

13    out what domains that Bankrate used, when we're talking

14    about the mark in question here.

15          A.    From the ads introduced from the

16    Complaint, there was one domain, yes.

17          Q.    Okay.  Do you know of any other domains?

18    You mentioned the ones that are in the Complaint.  Do

19    you know of any other domains that were not mentioned

20    in the Complaint?

21                MS. HYLAND:  Object to form.

22          A.    For what?

23          Q.    (BY MR. PEACOCK)  That Bankrate used -- in

24    which Bankrate used the mark in question, the

25    "Insurance Depot" mark.

Matthew Rihtar                                    August 3, 2017

                                                        Page 100

 1          A.    No.

 2          Q.    So we established a few minutes ago that

 3    the one you're looking at on page 36 likely was an

 4    affiliate ad, correct?

 5          A.    Correct.

 6          Q.    Moving on, what's shown on page 38, is

 7    this a form that a consumer would likely see, either

 8    from an affiliate or from Bankrate, when they would

 9    enter -- when they would go to a landing page, and then

10    they would have to enter the information into a form?

11          A.    This was one of the Bankrate forms,

12    correct.

13          Q.    Do you know by looking at this page, this

14    document, if this is a form that was created in the

15    course and scope of the affiliate's work, or with

16    Bankrate?

17          A.    Could you rephrase that?

18          Q.    Was this form something that an affiliate

19    used, or was this a form that Bankrate used, as shown

20    in here?  I know that you just testified that -- you

21    gave a generalized answer, but I'm asking about this

22    specific form.

23          A.    This specific form, in general, was

24    primarily used for affiliate lead referral; although,

25    there were some cases where Bankrate may have used it

Matthew Rihtar                                    August 3, 2017

                                                        Page 101

 1    as well.

 2              Q.    Okay.  And looking at this document, is it

 3    your testimony you don't know if this form, as it's

 4    seen here, was used as a Bankrate form or an affiliate

 5    form?

 6              A.    That's correct.

 7              Q.    Let's move on to page 39.  You see in the

 8    bracket area it has "Insurance Smart Choice:

 9    www.insurancedepot.com"?  Do you see that?

10              A.    I do.

11              Q.    Is this a Bankrate ad or an affiliate ad?

12              A.    Affiliate.

13              MS. HYLAND:  Object to form.

14              Q.    (BY MR. PEACOCK)  Let's move on to page 41

15    of 69 of Exhibit C.  Do you see where toward the top

16    middle it has "www.insurancedepot.com," and then dash,

17    "Easy to save auto insurance"?  Do you see that?

18              A.    Yes.

19              Q.    Was this a Bankrate form -- excuse me, a

20    Bankrate ad or an affiliate ad?

21              MS. HYLAND:  Object to form.

22              A.    Affiliate.

23              Q.    (BY MR. PEACOCK)  And if a consumer landed

24    on this page, they would likely then proceed to a form,

25    correct, where they would enter their information.  And

Matthew Rihtar                                        August 3, 2017

Page 102

```
 1   a lead, hopefully, would be generated by that, correct?

 2           A.    In general, that's the way the flow was.

 3           Q.    I understand, in general.  But do you

 4   know, looking at this, if that was what happened here?

 5   I mean, if you don't, you don't.  It's not a trick

 6   question.

 7           A.    No.

 8           Q.    Moving on, page 44 of 69, do you see where

 9   in the bracket it has "insurancedepot.com"?

10           A.    Yes.

11           Q.    Was this a Bankrate ad or an affiliate ad?

12           A.    Affiliate.

13           Q.    And by the way, some of the affiliate ads

14   that we've looked at, some of them -- isn't it correct

15   that some of them would have been generated by

16   Mr. Prompun, and some would have been generated by

17   Mr. Metalnikov?

18                 MS. HYLAND:  Object to form.

19           A.    That's correct.

20                 MR. PEACOCK:  What's the basis of your

21   objection?

22                 MS. HYLAND:  I'm just continuously

23   objecting to the characterization of all of this as

24   being ads.

25                 MR. PEACOCK:  Well, so you're just
```

Matthew Rihtar                                    August 3, 2017

Page 103

1    objecting about that characterization?

2              MS. HYLAND:  Yes.

3         Q.   (BY MR. PEACOCK)  I think we've talked

4    about this, but do you consider these ads?

5              MS. HYLAND:  Object to form.

6         Q.   (BY MR. PEACOCK)  We've talked about this.

7         A.   Can you be more specific what "this" is?

8         Q.   I think you've testified that -- I don't

9    think we need to rehash all that.  I agree, you've

10   stated your opinion on that, and I think we'll move on.

11             Going to page 46 of 69, do you see

12   where -- the underlined portion on that page where it

13   has "insurancedepot.com," and then it's got a sentence

14   after that, after the dash?

15        A.   Yes.

16        Q.   Is this a Bankrate ad or an affiliate ad?

17             MS. HYLAND:  Object to form.

18        A.   An affiliate.

19        Q.   (BY MR. PEACOCK)  Do you know, offhand, if

20   this was the affiliate Metalnikov or Mr. Prompun?

21        A.   If I could reference the expert report, I

22   could tell you; but off memory, no.

23        Q.   So it's your understanding that that

24   information would be in the expert report?

25        A.   Correct.

Matthew Rihtar                                    August 3, 2017

                                                  Page 104

1           Q.    Let's move on.  And by the way, before we

2    move on, when -- again, I just want to make sure we're

3    clear.  When someone goes to this ad, even though your

4    testimony is it's an affiliate ad, Bankrate receives a

5    lead from this, hopefully, if the consumer enters the

6    information that they're supposed to enter into the

7    form, correct?

8           A.    That is correct, if this particular form

9    is being powered by Bankrate.

10          Q.    Okay.  Are any of these forms -- strike

11   that.

12                In any of these advertisements that we've

13   looked at so far, are any of the forms not being

14   generated by Bankrate?

15          A.    None that I have seen.

16          Q.    None of them are being generated by

17   Bankrate or -- I didn't understand your question (sic).

18          A.    Sorry.  None were -- they were all

19   being -- they were all -- from what I've seen, those

20   form snapshots were all Bankrate forms.

21          Q.    Let's move on to page 50 of 69.  Do you

22   see in the bracketed portion it has "Depot Insurance"?

23   Do you see that?

24          A.    I do.

25          Q.    Is that a Bankrate ad or an affiliate ad?

Matthew Rihtar                                    August 3, 2017

Page 105

1          A.    That is an affiliate ad.

2          Q.    Let's move on to page 52 of 69.  Let's

3    see.  Do you see where it's got kind of -- if you look

4    at it in landscape, in the middle of the page it's got

5    "Depot Insurance."  Do you see that?  I'm looking on

6    page 52.

7          A.    Yes.

8          Q.    Is this a Bankrate ad or an affiliate ad?

9          A.    This is an affiliate web page.

10         Q.    And you said "affiliate web page."  Are

11   you making a distinction between web page and landing

12   page?

13         A.    Landing page.  I'm looking at the domain

14   in the address bar at the top.

15         Q.    Okay.  So that's how you're determining

16   which one?

17         A.    Correct.

18         Q.    Okay.  I notice there's a form -- well,

19   it's a small form, I don't know if you'd call it a

20   form -- but it has "Insurance Gets Better," and then it

21   has a place "Type," select an insurance, and then

22   "Zip."  Is that something that -- a form that Bankrate

23   would also use?

24         A.    Correct.

25         Q.    Okay.  We can move on to page 53 of 69.

Matthew Rihtar                                    August 3, 2017

                                                    Page 106
1    It doesn't appear to have any boxes or rectangles or

2    anything on this page.  But looking at this page, do

3    you see any links either to a Bankrate ad or to one of

4    Bankrate's affiliate ads?  Oh, you know what?  I

5    apologize.  I think if you go to the next page,

6    page 54, it looks like there is a rectangle there.  Do

7    you see that?

8             A.    I do.

9             Q.    Is that a Bankrate ad or an affiliate ad?

10            MS. HYLAND:  Object to form.

11            A.    Affiliate.

12            Q.    (BY MR. PEACOCK)  Going on to page 55 of

13   69 of Exhibit C, do you know if this is a Bankrate ad

14   or an affiliate ad?  Do you know what this ad is at

15   all?

16            MS. HYLAND:  Object to form.

17            MR. PEACOCK:  I know.  Bad question.

18            Q.    (BY MR. PEACOCK)  Let's move on, unless --

19   well, let me back up, because it does have InsureMe on

20   there.  So apparently this is -- that is a Bankrate

21   form, correct?

22            A.    It is a Bankrate form on an

23   affiliate-owned domain.

24            Q.    So this is affiliate.  Okay.  And again,

25   you're determining that it's an affiliate by looking at

Matthew Rihtar                                    August 3, 2017

                                                       Page 107

 1    the domain up there at the top of the search bar?

 2           A.    That's correct.

 3           Q.    Going on to page 56 of 69, toward the

 4    bottom of the page, you see the brackets there?

 5           A.    Yes.

 6           Q.    And do you see where it says, "Auto

 7    Insurance Depot - affordable insurance"?

 8           A.    Yes.

 9           Q.    Is this a Bankrate ad or affiliate ad?

10           A.    An affiliate ad.

11           Q.    Moving on to page 58 of 69, do you see

12    toward -- in the landscape mode of the page

13    orientation, do you see where it says "Auto Insurance

14    Depot"?

15           A.    Yes.

16           Q.    Is this a Bankrate ad or an affiliate ad?

17           A.    Affiliate.

18           Q.    And then moving on to page 59 of 69 of

19    Exhibit C, do you see where it has the brackets on that

20    page?

21           A.    Yes.

22           Q.    And it has "Insurance Depot - Quotes,"

23    correct?

24           A.    Correct.

25           Q.    Is this an affiliate ad or Bankrate ad?

Matthew Rihtar                                    August 3, 2017

Page 108

1          A.    Affiliate.

2          Q.    At the top of page 60, it looks like it's

3    a pay-per-click ad.  It has "Car Insurance Depot/

4    Depot.AutoInsuranceQuotes.com."  Is that a Bankrate ad

5    or an affiliate ad, or do you know, or do you not know?

6          A.    The very top ad?

7          Q.    Right.  It looks like it's in the PPC

8    portion.

9          A.    That is a Bankrate.

10         Q.    So this here is a pay-per-click ad that

11   Bankrate executed, correct?

12         A.    That's correct.

13         Q.    So in this -- for this particular ad, when

14   someone clicked on this ad, they would be taken to a

15   landing page, correct?

16         A.    Generally speaking, that's correct.

17         Q.    And you will agree -- you say "generally

18   speaking."  In regard to this ad -- you don't know, in

19   regard to this ad, where the consumer would be taken?

20         A.    This specific ad, no.

21         Q.    You will agree with me that the ad shows

22   "Insurance Depot" in a bigger font than it shows

23   everything under that, correct?

24         A.    That is correct.  But again, I think that

25   that's the layout of the Bing.  Every ad has that.

Matthew Rihtar                                    August 3, 2017

Page 109

1          Q.    But it's also true that Bankrate could
2    have used different terms in there, correct?  Bankrate
3    bid on those terms, correct?
4          A.    The search in the search bar, "Insurance
5    Depot Online," is what was searched.
6          Q.    Right, but that's not my question.  My
7    question is:  Bankrate bid -- correct or not, Bankrate
8    bid on "Insurance Depot"?
9          A.    Correct.
10         Q.    And in this particular ad, Bankrate could
11   have requested, if it wanted to, different terms to
12   appear at the top portion of that ad, correct?
13         A.     It -- you know, there is a -- what's
14   called dynamic keyword insertion, where these search
15   engines will dynamically insert what was searched in
16   the tag.  And so it's not knowable if that was a -- if
17   that particular one was a -- the search engine put that
18   in there or not.
19         Q.    But Bankrate can make -- can execute this
20   ad in such a way that certain terms appear and certain
21   terms don't appear.  Let me give you an example.  I'm a
22   lawyer.  If I want to advertise my legal services, I
23   don't want, at the top of my ad, it saying "car
24   insurance."  I want it to say something that has to do
25   with the services that I provide.  Isn't that true for

Matthew Rihtar                                    August 3, 2017

```
                                                    Page 110
 1   Bankrate?  Bankrate can control what appears at the top
 2   of this ad, correct?
 3                MS. HYLAND:  Object to form.
 4        A.    The search engine allows you to control
 5   the -- what is in that ad.  That is true.  The search
 6   engine also allows you to bid on trademarks as well.
 7        Q.   (BY MR. PEACOCK)  Right, it does.  And
 8   because the search engine allows a party such as
 9   Bankrate to bid on trademarks, does that mean it's
10   proper to do so?
11                MS. HYLAND:  Object to form.
12        A.    I think that -- you know, I think it was
13   in the belief of the company that there was nothing
14   wrong with it.
15        Q.   (BY MR. PEACOCK)  So --
16        A.    A search engine is facilitated.  They had
17   platforms that facilitated it.  It was common practice
18   in the industry, everyone was doing it.  And as I
19   testified earlier, you know, however, if it was brought
20   to our attention, it would absolutely be removed.
21        Q.    Well, as my mom used to tell me when I was
22   growing up, "If everyone is jumping off a bridge,
23   doesn't mean you have to go jump off a bridge."
24                Just because everyone in the industry is
25   violating people's or corporations' trademarks rights,
```

Matthew Rihtar                                    August 3, 2017

                                                      Page 111

1    doesn't mean that Bankrate has to do it.

2              MS. HYLAND:  Objection.

3              MR. PEACOCK:  But I'll throw that out, for

4    whatever it's worth.  Let's move on.  We're almost

5    done, I think, here.  And, I guess, once we get done,

6    did you want to break?

7              MS. HYLAND:  It's lunchtime.  Sure.

8              MR. PEACOCK:  Oh, yeah.  Well, I'm still

9    looking at standard time.  So it's 12:10, correct?  So

10   we will get done with this, and then we can figure out

11   we we want to do, if we want to break for lunch.

12        Q.   (BY MR. PEACOCK)  Moving on to page 61 of

13   69 of Exhibit C of the Complaint, the live Complaint --

14   well, let's move on.  Moving on to page 62, do you see

15   in the brackets toward the bottom of the page it has

16   "The Insurance Depot - Quotes"?

17        A.   Yes.

18        Q.   Is this a Bankrate ad or an affiliate ad?

19        A.   Affiliate.

20        Q.   By the way, in regard to -- and I'm sorry

21   to be jumping around like this -- in regard to this

22   Bankrate ad that we saw on page 60 that you testified

23   to a moment ago that's a PPC ad, when was this ad

24   created?

25        A.   I don't know.

Matthew Rihtar                                    August 3, 2017

Page 112

1          Q.    And when was it taken down?

2          A.    I don't know.

3          Q.    So as we sit here today, it could still be

4    running, correct?

5          A.    I think anything is possible; I think,

6    keeping in mind, the company was sold in 2015.

7          Q.    Let's move on.  Page 62, you testified a

8    moment ago this is an affiliate ad.  Let's move on.

9    Page -- oh, by the way, on page 64, do you see at the

10   bottom where it has the domain name, and then it has

11   the name of the page right after that, which is

12   "the-insurance-depot.html"?

13         A.    Yes.

14         Q.    Is this an affiliate ad or is this a

15   Bankrate ad?

16              MS. HYLAND:  Object to form.

17         Q.    (BY MR. PEACOCK)  The document -- the

18   contents shown in this -- on this web page, on its web

19   page.

20         A.    This is an affiliate web page.

21         Q.    Okay.  So it's an affiliate.  Did Bankrate

22   ever -- has Bankrate ever created pages where the name

23   of the page itself is or was utilizing the term

24   "Insurance Depot"?

25              MS. HYLAND:  Object to form.

Matthew Rihtar                                    August 3, 2017

                                                      Page 113

1          A.    Can you rephrase that?

2          Q.    (BY MR. PEACOCK)  Sure.  Has Bankrate ever

3    created a web page where the name of the page, as shown

4    in the address bar, is entitled "Insurance Depot,"

5    anywhere in the name of the page itself?  I'm not

6    talking necessarily about the contents of the page, but

7    in the actual domain name itself.

8          A.    I don't believe so.

9          Q.    But as we sit here today, you don't know?

10         A.    I do not know.

11         Q.    What is the domain name -- and I apologize

12   if I asked you this question earlier, and if I did, I'm

13   sure I'll draw an objection.  But what was the domain

14   name that Bankrate used as it relates to Insurance

15   Depot?  You mentioned you can tell by looking at the

16   domain name if it's a Bankrate or an affiliate ad.

17   What is the domain name?

18         A.    Well, it's the "AutoInsurancQuotes.com."

19         Q.    And there were no other domain names that

20   Bankrate used in relation to the use of "Insurance

21   Depot," correct?  It was just one domain?

22         A.    Correct.

23         Q.    If you go to page 67, it's kind of hard to

24   see at the top there, but it looks like it's -- when

25   this document was printed, a portion of the top got

Matthew Rihtar                                        August 3, 2017

Page 114

1    cut off.  But do you see where it has "Insurance Depot

2    Texas - free instant quotes"?

3              A.    Yes.

4              Q.    Is this a Bankrate ad or an affiliate ad?

5              A.    Affiliate.

6              Q.    And then page 69 of 69, Exhibit C of the

7    live Complaint, do you see toward the middle of the

8    page where it says "Insurance Depot Texas"?

9              A.    Yes.

10             Q.    Is this a Bankrate ad or an affiliate ad?

11             A.    Affiliate.

12             Q.    By the way, before we break for lunch, we

13   had gone through the agreement that Trouve Media had

14   with Mr. Prompun.  I noticed in the document production

15   that Bankrate served on the plaintiff there are no

16   agreements between Mr. Metalnikov, with anyone.  Do you

17   know if he signed any agreements; and, if so, why were

18   none produced to the plaintiff?

19             A.    There would have likely been an agreement.

20   I don't know -- between the year and a half since the

21   company was sold and all of that, I don't know what

22   would have happened to it.

23             Q.    So as we sit here today, it's Bankrate's

24   testimony that the agreement that Mr. Metalnikov had or

25   supposedly had with Bankrate doesn't exist, or if it

Matthew Rihtar                                    August 3, 2017

Page 115

1    did, you don't have it?

2          A.    It would have -- it would have likely

3    existed.  You know, he was -- if you saw in these

4    screen grabs, the InsureMe logo, he would have been an

5    InsureMe affiliate, which means there were -- the

6    InsureMe platform had an electronic acceptance of terms

7    and conditions and, basically, the contract.

8          Q.    Okay.

9          A.    So that would have existed for him, too.

10   That would have been -- you cannot -- you know, that

11   particular system at that point in time -- and that

12   system has been long gone now for many years, even

13   prior to the company being sold to All Web -- you could

14   not become an active affiliate without agreeing to the

15   terms and conditions, stating he's a third-party

16   affiliate.

17         Q.    But as we sit here today, Bankrate has

18   produced no contract between itself or one of its

19   divisions that it acquired and Mr. Metalnikov; is that

20   correct?  We don't have any written agreements, do we?

21         A.    I will defer -- I mean, I don't know.  I

22   haven't seen all the documents, so I can't --

23         Q.    Well, my understanding was you -- except

24   for the financials, you reviewed all these documents so

25   you could testify for Bankrate on behalf of this case.

Matthew Rihtar                                    August 3, 2017

1              MS. HYLAND:  Objection.

2         Q.  (BY MR. PEACOCK)  I'll just ask you,

3    clearly:  Does Bankrate have any documents -- I should

4    say any agreements that are signed between

5    Mr. Metalnikov and itself or one of its sister

6    companies?  When I say "sister companies," one of the

7    companies that it acquired.

8         A.   I haven't seen the document.

9         Q.   I understand that you've seen it.

10        A.   I haven't seen it.

11        Q.   Does one exist or not?  Did it exist or

12   not?

13        A.   I can tell you the way the system worked;

14   is that in order to become a live affiliate, you would

15   have to accept these terms and conditions.

16        Q.   So if -- let's assume for the moment that

17   one did exist.  What happened to it?

18        A.   I don't know.

19        Q.   Briefly, before we break, you said that

20   Mr. Prompun was associated with the InsureMe?  Is that

21   what you said, the InsureMe -- what is InsureMe?  You

22   mentioned something about InsureMe.  Oh, it was one of

23   the divisions that Bankrate purchased, correct?

24        A.   That is correct.

25        Q.   So you said that Mr. Prompun was

Matthew Rihtar                                    August 3, 2017

Page 117

1    associated -- his agreement was with InsureMe; is that

2    correct?

3           A.   I believe it's the other way around.  It

4    was the other one.

5           Q.   Mr. Metalnikov?

6           A.   Maxim.

7           Q.   Is it Maxim?  Can we just say Maxim, so we

8    make it easier on ourselves?

9           A.   Absolutely.

10          Q.   Maxim.  So he signed a contract, according

11   to what you say, with InsureMe, correct?

12          A.   I believe that to be the case.  That's

13   right.

14          Q.   And --

15          A.   Because we have the contract with Prompun.

16          Q.   But that's with Trouve?

17          A.   Correct.

18          Q.   Okay.  And so Trouve didn't sign a

19   contract with Maxim Metalnikov?

20          A.   Not that I know of.

21          Q.   And if one did exist, it would be with

22   InsureMe?

23          A.   From what -- in the documentation where

24   I've seen it, that would have been the case.

25          Q.   Okay.  Do you know kind of what happened?

Matthew Rihtar                                      August 3, 2017

Page 118

 1    I mean, you say you don't know what happened to that

 2    contract.  Is that the only contract that InsureMe has

 3    not been able to find, or did something happen where

 4    InsureMe lost a lot of different documents and that was

 5    one of the documents that it lost?  I mean, does anyone

 6    know why it was lost or how it happened?  Companies

 7    don't just normally -- of Bankrate's size and the size

 8    of these companies, go around losing documents.

 9    Usually, they have procedures in place.

10              MS. HYLAND:  Objection.

11         Q.   (BY MR. PEACOCK)  So is there a reason,

12    that you know of, as to why the document was lost?

13         A.   I think we're assuming the document was

14    lost.  All I'm saying is that InsureMe was a platform

15    that had been around for a long time.  It was, at one

16    point, shut down, because we migrated the entire

17    affiliate program under one platform.  And so we shut

18    down InsureMe, we shut down NetQuote, and then we sold

19    the company.  And so it exists on maybe a server out

20    there somewhere.  I wouldn't assume it's lost.  I think

21    that's speculation.  I'm just saying that how I knew

22    the system to work, is it was an electronic agreement.

23         Q.   So as we sit here today, there is no

24    agreement that you can produce to us about this

25    supposed, alleged contract that Bankrate had with

Matthew Rihtar                                          August 3, 2017

Page 119

1   Mr. Maxim Metalnikov?

2        A.   I suppose if it wasn't produced, we don't

3   have it.

4             MR. PEACOCK:  I can keep going or we can

5   break for lunch.  What would you like to do?

6             MS. HYLAND:  If you're at a natural stop.

7   If you're not at a natural stop --

8             MR. PEACOCK:  Well, I do have -- let's go

9   off the record for a second.

10             (Discussion off the record.)

11             (Recess taken, 12:25 p.m. to 1:50 p.m.)

12             MR. PEACOCK:  Okay.  We're back on the

13   record.

14        Q.   (BY MR. PEACOCK)  We were talking a little

15   bit about the agreements -- before we went off the

16   record, we were talking about the agreements between

17   the affiliates and Bankrate.  I'd like to kind of pick

18   up on that topic a little bit.  It's my understanding

19   that when Bankrate was provided notice of this lawsuit,

20   that Bankrate communicated to the affiliates to

21   essentially stop using the mark in question, the

22   trademark here, the "Insurance Depot."  Am I correct?

23        A.   Correct.

24        Q.   And Bankrate's attorneys have produced

25   several e-mails between Bankrate -- people at Bankrate

Matthew Rihtar                                    August 3, 2017

Page 120

1    and either Mr. Prompun or Mr. Metalnikov.  I'm not

2    going to go through all of these e-mails, because a lot

3    of them do speak for themselves.  However, I do have

4    some questions about a few of these e-mails.  And so

5    I'm just going to show you a few of these and just ask

6    you what certain words mean or what the context is in

7    the e-mail.

8              I'll show you -- and I'll try to do this

9    quickly, because we don't need to spend a lot of time

10   on this.  I'm not going to mark this.  I'm just going

11   to refer to it as the Bates number below.  I'm handing

12   you what is Bates-numbered 302002 and 302003 and

13   302004.  On the third page, 302004, someone at

14   Bankrate -- it looks like the person's name is Bodara

15   Mak -- sent an e-mail to Mr. Sunti Prompun on Friday,

16   May 30, 2014.  And she says, "Hey Sunti" -- by the way,

17   are you following along with me so far?  Do you see

18   what page I'm on?

19        A.   Yes.

20        Q.   Okay.  "Hey Sunti, I need you to block and

21   negative match the following keywords from your

22   campaigns."  Then she goes on to -- I don't know if

23   it's her or she; I guess it's a he that signed "Bo" --

24   but then Bo goes on to list:  Please let me know if you

25   have done so.  And then he lists three different

Matthew Rihtar                                    August 3, 2017

Page 121

1    phrases, one being a domain name.

2              My question is:  When Bo says, "You need

3    to block and negative match," what is "negative match"?

4    What does that mean?

5         A.   Negative match is where in the search

6    engines you will designate certain keywords as a

7    negative match, and they will not show up in any case.

8         Q.   Show up where?

9         A.   So it won't display your ad in the search

10   listing.

11        Q.   So the ad won't be displayed, or just

12   those terms in the ad?  The ad will still be displayed,

13   but not the specific terms in the ad?

14        A.   The keyword will not be displayed if you

15   negative match the keyword.

16        Q.   So in certain cases like we've looked at

17   in the advertisements from the affiliates, assuming

18   that Mr. Sunti did this -- which is, do a negative

19   match -- the rest of the ad would not be affected; is

20   that correct?  It would just -- in this case, Insurance

21   Depot would not show up in the ad, but the remaining

22   portions of the ad would still be intact.  It would

23   still be displayed, correct?

24        A.   It depends on the dynamic -- if there was

25   a dynamic keyword component to it.  But those keywords

Matthew Rihtar                                    August 3, 2017

                                                    Page 122

 1   would not show up.

 2          Q.   Okay.  And as we sit here today -- well,

 3   strike that.  Strike that question.  And we'll get

 4   there in just a second.

 5               So I notice that one of those is

 6   "insurancedepot.com."  Is that a keyword, or is that a

 7   domain name?

 8          A.   It could be both.

 9          Q.   So it could be used as both, a domain name

10   and a keyword?

11          A.   Yes.

12          Q.   Did Bankrate ever use it both as a keyword

13   and as a domain name, or just one or the other?

14          A.   I think that there were -- you know, in

15   the whole context, generally, there were, at one point

16   in time, millions of keywords that we were -- that we

17   had in our portfolio.  Some were generated -- in fact,

18   most were generated likely by software, right, because

19   you can't generate millions of keywords.  So likely a

20   lot of these keywords were generated by a piece of

21   software.  And that piece of software might have

22   suggested certain keywords like the keywords you may be

23   seeing on the page.

24          Q.   Is it possible that Bankrate could have

25   implemented in their software a way to flag keywords

Matthew Rihtar                                    August 3, 2017

Page 123

1    that would be registered trademarks?

2              MS. HYLAND:  Object to form.

3         A.   Can you --

4         Q.   (BY MR. PEACOCK)  Is there a way in

5    Bankrate's software -- because you said that the

6    software is the -- is where the keywords are generated,

7    correct?

8         A.   The search engines --

9              MS. HYLAND:  Object to form.

10        A.    The search engines have software, which,

11   themselves, make suggestions to automatically create

12   lists for you; not Bankrate, the search engines.

13        Q.   (BY MR. PEACOCK)  And is there a process

14   that Bankrate could create that would take that list

15   and review it to determine what keywords on that list

16   are registered trademarks?

17        A.    I suppose there could be a process.  I

18   think, again, you look at the hundreds of thousands, if

19   not millions, of keywords, there was -- it simply was

20   one keyword or two keywords were rounding errors, at

21   best, right?  It just was in the details, in the weeds.

22   And how could anyone know one keyword out of two

23   million.

24        Q.    I'm not following you.  When you say --

25   well, what do you mean by that?

ABC COURT REPORTERS              214.303.0ABC   (0222)

Matthew Rihtar                                    August 3, 2017

Page 124

1          A.   So when you say, "Could there be a

2    process," there could be a process, but a process on

3    what?  There were millions of keywords.  And so from a

4    microperspective, it was one or two keywords,

5    potentially, out of millions.  It just didn't make

6    sense.

7          Q.   But from a business standpoint, you would

8    agree with me that if Bankrate wanted to, it could take

9    those keywords and review them and determine if those

10   keywords were registered trademarks or not?

11               MS. HYLAND:  Object to form.

12         A.   Again, I think it's just -- it wasn't that

13   big of a deal in the context of millions and millions

14   of keywords, upon then generating billions of

15   impressions, billions.

16         Q.   (BY MR. PEACOCK)  So you're saying that it

17   doesn't -- it's not that big of a deal when Bankrate

18   uses someone else's trademark?  Is that what you're

19   saying?  In the whole scheme of things, it's not that

20   big of a deal?

21         A.    I think what I've testified is that we

22   didn't feel there was anything wrong with it.  However,

23   there was a process to remedy or cure any notice we

24   received.  And I think this is one example of that,

25   this e-mail.

Matthew Rihtar                                    August 3, 2017

Page 125

1          Q.   And we have discussed that earlier in the
2    deposition.  But I find it astonishing that --
3                MS. HYLAND:  Objection.
4                MR. PEACOCK:  You don't know if I'm going
5    to ask a question yet.  I might be using colorful
6    language.
7          Q.   (BY MR. PEACOCK)  I find it astonishing
8    that Bankrate would be so careless and callous --
9                MS. HYLAND:  Objection.
10         Q.   (BY MR. PEACOCK)  -- in not reviewing
11   keywords that it uses.
12               MS. HYLAND:  Objection.  This is a
13   narrative.
14               MR. PEACOCK:  Hold on.  I've only -- it
15   might be a leading question, and I'm allowed to ask
16   leading questions.
17               MS. HYLAND:  Get to your question,
18   please.
19         Q.   (BY MR. PEACOCK)  Okay.  Well, why would
20   Bankrate be so callous and careless --
21               MS. HYLAND:  Objection to form.
22         Q.   (BY MR. PEACOCK)  -- with the use of
23   keywords that might be someone else's trademark?
24               MS. HYLAND:  Objection to form.
25         A.   I think it's pretty clear that's your

Matthew Rihtar                                        August 3, 2017

Page 126

1  characterization of it.  I'm not sure it converted that

2  much.  But like I said, millions and millions of

3  keywords.  One wasn't particularly more interesting

4  than another, if you see what I'm saying.  And there's

5  a lot of weeds and there's a lot the keywords and

6  there's a lot of things going on, but there's certainly

7  a process to fix it, should we be notified.

8           Q.   (BY MR. PEACOCK)  I understand there's a

9  process to fix it, but that process occurs after the

10 infringement has already occurred.  Wouldn't you agree?

11          MS. HYLAND:  Object to form.

12          Q.   (BY MR. PEACOCK)  Let me rephrase that. It

13 has occurred once the word -- or the mark has already

14 been used by Bankrate, correct?

15          A.   That's correct.  But one mark out of --

16 one keyword out of millions and millions and

17 millions --

18          Q.   Right.  And that's my point.

19          A.   -- of keywords, upon billions, that

20 generate billions of ad impressions.

21          Q.   Right.

22          A.   And as we testified earlier, from this

23 particular mark, the amount that was generated is so

24 minuscule, it's almost not worth talking about.

25          Q.   Bankrate -- and I'll get into this with

Matthew Rihtar                                    August 3, 2017

Page 127

1    the other witness that will be here a little bit later

2    on today to testify about the financials.  But

3    Bankrate's testimony today, and correct me if I'm

4    wrong, is that it doesn't matter that we use someone

5    else's trademark, as long as we correct it when it's

6    brought to our attention?

7         A.   I think the testimony was the position of

8    the company was we didn't feel -- the company did not

9    feel that there was anything wrong with bidding on a

10   trademark.  It was common -- a common industry

11   occurrence.  It happened all the time.  The -- all of

12   the search engines, each had platforms which

13   facilitated it.  And there was a clear process in place

14   that, should and when any notice be sent, it was

15   cleaned up.

16        Q.   And when a plaintiff, such as Neutron

17   Depot, then challenges Bankrate on Bankrate's actions,

18   Bankrate, then, would just pay a nominal settlement fee

19   to get them to go away.  Is that --

20             MS. HYLAND:  Objection, form.

21        Q.   (BY MR. PEACOCK)  -- is that how this is

22   done in the industry, where Bankrate uses everyone's

23   marks, and if the little guy, like plaintiff,

24   complains, Bankrate then says, "Okay.  We'll stop using

25   it.  And if they sue us, we'll pay them a small amount

Matthew Rihtar                                    August 3, 2017

                                                      Page 128

 1   to go away"?

 2            MS. HYLAND:  Object to form.

 3            Q.   (BY MR. PEACOCK)  Is that how Bankrate

 4   does business or did business --

 5            MS. HYLAND:  Object to form.

 6            Q.   (BY MR. PEACOCK) -- in this particular

 7   market, in the insurance market?

 8            MS. HYLAND:  Object to form.

 9            A.   I don't know if I have the knowledge of

10   that, honestly.  I don't think -- to my recollection, I

11   don't recall anyone challenging Bankrate.

12            Q.   (BY MR. PEACOCK)  So is this --

13            A.   It was simply a notice, "Hey, take it

14   down."  Take it down, end of story.

15            Q.   So is this the first trademark

16   infringement lawsuit that's ever been filed by anyone

17   against Bankrate?

18            A.   I can't speak to that.  I don't know that.

19            Q.   Have you ever testified before on behalf

20   of Bankrate in a trademark infringement case?

21            A.   I have not.

22            Q.   Have you ever testified for any -- on

23   behalf of any company in a trademark infringement

24   lawsuit?

25            A.   I have not.

Matthew Rihtar                                          August 3, 2017

Page 129

1        Q.   Some of the e-mail correspondence that
2   plaintiff received during this litigation -- I'll show
3   it to you here, if you would like for me to do so.  I
4   think it was -- it was either Mr. Prompun or
5   Mr. Metalnikov who mentioned that he would be okay if
6   someone from Bankrate called him.  And are you aware of
7   any phone calls that occurred between either
8   Mr. Metalnikov or Mr. Prompun and Bankrate?
9        A.   You mentioned a document.  Can we please
10  see that?
11       Q.   Sure.  I will show it to you.  I
12  highlighted it, so I know it's here somewhere.  Just
13  give me one second here.  Oh, here we go.  And I won't
14  mark this.  I'll just refer to it by its Bates number.
15  It's Bates No. 317173.
16            MS. HYLAND:  What exhibit number is this?
17            MR. PEACOCK:  Well, I didn't mark it as an
18  exhibit.  I'm just going to refer to it by its Bates
19  number.
20            MS. HYLAND:  Is there a reason it's not an
21  exhibit?
22            MR. PEACOCK:  I mean, I can make it an
23  exhibit, but -- there's a lot of documents in this
24  case, and I decided that instead of loading this case
25  up with huge amounts of exhibits, where the transcript,

Matthew Rihtar                                    August 3, 2017

```
                                            Page 130
 1   with all the attachments, would be huge, that I
 2   would -- on some of these documents I would just refer
 3   to them by Bates numbers.  If, on the other hand, you
 4   would like for me to use it -- make this an exhibit, I
 5   will.  But I would just ask that we agree that you pay
 6   for the transcript.  If you want all these exhibits,
 7   you pay for it.  We don't want to pay for it.
 8              MS. HYLAND:  I'll pay for my own copy of
 9   the transcript.  I'm not paying for your copy of the
10   transcript.
11              MR. PEACOCK:  Well, then, we'll just keep
12   it as is, then, unless --
13              MS. HYLAND:  I can't consent to that.  We
14   either need a clean record where we're making --
15              MR. PEACOCK:  I'm referring to them by
16   Bates numbers.  That's for the record.
17              MR. TRIMBLE:  We can enter our own
18   exhibits, if we like.
19              MR. PEACOCK:  Yeah.  If you want to enter
20   that as an exhibit -- well, I'm not sure you can do
21   that, because -- well, I don't know.
22              MS. HYLAND:  What exhibit number would we
23   be on if this was an exhibit?
24              MR. PEACOCK:  This would be No. 4.
25              MS. HYLAND:  Okay.
```

Matthew Rihtar                                    August 3, 2017

Page 131

1              MR. PEACOCK:  But if you -- there is no

2     rule that says I have to -- all the documents that I

3     show the witness have to be exhibits.

4              MS. HYLAND:  I'm not suggesting it's a

5     rule.  It's just much easier later to have the

6     documents that the witness is referring to included as

7     part of the deposition.

8              MR. PEACOCK:  I'm referring to it by Bates

9     numbers.  These are your Bates numbers.  These are

10    documents that you produced.  These are not our

11    documents; these are your documents.  So I don't know

12    why you would have any problem finding your own

13    documents that I reference by the Bates numbers that

14    you provided.

15             MS. HYLAND:  It's just highly unorthodox

16    and odd, but if that's how you want to do it --

17             MR. PEACOCK:  That's how I want to do it.

18    Thank you.

19             MR. TRIMBLE:  And along the same lines,

20    there is no rule preventing us from entering anything

21    into the record.

22             MR. PEACOCK:  I don't know if there is or

23    not.

24             MR. TRIMBLE:  There's definitely not.

25             MS. HYLAND:  There's definitely no rule

Matthew Rihtar                                        August 3, 2017

Page 132

1    that I can't enter this as my own exhibit in a minute.

2    But that's fine.

3                   MR. PEACOCK:  I'm not sure if there is or

4    not, but whatever.

5             Q.   (BY MR. PEACOCK)  So looking at Bates

6    No. 317173, do you see the e-mail correspondence

7    between Mr. Terry Fung and Mr. Sunti Prompun?

8             A.   Yes.

9             Q.   Okay.  If you look in the e-mail

10   correspondence at the last portion that is

11   underlined -- and I'll read it, and you can let me know

12   if I read it correctly -- it says, "Bankrate needs your

13   immediate assistance and cooperation in addressing this

14   matter - please let me know good times to have call in

15   the next day or two."  Did I read that correctly?

16            A.   You did.

17            Q.   Was there ever a call that happened

18   between Bankrate and Mr. Prompun?

19            A.   Where is the response by Mr. Prompun?

20   Because I do recall reviewing this document a couple of

21   days ago, and the response was, "I'm not first" --

22   something to the extent, "I'm not good with calls, so

23   don't call me."

24            Q.   That might have been Mr. Metalnikov,

25   because he also kind of made the same remark as well.

Matthew Rihtar                                    August 3, 2017

Page 133

1    I think it was him that said his English wasn't very

2    good.  But anyway, do you know if there was a call that

3    was ever placed?

4          A.    Do we have the response to this?  Is there

5    more documentation?

6          Q.    Here, I will give you -- if you want to go

7    off the record, I will let you look at -- these are all

8    the e-mails that were produced to us by Bankrate.  If

9    you want to look for a response, we can go off the

10   record and you can review these and determine if there

11   was a response.

12                MS. HYLAND:  Okay.  We can go off the

13   record.

14                (Discussion off the record.)

15                MR. PEACOCK:  We're back on the record.

16         Q.    (BY MR. PEACOCK)  You've had a chance to

17   review the documents, correct?  Is that correct?

18         A.    Yes.

19         Q.    Let me hand you this one.  And the

20   documents that you pointed out, which is the response

21   to the e-mail that I just read to you, where it talks

22   about a call, you've referenced Bates No. 317175 as

23   being the response to that particular e-mail, correct?

24         A.    Yeah.  It appears to be the response back,

25   right.

Matthew Rihtar                                    August 3, 2017

Page 134

1          Q.   So after reviewing -- well, because you
2    wanted to look at the response, so now I'll ask the
3    question again.  Was a call ever made between Bankrate
4    and Mr. Prompun?
5          A.   I don't know of any call, but I do see the
6    e-mail response.
7          Q.   And the response doesn't address a call,
8    does it?
9          A.   It does not, but it does clearly say the
10   trademark has been removed.
11         Q.   Is there a reason that Bankrate refers to
12   it as a trademark in its e-mails, but in litigation it
13   says that it's not a trademark, in Bankrate's answer to
14   the lawsuit?
15              MS. HYLAND:  Object to form.
16         Q.   (BY MR. PEACOCK)  Is there a reason why --
17   let me ask it this way -- well, strike that.  It's not
18   important.  I don't care.
19              I'm going to show you what is
20   Bates-numbered 317177 through 317178.  These are e-mail
21   correspondence that were provided to me by Bankrate's
22   counsel.  It's an e-mail between Mr. Terry Fung and
23   Mr. Sunti Prompun.  Do you see that?
24         A.   Yes.
25         Q.   Okay.  Mr. Fung, I think is the way you

Matthew Rihtar                                    August 3, 2017

Page 135

1    pronounce his name, toward the end of his e-mail, it's

2    the last -- well, last sentence of the first paragraph,

3    it says, "Can you please tell me what percentage of

4    traffic to your four sites came from the use of

5    keywords and/or the ads that had the infringing

6    'Insurance Depot' trademarks?"

7             Do you know if that ever happened?  Did he

8    ever tell Bankrate the percentage?

9        A.   I saw a document where one of the two

10   affiliates provided some data.  I don't know -- I can't

11   recall which one it was.

12       Q.   But as we sit here today, if you would

13   like, you can look through these e-mails, but -- and

14   I'll certainly take a break and let you do that, but

15   reviewing the documents that came from Bankrate, you

16   will agree with me that neither Mr. Metalnikov nor

17   Prompun were able to give Bankrate a specific answer,

18   correct?

19            MS. HYLAND:  Object to form.

20       A.   I think one of them came back with an

21   answer.  It was a very small, very tiny, very tiny use

22   of that particular instance.

23       Q.   (BY MR. PEACOCK)  Well, isn't it true,

24   though, that both affiliates told Bankrate in e-mail

25   correspondences that they couldn't provide an exact

Matthew Rihtar                                         August 3, 2017

Page 136

1    figure, all they could provide are guesses?  I guess we

2    could call it educated guesses; isn't that correct?

3            A.   Is there a document that we can reference?

4            Q.   Sure.  Well, it escapes me right now.

5    Would it be your testimony that any information --

6    well, is it your understanding -- let me put it that

7    way -- that Sunti Prompun provided exact data that he

8    obtained from, like, for example, Google Analytics, or

9    was it a rough estimation that he tallied and provided

10   to Bankrate?

11           A.   From what -- the document that I saw that

12   we don't have, he did go and look.  And it wasn't

13   necessarily exact numbers, but he had a pretty good

14   sense at the particular issue at hand, and it was a

15   pretty small number.

16           Q.   Okay.  Well, he says it was a small

17   number, but he didn't provide Bankrate any hard

18   evidence, except for his own educated guesses, correct?

19               MS. HYLAND:  Object to form.

20           A.   Can you please repeat that?

21           Q.   (BY MR. PEACOCK)  Sure.  He didn't provide

22   Bankrate any data that he obtained that would -- strike

23   that.

24               The only data that he provided to Bankrate

25   was data that he surmised was correct.  Am I right

Matthew Rihtar                                    August 3, 2017

Page 137

1   about that?

2            MS. HYLAND:  Object to form.

3        A.   I don't -- I don't know if I would agree.

4   I think he referenced his analytics, and he came up

5   with those numbers somehow.

6        Q.   (BY MR. PEACOCK)  I'll show you what is

7   labeled Bates Nos. 382616 through 382620.  It appears

8   that this is several e-mail correspondences between

9   Sunti Prompun and Bankrate.  You'll notice on the -- do

10  you see this document that I've shown you?

11       A.   I do see the document.

12       Q.   You'll notice the first e-mail that's on

13  the page 382616 states, "Hi Terry, From attached Bing

14  Ads report.  All ads impression equal 10249.  All

15  Clicks on Ads equal 291.  And my conversion on your

16  site is about 25 percent.  This means that from 2012 I

17  receive about 73 leads with total earnings $912.50" --

18  and he has in parentheses $12.50 per lead -- "Thanks,

19  Sunti."

20            You will agree with me that that's an

21  estimation, isn't it, because he says, ". . . my

22  conversion on your site is about 25 percent"?

23       A.   I think all click-on ads, the 291 is

24  pretty clear.

25       Q.   But we're talking about conversion.  I'm

Matthew Rihtar                                    August 3, 2017

 1   talking about conversion.  Isn't he taking -- does

 2   Bankrate have any evidence to show that the conversion

 3   rate that Sunti proposes here, which is 25 percent, is

 4   actually 25 percent?

 5          A.   I don't think there's any concrete data

 6   that suggests that.  I think that that 25 percent,

 7   having been in the industry, looks light.  I think

 8   that, again, when you're talking about all these

 9   different affiliates and all these different keywords

10   and the fact that we saw in a previous document they

11   removed the keyword within an hour or so, demonstrates

12   how sort of little people care about removing it.

13          Q.   Now, he references the Bing Ads report.

14   Aren't there other reports, too, like Google Analytics?

15          A.   There is a Google Analytics.

16          Q.   And doesn't that report on additional

17   impressions and clicks?

18          A.   I'm sorry.  Was that a question?

19          Q.   Right.  You have the Bing Ads report, then

20   you have another software program called Google

21   Analytics, correct?

22          A.   Correct.

23          Q.   He's only giving us information about Bing

24   Ads report, correct?

25          A.   Yes.

Matthew Rihtar                                    August 3, 2017

                                                      Page 139

1          Q.   He's not giving us information about what

2    Google Analytics would provide, correct?

3          A.   I don't see any Google Analytics, but we

4    don't know and we have no way of knowing if he ever

5    used Google.

6          Q.   Right.  So he could have?

7          A.   He could have.  He very well could not

8    have used Google.  So this could very well be it.

9          Q.   And it could very well be not it, correct?

10         A.   That is correct.

11         Q.   So this is just an estimation.  We don't

12   really know.

13         A.   We don't really know what?

14         Q.   We don't really know how many ad

15   impressions or clicks on ads that Mr. Prompun obtained

16   in using the mark "Insurance Depot," do we, in which

17   then produced a lead for Bankrate and made Bankrate

18   money?  We don't know that, do we?

19         A.   There is no way of tracking that.

20         Q.   Right -- well, there is a way of tracking

21   it.  You could use different programs like Google

22   Analytics -- isn't it true that he could have provided

23   all that information?

24              MS. HYLAND:  Object to form.

25         Q.   (BY MR. PEACOCK)  But he didn't, did he?

Matthew Rihtar                                      August 3, 2017

                                                      Page 140

 1            A.    Not from the documents that I've seen.

 2            Q.    Okay.  Let's go to Mr. Metalnikov.  I'm

 3    going to show you an e-mail correspondence between he

 4    and Bankrate, which is labeled 316171 through 3- -- I'm

 5    sorry.  Let me repeat that.  136171 through 136172.

 6    This looks like an e-mail between you and

 7    Mr. Metalnikov; is that correct?

 8            A.    That is correct.

 9            Q.    Two e-mails.  Now, if you look at the

10    second page, which is 136172, Mr. Metalnikov states to

11    you in an e-mail, "Hello Matt, I have problems speaking

12    English over phone, so it would be better to chat in

13    any instant messenger like icq or skype."  Do you see

14    that?

15            A.    Yes.

16            Q.    Did you and Mr. Metalnikov or anyone else

17    at Bankrate ever have any other communications with

18    Mr. Metalnikov, other than e-mails?

19            A.    No.

20            Q.    Now, if you flip to the first page, which

21    is 136171, you specifically ask Mr. Metalnikov for

22    documentation.  I'll read the sentence.  It says, "Can

23    you please provide any data on what volume of clicks

24    were sent to InsureMe that had 'Insurance Depot' in the

25    ad copy or the landing pages?"  Did I read that

Matthew Rihtar                                    August 3, 2017

                                                       Page 141

 1    correctly?

 2            A.    Yes.

 3            Q.    So we had this whole discussion about

 4    whether a landing page is an ad or not.  I think your

 5    e-mail to Mr. Metalnikov answers that.  I mean, you

 6    referred to it as the ad copy.  So -- but my question,

 7    though, refers --

 8            MS. HYLAND:  I'm going to have to object.

 9    You just made a statement and then --

10            MR. PEACOCK:  You can object, but you

11    don't get to coach.  You can object to form.

12            MS. HYLAND:  I'm objecting to form.

13            MR. PEACOCK:  Okay.  Sounds good.

14            A.    So I disagree with what you said.

15            Q.    (BY MR. PEACOCK)  Anyway, let's move on.

16            A.    Well, no, you didn't read that right.

17            Q.    Okay.

18            A.    Ad copy or landing page.  I didn't say --

19            Q.    What's the difference between the two?

20            A.    Ad copy would be in the search listing,

21    landing page is a landing page.

22            Q.    Right.  Well, you've already

23    established --

24            A.    I'm just -- you asked me if you read it

25    right, and the answer was no.

Matthew Rihtar                                    August 3, 2017

                                                        Page 142

1         Q.    So did Mr. Metalnikov provide you the data

2    which you had requested?

3         A.    Do we have a document of that?  Do you

4    have a document of that?

5         Q.    I'm asking you if he provided you that

6    data?

7         A.    I would need to have my memory refreshed,

8    if we have that data.

9         Q.    What documents do you need to refer to?

10        A.    Well, the e-mail.  What's the response?

11        Q.    Well, read the e-mail.

12        A.    Okay.  What's his response?

13        Q.    If you read 136172, look at the second to

14   last paragraph.  He says, "I don't have any documents

15   with that term."

16        A.    Let me read the response.  Sorry.

17        Q.    Did I read that correctly?

18        A.    Let me read it.

19             (Pause.)

20        A.    I think this shows a perfect example of

21   what we've been talking about, about how things in this

22   industry aren't tracked.  There's thousands upon

23   thousands upon thousands upon millions of keywords that

24   are used.  And the fact that it was removed very

25   quickly, goes to show no one really cares.

Matthew Rihtar                                      August 3, 2017

Page 143

1          Q.   No one cares if someone violates the law.

2     Go ahead.   Sorry.

3          A.   Don't put words in my mouth.

4          Q.   Go ahead.

5          A.   I find that to be offensive, for the

6     record.

7          Q.   Go ahead.   I object to your

8     non-responsive -- my question to you is:  Did I read

9     that right?

10          A.   You didn't allow me to finish.   Maybe I

11     would have answered your question.

12          Q.   It's either, did I read it wrong or did I

13     read it right?

14          A.   What did you read?

15          Q.   I read, "I don't have any documents with

16     that term."  Did I read that right?

17          A.   You read that right.

18          Q.   So Bankrate didn't receive any documents

19     that it had requested from Mr. Metalnikov, correct?

20          A.   Apparently not.

21          Q.   So not only do we not have any agreements

22     that Bankrate has with Mr. Metalnikov, we don't even

23     have the documents that Mr. Metalnikov supposedly had

24     about whether -- about the infringement of this mark,

25     correct?

Matthew Rihtar                                    August 3, 2017

Page 144

1              MS. HYLAND:   Objection, object to form.

2         A.   I believe we do have an agreement.  We do

3    have the agreement, which was provided to you.

4         Q.   (BY MR. PEACOCK)  What was provided to me?

5         A.   The agreement.  We do have the agreement.

6         Q.   You have the Metalnikov agreement?

7         A.   Yes.

8         Q.   Where is it?

9         A.   It was provided to you.  I don't know.

10   It's not my problem if you don't have it or read your

11   documentation.

12        Q.   You just got done telling me that you --

13   well, it's your testimony that you didn't have the

14   document and you didn't know what happened to it.  So

15   now you're changing your testimony?

16        A.   I am, because now we've -- I've discovered

17   the document -- we've discovered the document that I

18   did not --

19        Q.   You've discovered the document?

20        A.   -- that I did not recall.  And it's

21   perfectly acceptable to not recall things that happened

22   many, many years ago in an affiliate program where

23   there's hundreds upon hundreds of affiliates, and no

24   one knows what's going on, and systems are being

25   merged.

Matthew Rihtar                                    August 3, 2017

Page 145

1          Q.   Who was the agreement with between

2     Mr. Metalnikov and Bankrate?

3          A.   Like we said before, it was InsureMe; and

4     like I said before, it was an electronic agreement, so

5     there is not actually a physical signature on it.  But

6     it was the document that he would have --

7          Q.   So there is no signature on it?

8          A.   -- that he would have accepted to be --

9     I'm telling you the way the software worked, is that if

10    you didn't accept the agreement, you couldn't have been

11    an affiliate.

12         Q.   So he -- you're saying he agreed -- how

13    did he agree to this contract if he didn't sign it?

14         A.   Same way you agree to your Apple terms and

15    conditions.  You click "I Accept" on the screen.

16    You're not signing your phone, are you, when you update

17    your software?

18         Q.   So when you -- I guess you found this

19    information out during lunch.  Did you review the

20    document?

21         A.   I took a look at the document.

22         Q.   So you have the document here with you?

23         A.   We've seen the document, yes.

24         Q.   You have seen the document?  Under the

25    rules, if you review documents, I'm entitled to review

Matthew Rihtar                                    August 3, 2017

Page 146

1   them as well, under the rules.

2            A.   Apparently it was already sent to you, so

3   you should have seen it.

4            Q.   Right.  But under the rules, when a

5   witness comes to a deposition with documents, the

6   opposing attorney -- the attorney questioning the

7   witness has the right to review the documents.

8                 MS. HYLAND:  He didn't come with the

9   document.  We located it in the database of documents

10  that were produced to you, during lunch.  So if you

11  would like to see it --

12                MR. TRIMBLE:  Happy to give it to you.

13                MS. HYLAND:  -- we have a copy of it, but

14  he didn't come with it.  He didn't bring it.

15                MR. PEACOCK:  Well, I guess during one of

16  the breaks you and I can discuss that, and we can

17  figure out what we can do about that.

18                MS. HYLAND:  Do you want to take a break

19  now and look at the issue now, or do you want to come

20  back to it?

21                MR. PEACOCK:  We can take a break.  We'll

22  do that.  We'll go off the record.

23                (Discussion off the record.)

24                MR. PEACOCK:  Let's go back on the record,

25  and I'm going to mark that.

Matthew Rihtar                                    August 3, 2017

Page 147

1              (Deposition Exhibit 4 was marked.)

2         Q.   (BY MR. PEACOCK)  All right.  The alleged

3    agreement has just surfaced.  And it's been marked as

4    Exhibit 4.  I'd like for you to take a look at this and

5    tell me if you recognize this document.

6         A.   I do.

7         Q.   What is this document?

8         A.   This would have been a contract that

9    Bankrate would have used early on when the InsureMe

10   affiliate program was still going.  So prior to 2013 or

11   midway through '14, this would have been an electronic

12   agreement that affiliates, in order to become an

13   affiliate of InsureMe, would have had to accept.  At

14   the end, there would have been a button that said

15   "Accept" or something to that effect.  And that would

16   have been the electronic signature that would have been

17   stored in some database agreeing to these online terms

18   and conditions.  And that's how the InsureMe system

19   worked.

20        Q.   Does Bankrate have any documentation --

21   and if it's been produced to us, that's fine -- but

22   does Bankrate have any documentation that shows that

23   this agreement between Metalnikov and Bankrate was

24   accepted by Mr. Metalnikov and agreed to?

25        A.   You know, specific to this, I don't know

Matthew Rihtar                                    August 3, 2017

                                                      Page 148

 1    what still exists, because that -- the InsureMe

 2    platform was shut down sometime in, I think, 2013 or

 3    2014.  It may very well have been before this suit was

 4    brought, as a part of a business decision to merge

 5    systems.  But I know that prior to those times, we did

 6    have to go back and check electronic signatures and the

 7    database, and they were there.

 8            Q.   But as we sit here today, you have no

 9    knowledge that any document was produced to the

10    plaintiff that shows that Mr. Metalnikov accepted this

11    agreement?

12            A.   He would have had to have accepted.

13            Q.   I understand that he would have had to,

14    but my question relates to just documentation.  I

15    understand your position is that in order for him to be

16    an affiliate, he would have had to do it.  But my

17    question relates to documentation.  And if you know if

18    it's been produced, that's fine; if you don't know,

19    that's fine.  It's not a trick question.  Do you have

20    any knowledge of any documents that were produced to

21    the plaintiff that would show that this document was --

22    that this agreement was accepted and agreed to by

23    Mr. Metalnikov?

24            A.   Not specifically.  I can speak to the way

25    the system worked.

Matthew Rihtar                                         August 3, 2017

                                                              Page 149

 1          Q.   All right.  Did others in the program also
 2   sign agreements similar to this?
 3          A.   Every single one of them would have had to
 4   have, correct.
 5          Q.   I wanted to ask you -- I'll just show this
 6   to you real briefly.  I'm not going to spend a lot of
 7   time on this, because we have already been kind of
 8   covering it.  This is another e-mail correspondence
 9   between you and Mr. Metalnikov.  It's Bates-numbered
10   136173 through 136174.  You asked for documentation.
11   We've already looked where in one of his correspondence
12   he said he didn't have any.  But in this one -- I'll
13   read it, and you can tell me if I read it correctly.
14   The first sentence on 136173 says, "I don't keep any
15   statistics, sorry.  I can only give approximate
16   calculations."  Did I read that correctly?
17          A.   Correct.
18          Q.   There are some various correspondence that
19   go back and forth between you and Mr. Metalnikov.  And
20   then I'll show you this e-mail exchange between you and
21   he.  And it's document 136175 through 136177.  But on
22   13675, you state to Mr. Metalnikov, "Thanks for the
23   prompt response.  I think we should be OK now so long
24   as all 'Insurance depot' copy and keywords are
25   removed."  Did I read that correctly?

Matthew Rihtar                                          August 3, 2017

                                                        Page 150

    1          A.    You read it correctly.

    2          Q.    What did you mean by "we should be OK

    3    now"?  What did that mean, "we should be OK now"?

    4          A.    It looks to be an answer to his question

    5    down the chain, ". . . could you please answer a

    6    question:  should I start searching another insurance

    7    affiliate or you'll eventually unsuspend my stats?"

    8          Q.    So you were basically -- and correct me if

    9    I'm wrong, you were basically saying, our relationship

   10    is okay for now.  We'll continue to have a relationship

   11    with you, a business relationship; is that correct?

   12          A.    I think what I'm saying there is -- that's

   13    correct.  We wouldn't, at that point in time, terminate

   14    him.

   15          Q.    Did you eventually terminate

   16    Mr. Metalnikov?

   17          A.    I believe we did as part of a migration.

   18          Q.    Now, in the documentation from your

   19    lawyers, Bankrate has stated in interrogatories that

   20    Bankrate has -- no longer has any contact with

   21    Mr. Metalnikov or Mr. Prompun.  Is that true, all the

   22    way as of today as well?  I know they made that

   23    statement in previous documents that they sent to us.

   24    But to your knowledge, from that time going forward to

   25    today, is that still a correct statement?

Matthew Rihtar                                    August 3, 2017

Page 151

1           A.   I do not know.

2           Q.   So you don't know if Bankrate has

3    contacted Mr. Metalnikov or Mr. Prompun within the last

4    year?

5           A.   I don't -- I don't know, yeah.

6           Q.   All right.  One other question about

7    e-mails, and I think we'll be done.  I'm going to show

8    you what is an e-mail exchange.  And it's Bates-

9    numbered 136181 through 136813.  Looking on

10   page 136181, it's an e-mail from Mr. Metalnikov to you.

11   And in the second paragraph he says, "I don't use

12   google analytics for those websites.  I just look at

13   raw apache log files to check traffic amount."  What is

14   "raw apache log files"?  What is that?

15          A.   I'm not sure.  I don't really have a

16   technical background.

17          Q.   So -- okay.  So you don't know.  All

18   right.

19          A.   I mean, you could extrapolate from that

20   that he uses his own tracking and own database to

21   query.

22          Q.   I wanted to ask you about this e-mail

23   exchange.  It's not between any of the plaintiffs or

24   defendants in this case -- well, it is between

25   Bankrate, which is a defendant.  I'm going to show you

Matthew Rihtar                                    August 3, 2017

Page 152

1    an e-mail exchange.  It's Bates-numbered 304135 through

2    304137.  Looking on page 304135 in an e-mail that looks

3    like you wrote to -- I'm not sure who you wrote it to,

4    but it looks like someone else at Bankrate -- you say,

5    "Hi All, Please take a look at the attached

6    infringements from Geico and provide an update."  Do

7    you see where I'm reading that?

8            A.   I do.

9            Q.   "Remind your affiliates that incentivized

10   traffic is unacceptable and we will hold payment per

11   the agreement if we see it again."  Did I read that

12   correctly?

13           A.   Yes.

14           Q.   What is "incentivized traffic"?

15           A.   This is -- in the industry, it's known as

16   any type of marketing efforts in which something was

17   offered to take an action.  So by way of example, get

18   ten airline -- for airline miles if you -- if you sign

19   up for whatever product; or enter yourself for a chance

20   to win an iPad if you register your e-mail with us.

21   Those are examples.

22           Q.   Why would that be wrong?  Why do you

23   discourage affiliates from doing that?  What is wrong

24   with incentivized traffic?

25           A.   Typically -- and this is across not just

Matthew Rihtar                                    August 3, 2017

Page 153

1    insurance, across all these lead generation

2    verticals -- is that, typically, this traffic -- the

3    consumer doesn't have intent, necessarily, to purchase

4    your product or service.  So in this case, winning a

5    free iPad doesn't mean that they're going to buy

6    insurance.  They maybe just were doing it to win -- for

7    a chance to win a free iPad.  So the consumer intent is

8    not there.  So we try to -- well, we never allowed

9    incentivized traffic.

10        Q.    I'm still not clear.  If it results in a

11   lead for Bankrate, what's the problem if the consumer

12   gets a laptop out of it or gets some other -- it's --

13   if they get a gift, what -- I'm not --

14        A.    Because the concern is, and what the

15   company was trying to solve for, was we want policies

16   to be generated.  We don't want leads.  I mean, leads

17   are great, and that's the business we were in, but

18   policies have to be written from those leads.  Because

19   if policies aren't being written, then the carriers

20   aren't underwriting policies or making money.

21        Q.    So what I'm gathering from you is that

22   some of these consumers would not really be interested

23   in insurance.  They would be interested in the gift

24   they get, and they would generate a lead, but that lead

25   would probably be worthless to the policyholders (sic)?

Matthew Rihtar                                    August 3, 2017

Page 154

 1          A.    That's generally correct.

 2          Q.    Okay.  Further in this e-mail you

 3    mention -- well, the first sentence that we just read,

 4    you said, "Please take a look at the attached

 5    infringements from Geico and provide an update."  Do

 6    you remember what you were talking about when you said

 7    "attached infringements from Geico"?  Was Bankrate

 8    involved in an infringement lawsuit with GEICO?  Is

 9    that what you were referring to?

10          A.    No.  But let me read, first.

11          Q.    Sure.  Go ahead.

12          (Pause.)

13          A.    So in reading this -- and I don't

14    necessarily recall this specific e-mail -- but, in

15    general, with GEICO, who worked with us closely on

16    whatever issues, it looks like they had a list of -- in

17    the initial e-mail here on the second page, it says

18    that they had a list of reports -- ". . . represents a

19    marketing tactic that GEICO does not want . . ."  And

20    so I think they were notifying us, so that to the

21    extent any of our affiliates were on that list, we

22    would then reach out and notify them, in terms of -- I

23    think for the context of this was incentivized traffic.

24          Q.    So you're saying that GEICO didn't want

25    that occurring?  When I say "that," I'm talking about

Matthew Rihtar                                    August 3, 2017

                                                      Page 155

1    the incentivized traffic.

2           A.    Correct.

3           Q.    Okay.  Why did you use -- if you don't

4    recall, you don't recall.  But why did you use the word

5    "infringement"?  Because that's not the same -- and

6    correct me if I'm wrong, but that's not the same as

7    "incentivized traffic."

8           A.    I think what we're referring to is the

9    e-mail where some affiliates may be infringing on the

10   policy not to use incentivized traffic.

11          Q.    So infringing -- well, okay.  All right.

12   So there was no alleged infringement occurring of a

13   trademark.  You're talking about infringement of a

14   right from a contract?

15          A.    Right.  That appears to be the case, yes,

16   absolutely.

17                MR. PEACOCK:  Do you-all need to take a

18   break, or do you want to keep going?

19                MS. HYLAND:  I'm good.

20                MR. PEACOCK:  We're off the record for a

21   second.

22                (Discussion off the record.)

23                MR. PEACOCK:  We are back on the record.

24   We have a little bit more to go.

25          Q.    (BY MR. PEACOCK)  And the next area I want

Matthew Rihtar                                        August 3, 2017

```
                                                      Page 156
 1   to talk to you about -- well, before we get there, I
 2   wanted to go back.  When we had initially started this
 3   deposition, we talked about Bankrate a little bit, the
 4   policies and procedures, its customers, its clients.  I
 5   want to go back to that a little bit.  Is it fair to
 6   say that the consumer who fills out a form doesn't have
 7   to have any specialized training to do that, correct?
 8           A.   Correct.
 9           Q.   There's no sophistication that is required
10   for that, right?
11           A.   No.
12           Q.   Now, as you know, we're here in regard to
13   an infringement of the phrase "Insurance Depot."
14   Bankrate has alleged in this lawsuit that "Insurance
15   Depot" is not a valid trademark.  So I want to ask you
16   a little bit about that.  Why is "Insurance Depot" not
17   a valid trademark?
18           MS. HYLAND:  Object to form.
19           A.   I think -- I think the position of the
20   company is that it's general.  It doesn't mean
21   anything.
22           Q.   (BY MR. PEACOCK) Okay.  When you say it
23   doesn't mean anything, doesn't it convey something?
24           A.   It's a very general term.
25           Q.   Would you say the same thing about "Home
```

Matthew Rihtar                                    August 3, 2017

Page 157

1    Depot"?

2         A.   I think "Home Depot" -- the term "Home

3    Depot," as well, is very general.

4         Q.   So if I started an Internet business

5    selling things for the home, and I used "Home Depot,"

6    do you think Home Depot would have a problem with that?

7              MS. HYLAND:  Object to form.

8         Q.   (BY MR. PEACOCK)  The big retail store

9    that everyone knows, which is Home Depot.  That's what

10   I'm talking about.

11        A.   Uh-huh.

12        Q.   Do you think they'd have a problem with

13   that?

14        A.   I don't know.

15        Q.   So is "Home Depot" -- is that a

16   generalized, vague term as well, that carries no

17   trademark value?

18             MS. HYLAND:  Object to form.

19        A.   I think -- I think it's a very -- if you

20   look at the two words, "Home" and "Depot," those are

21   very general, sort of non-descriptive terms.  I think

22   you could argue that Home Depot has spent billions of

23   dollars investing in the brand.  And it's a

24   household -- I would say it's a household name.

25   Frankly, I've never heard of the term "Insurance

Matthew Rihtar                                    August 3, 2017

Page 158

1    Depot," and I've been in the space.

2          Q.   (BY MR. PEACOCK)  So your analysis, then,

3    depends on how much in advertising is spent, correct?

4          A.    I think that was one example of what I

5    said.

6          Q.    So if -- in this case, we have documents

7    that we have produced to Bankrate that shows that

8    millions have been spent advertising this mark.  Does

9    that change your mind at all now, whether it's a valid

10   trademark or not?

11              MS. HYLAND:  Object to form.

12         A.    Personally, I don't have an opinion, one

13   way or another, personally.

14         Q.   (BY MR. PEACOCK)  I'm not asking you for

15   your personal opinion.  You're here to speak on behalf

16   of Bankrate.

17         A.    Okay.

18         Q.    So does the value that is spent, in terms

19   of money to promote a trademark, change your mind?

20   Because your testimony just a moment ago, you seemed to

21   suggest that Home Depot is valid, because lots of money

22   has been spent by Home Depot.

23         A.    Home Depot is a household name.

24         Q.    And how did it become a household name?

25              MS. HYLAND:  Object to form.

Matthew Rihtar                                    August 3, 2017

Page 159

1          Q.    (BY MR. PEACOCK)  How did it become a

2     household name?

3                MS. HYLAND:  Object to form.

4          A.    Because millions and millions and millions

5     and millions and millions of people use Home Depot.

6          Q.    (BY MR. PEACOCK)  And how did all those

7     millions of people learn about Home Depot --

8                MS. HYLAND:  Object to form.

9          Q.    (BY MR. PEACOCK)  -- to use and to go to

10    their stores?

11               MS. HYLAND:  Object to form.

12         A.    Well, Home Depot built a lot of stores.

13         Q.    (BY MR. PEACOCK)  And didn't they do a lot

14    of advertising, correct?

15         A.    I don't know the advertising.  I don't

16    know the advertising of Home Depot.  I know they built

17    a lot of stores, and people have homes.

18         Q.    Well, you just testified they spent

19    billions -- I think your exact words were billions and

20    billions advertising.

21               MS. HYLAND:  Object to form.

22         A.    Okay.  Well, we can strike that.

23         Q.    (BY MR. PEACOCK)  I'm not sure witnesses

24    can strike their own testimony, but . . .

25         A.    Well, I recant.  Look, I don't know the

Matthew Rihtar                                    August 3, 2017

Page 160

1    exact number, but I know that -- you asked me the

2    question.  They built a lot of stores, and people have

3    houses that they need to go and buy products at Home

4    Depot.  And it's become a household brand.

5              Q.   You mentioned, also, that you suggested

6    that it wasn't a valid trademark because the word

7    "Insurance" -- you mentioned it had a connotation one

8    way, and then you looked at the word "Depot."  Is

9    Bankrate suggesting that it is not valid by looking at

10   the two words separately?  Is that what you're trying

11   to suggest?

12             MS. HYLAND:  Object to form.

13             A.   I think that the entire thing is very --

14   is very general.

15             Q.   (BY MR. PEACOCK)  The entire thing.  What

16   do you mean by "the entire thing"?

17             A.   "Insurance Depot:

18             Q.   The phrase "Insurance Depot"?

19             A.   Correct.

20             Q.   You think it's general?

21             A.   Correct.  And there are many, many

22   businesses from a list that I sort of cherry-picked and

23   went through randomly -- not cherry-picked, but

24   randomly -- there's many businesses with the name

25   "Insurance Depot" in it.

Matthew Rihtar                                  August 3, 2017

                                                     Page 161

 1          Q.   Bankrate also alleges that it's

 2   descriptive.  Why is "Insurance Depot" descriptive?

 3               MS. HYLAND:  Object to form.

 4          A.   Why is it descriptive?

 5          Q.   (BY MR. PEACOCK)  Bankrate alleges that

 6   "Insurance Depot" is descriptive.  Why is it

 7   descriptive?

 8          A.   It describes a, one could argue, like a

 9   facility -- a depot, a warehouse -- of insurance.

10   You're describing an insurance warehouse.

11          Q.   Just like "Home Depot."  Same kind of

12   thing, right?

13          A.   Go and get your insurance in a box.  Pick

14   it off the shelf.

15          Q.   Bankrate argues that no confusion has been

16   created.  Are you aware of any confusion that was

17   created by the use of "Insurance Depot," by Bankrate,

18   versus the plaintiff in this lawsuit, any actual

19   confusion?

20               MS. HYLAND:  Object to form.

21          A.   No.

22          Q.   (BY MR. PEACOCK)  Bankrate alleges that

23   the mark is not famous.  Why does Bankrate believe the

24   mark is not famous?

25               MS. HYLAND:  Object to form.

Matthew Rihtar                                    August 3, 2017

                                                      Page 162

 1          A.   I don't think anyone, outside of maybe

 2    your client, has really ever heard of that trademark.

 3          Q.   (BY MR. PEACOCK)  So that's your reason

 4    that it's not famous, because no one has heard of it?

 5    Is that your answer?

 6          A.   No one has heard of it.

 7          Q.   And where -- how do you make that

 8    statement?  Have you talked to everyone?  How do you

 9    know that no one has heard it?

10          A.   I think having been in the space for

11    awhile and certainly when this originally came up, you

12    know, you sort of talk to colleagues that have been in

13    the space for a while, no one knows it.  No one has

14    heard of it.  And having been out there, we're in the

15    space.  We have domain knowledge of what's going on in

16    the insurance space.

17               And it's not a name that anybody had ever

18    heard of.  It's not somebody we had done business with.

19    It just happened to be some -- two words that showed up

20    on a keyword list of 2 million, or whatever the number

21    was.  And we were never notified until this thing --

22    until you notified us.  And here we are.

23          Q.   What is your understanding of a trademark?

24               MS. HYLAND:  Object to form.

25          A.   It's a word or phrase that describes a

Matthew Rihtar                                    August 3, 2017

                                                    Page 163

1    company or a product.

2         Q.   (BY MR. PEACOCK)  Bankrate asserts an

3    affirmative defense that the plaintiff's claims are

4    barred because Bankrate did not endorse, approve, or

5    otherwise control the ads and website at issue.  But

6    that's not a correct statement, right?

7              MS. HYLAND:  Object to form.

8         A.   I think -- I don't know if I agree with

9    that.  I think for the majority of the ads that we

10   walked through earlier today, those were affiliate ads.

11   And those were entities that Bankrate had no control

12   over.  They were their own businesses.  They did what

13   they want.  They operated independently.  They were one

14   of the examples of -- the two affiliates we've been

15   talking about were one -- or, sorry, two of hundreds of

16   affiliates that no one really cared about.  Because in

17   the whole universe of Bankrate and the ecosystem, from

18   a macroperspective, there was billions of impressions,

19   millions of clicks, millions of leads.  And so in the

20   whole ecosystem of two affiliates, no one really cared.

21        Q.   (BY MR. PEACOCK)  Kind of a shocking

22   statement, if you think about it.

23             MS. HYLAND:  Objection.

24        Q.   (BY MR. PEACOCK)  No one really cared.

25        A.   Well, we cared about the business, but we

Matthew Rihtar                                      August 3, 2017

Page 164

1    had hundreds of affiliates.  And these were two that

2    were not even in the United States.  These were two

3    that, to my knowledge, we never had phone calls with.

4    These were two that had never shown up on e-mails,

5    outside of your notice, as a result of your notice and

6    us reaching out, which they quickly took the ads down.

7    We had no reason to reach out to them.  There was no

8    problems.  And I'm not saying that -- we cared about

9    the business.  We didn't care with every individual

10   affiliate.

11        Q.   Do you care about other companies'

12   trademark rights?

13             MS. HYLAND:  Object to form.

14        A.   Sure, we do.  And I think it's evident

15   that when it's brought to our attention, when it's

16   brought to Bankrate's attention, there was a quick

17   remedy in place, procedure in place, to have that

18   removed.  And proof of this is the e-mail; very quick

19   responses.

20        Q.   (BY MR. PEACOCK)  But if no cease and

21   desist letter was ever sent, I guess --

22        A.   Absolutely.

23        Q.   -- Bankrate would continue using

24   "Insurance Depot"?

25        A.   Absolutely not.  There have been instances

Matthew Rihtar                                    August 3, 2017

                                                        Page 165

1    in the past -- and I don't recall specifics -- but, in

2    general, we would receive e-mails from companies

3    saying, "Hey, just by the way, we happened to be,

4    whatever, searching.  We found this.  Can you please

5    remove it?"

6               "Absolutely."

7               The process was the same.  The process was

8    the same.

9         Q.    I have -- let's see here.  We're going to

10   go through this page by page.  No.  That's a joke.  I

11   do have a lot of this to go through, and I'm going to

12   try to do this very quickly.  I'm not going to spend

13   lots of time on this, because this could take a long

14   time.  But I do have some questions for you about this.

15   And I'm not going to offer this as an exhibit, because

16   it's probably close to 500 pages.  It's -- for the

17   record, it's the search report that was provided to the

18   plaintiff by the defense counsel.  And it's

19   Bates-numbered 381226 through 381662.

20        A.    This was produced by?

21        Q.    Bankrate, to the plaintiff's attorney, to

22   us, the plaintiff's attorney.  And I'm going to go

23   through some of this really quickly.  The questions I

24   have for you -- and I'm going to move through this very

25   quickly.  And if you need clarification, we can stop,

Matthew Rihtar                                    August 3, 2017

Page 166

1    and I'll certainly clarify.  But what -- the question I

2    have for you, since you're here representing Bankrate

3    and your answers are being imputed to Bankrate, is,

4    while this is a report, I'd like to know if Bankrate

5    has done any -- if Bankrate has any knowledge that

6    these marks are being used in commerce, as we sit here

7    today.

8              So I'm going to go through these very

9    quickly.  And some of -- a lot of these I'm not going

10   to go through, because they don't -- well, I want to

11   explain my process, but I'm going to focus on the

12   marks, the alleged marks, that Bankrate, in this search

13   report, says that -- what this report says.  So that's

14   what I'm going to do.  So I'm going to try to do this

15   quickly.

16            A.    May I offer --

17            Q.    Sure.  Go ahead.

18            A.    I have reviewed the document.

19            Q.    You have?

20            A.    I have.  I haven't reviewed all 500 pages,

21   but I have gone through a handful of the marks and the

22   companies.  And I went out and researched, clicked on

23   them, Googled them, and a good portion of them do

24   exist.  They do have web pages.

25            Q.    Okay.  Well, that's where I'm going.

Matthew Rihtar                                    August 3, 2017

Page 167

 1          A.   But I can't remember which ones they are,

 2    off of memory; but I know that just random sampling,

 3    that appears to be a valid search report.

 4          Q.   Well, we're going to go through this one

 5    at a time.  Now, like I said, this is, like, almost

 6    500 pages.  Some of this has to do with domain names,

 7    some of it has to do with common-law -- supposed

 8    common-law marks, some of this I won't need to go

 9    through.  So don't think that I'm going to go through

10    every single page, but a lot of pages we will go

11    through.  And I'm going to try to do it fast.

12               And if you'd like, I can provide the

13    question to you, and then I can say, "Same question as

14    to this alleged mark on Bates No. whatever."  That way

15    I don't have to repeat the same question to you over

16    and over.  If you want me to repeat the question to you

17    over and over, I certainly will do that, but I think it

18    would save time if I could just say, "Same question as

19    to" --

20          A.   That's fine.

21          Q.   -- "this."

22               MR. PEACOCK:  Go ahead.

23               MR. TRIMBLE:  I have a potential

24    suggestion to expedite this process, so your voice

25    doesn't wear out and we don't fall asleep hearing all

Matthew Rihtar                                     August 3, 2017

Page 168

1    that.  If you -- I mean, you could state the question.

2    And it seems like it's tabbed, so it seems like you

3    know where you're going.  If so, you could just say the

4    question, and then just tell him the pages, and just

5    let him flip through and answer as to each.

6              MR. PEACOCK:  Well, that's -- and I

7    appreciate the suggestion.  I just have a few tabs, but

8    they're not in the way that I'm going to ask the

9    questions.  I think my tabs separate the common law,

10   the state, the domain, and the business names.  So it's

11   a way for me just to figure out where -- it's not the

12   pages I'm going to be specifically going to.

13             MR. TRIMBLE:  Okay.

14        Q.   (BY MR. PEACOCK)  All right.  And you

15   mentioned that you have done some independent research.

16   So if we get to an alleged mark where you have done

17   alleged research, you can answer the question

18   accordingly.

19        A.   Okay.

20        Q.   Fair?

21        A.   Fair.

22        Q.   On 381243, Bates number, the applicant,

23   Seguros Insurance Depot, do you have any knowledge, as

24   we sit here today, that that company has used the mark

25   "Insurance Depot" in U.S. commerce?

Matthew Rihtar                                    August 3, 2017

                                                      Page 169

 1          A.   No.

 2          Q.   Page 381244, applicant is the Insurance

 3   Depot of South Florida.  The mark is "Insurance Depot."

 4   As we sit here today --

 5               MS. HYLAND:  If I may, Matt took some

 6   notes about his search of these.  I mean, he hasn't

 7   committed all this to memory.  But if he's allowed to

 8   refresh his recollection with his notes, I think it

 9   would be extremely helpful, for purposes of letting you

10   know which ones he's confirmed.

11               MR. PEACOCK:  Sure.  I don't have a

12   problem with that.  I just would ask that we be allowed

13   to -- I'd be allowed to review it.

14               MS. HYLAND:  Yeah, sure, that's fine.

15               MR. PEACOCK:  Did you want to go off the

16   record and review your notes?

17               THE DEPONENT:  Sure.

18               MR. PEACOCK:  Okay.  Let's go off the

19   record for a second.

20               (Discussion off the record.)

21               (Recess taken, 3:44 p.m. to 4:19 p.m.)

22               MR. PEACOCK:  We are back on the record

23   now.

24          Q.   (BY MR. PEACOCK)  As you know, we started

25   to go through this search report, we went off the

Matthew Rihtar                                      August 3, 2017

                                                      Page 170

1    record and counsel and everyone discussed it, and we

2    believe there's a better way to go forward on this.

3    And so I think we've all reached an agreement.  So I'll

4    go forward with what we talked about.  Just for

5    purposes of refreshing everyone's memory, the research

6    report I'm talking about is Bates-labeled 381226

7    through 381662.

8              (Deposition Exhibit 5 was marked.)

9         Q.   I'm going to show you what has been marked

10   Exhibit 5.  And I'd ask that you look at that and tell

11   me if you know what that document is.

12        A.   I do.

13        Q.   What is that document?

14        A.   This is a -- well, it's a cover page of

15   the Complaint (sic), but it's got notes on it that I

16   took down referencing the search report of companies

17   that I did independent research on that do exist.

18        Q.   Okay.  And that search report that you're

19   referring to is the search report that I just read

20   out -- with those two Bates numbers that I just read

21   out moments ago?

22        A.   Correct.

23        Q.   Okay.  Now -- so with that in mind, except

24   for there's one, two, three, four, five, six -- except

25   for the six entries that we have listed on Exhibit --

Matthew Rihtar                                    August 3, 2017

                                                      Page 171

1    is it Exhibit 5? -- Bankrate has no independent

2    knowledge that any mark that is listed in this search

3    report has ever been used in commerce, in

4    U.S. commerce; is that correct?

5            A.    Correct.

6            Q.    Now, let's go to the list in Exhibit 5.

7    On Exhibit 5, the first one is shown as page 185.  And

8    that's the page of the search report, but it also has a

9    Bates number.  And when I get there, I'll read the

10   Bates-numbered page.  The Bates-numbered page 4, the

11   entry 185 is on 381410.  Do you have that document in

12   front of you?

13           A.    Yes.

14           Q.    Okay.  Now, that document shows a business

15   name, Insurance Depot, correct?

16           A.    Correct.

17           Q.    And it has an address listed as

18   405 Del Prado Boulevard North, #100, Cape Coral,

19   Florida; is that correct?

20           A.    Correct.

21           Q.    Okay.  You've mentioned that you did some

22   independent research to verify that this company is

23   using this mark in commerce.  What did you do?

24           A.    I went out to the Internet, Google, typed

25   in this particular address and this business name, and

ABC COURT REPORTERS                    214.303.0ABC   (0222)

Matthew Rihtar                                    August 3, 2017

                                              Page 172

 1   a website popped up.  And I clicked on it, and it was a

 2   live website with this -- I believe the title of the

 3   website was this -- the trade style name.

 4         Q.   Did you see Insurance Depot anywhere on

 5   the website?

 6         A.   I don't recall, but I think I did.

 7         Q.   All right.  Did you -- what were they

 8   selling?  Were they selling goods or services?

 9         A.   To the best of my recollection, it was

10   just -- without going to the page -- briefly, it seemed

11   to be insurance services.

12         Q.   Did it list an e-mail or a phone number on

13   that website for web users to contact the company?

14         A.   I believe there was a phone number on the

15   page.

16         Q.   And did you attempt to call that number?

17         A.   I did not.

18         Q.   Did not.  Did you attempt to e-mail or in

19   any other way reach out to that company to see if it

20   was actually still doing business?

21         A.   I did not.  The web page was live, and

22   there was contact information.  It was content and

23   service, yup.

24         Q.   Let's move on to page -- on Exhibit 5, the

25   second entry, which is page 186.  And on the research

Matthew Rihtar                                    August 3, 2017

                                                      Page 173

1    report that's Bates No. 381411.  Are you there on that

2    document?

3              A.    Yes.

4              Q.    Okay.  And it's showing business name,

5    Insurance Depot.  And it lists an address:  17 Lambert

6    Drive, Sparta, New Jersey.  Did I read that right?

7              A.    Yes.

8              Q.    What did you do to verify that this

9    particular business was operating?

10             A.    So the answers for all of these will be

11   the same.  But we went out, Googled it -- Googled the

12   address, the business name.  There was a web page that

13   existed, clicked on the web page, and it was a valid

14   web page.

15             Q.    And again, you did not contact the company

16   at all, correct, to see if it was offering any goods or

17   services, correct?

18             A.    Correct.

19             Q.    Did you see Insurance Depot anywhere on

20   the website?

21             A.    Again, I don't recall, but I think that

22   there was.

23             Q.    Where on the website do you recall that

24   the "Insurance Depot" mark was displayed?

25                   MS. HYLAND:  Object to form.

Matthew Rihtar                                    August 3, 2017

Page 174

1          A.    One of them -- I can't recall if it's this

2    specific example.  One of them had it prominently on

3    the home page.

4          Q.    (BY MR. PEACOCK)  But you don't know if it

5    was this one?

6          A.    I don't know if it's this specific one.

7    It was one of the six.

8          Q.    And even though the website was up and you

9    saw the website was functioning and operable, as we sit

10   here today, you don't have any independent knowledge as

11   to whether goods or services are being sold by that

12   company, correct?

13         A.    That would be correct.

14         Q.    Let's go on to the next entry, which is

15   page 188, which is, on the search report, Bates

16   No. 381413.  Do you have that document in front of you?

17         A.    Yes.

18         Q.    Similar types of questions in regards to

19   this one.  The search report says, "Business Name:

20   Insurance Depot."  And it provides an address of

21   8729 Central Avenue NE, Minneapolis, Minnesota.  Did I

22   read that correctly?

23         A.    Yes.

24         Q.    Same kind of question as before.  What did

25   you do to verify that this company was operating?

Matthew Rihtar                                August 3, 2017

Page 175

1          A.    The same.

2          Q.    Same.  Okay.  So you went to the website,

3    and you saw the website was functioning?

4          A.    Correct.

5          Q.    Did you contact the company at all?

6          A.    I did not.

7          Q.    And did you see the phrase "Insurance

8    Depot" anywhere on the website?

9          A.    I don't recall.

10          Q.    And as we sit here today, you don't know

11    if that company at that time -- now, or at that time,

12    was offering any goods or services in U.S. commerce

13    under the mark "Insurance Depot"?

14          A.    Correct.

15          Q.    Let's go on to the next one, which is

16    page 189 on Exhibit 5, which -- the search report Bates

17    No. is 381414.  Do you have that document in front of

18    you?

19          A.    Yes.

20          Q.    Same type of thing.  I'll read it.  It

21    says, "Business Name:  Insurance Depot."  Address is

22    4540 Barharbor Drive, Lake in the Hills, Illinois.  Did

23    I read that correctly?

24          A.    Yes.

25          Q.    Okay.  And I take it that you did the same

Matthew Rihtar                                      August 3, 2017

Page 176

1    thing.  You went to their website, and it looked like

2    it was functioning.  It was a functioning website?

3              A.    Correct.

4              Q.    Did you reach out to that company at all?

5              A.    I did not.

6              Q.    So you don't know if they were offering

7    any goods or services in U.S. commerce?

8              A.    I don't.

9              Q.    And again, same question:  Did you see the

10   "Insurance Depot" phrase anywhere on the website?

11             A.    I don't recall.

12             Q.    Going to the next entry, 191; which is, in

13   the search report, Bates No. 31416.  I'll read the top

14   portion there of the document.  It says, "Business

15   Name:  Insurance Depot."  The address is 949 North Main

16   Street, Beaver Dam, Kentucky.  Did I read that right?

17             A.    Yes.

18             Q.    Same type of thing.  I guess you went to

19   the website and you saw it was a functioning website,

20   correct?

21             A.    Correct.

22             Q.    Did you reach out to the company at all to

23   see if it was selling goods and services?

24             A.    I did not.

25             Q.    Did you see the "Insurance Depot" phrase

Matthew Rihtar                                    August 3, 2017

                                                        Page 177

 1    anywhere on the website?

 2             A.   I don't recall.

 3             Q.   And then the last one is 140, but it's my

 4    understanding that -- well, let me ask you.  This last

 5    entry is -- it shows 140.  Is that the correct page

 6    number?

 7             A.   Well, it's at the top of page 140, listed

 8    there.  But apparently it also has a page, a dedicated

 9    page, on page 143.  So it's listed on both pages.

10             Q.   So let's go to page 143, which is Bates

11    No. 381368 in the search report.  And I will -- well,

12    there's -- do you have that document in front of you?

13             A.   Yes.

14             Q.   There are -- apparently on that document

15    are two entries -- two reports of two allegedly

16    different companies.  Which one are you referring to?

17             A.   The one at the top, "A Insurance Depot of

18    Louisiana, LLC."

19             Q.   Okay.  And it shows -- the document shows

20    that the registrant is Bryan Financial Holding Group,

21    LLC, having an address at 2115 Edenborn Avenue -- I

22    guess that's how you say it -- Metairie, Louisiana

23    70001.  Did I read that right?

24             A.   Yes.

25             Q.   Same questions as before.  You went to

Matthew Rihtar                                    August 3, 2017

Page 178

1   their -- how did you find their website?

2          A.   I simply typed in that -- the business

3   name into Google, and they were the first listing that

4   popped up.

5          Q.   And so you went to their website, and you

6   verified that it is a functioning website, correct?

7          A.   Correct.

8          Q.   Did you reach out to the company at all to

9   see if they are offering their goods and services to

10  the public in U.S. commerce?

11         A.   I did not.

12         Q.   Do you remember if you saw Insurance

13  Depot -- the "Insurance Depot" phrase anywhere on the

14  website?

15         A.   I believe the title of the home page is "A

16  Insurance Depot of Louisiana, LLC."

17         Q.   So in this -- for this particular one, you

18  did see --

19         A.   I believe, if memory serves, I believe

20  that sticks in my mind.

21              MS. HYLAND:  Did we get it clear on the

22  record what exhibit number the record -- the Bates

23  numbers will become?

24              MR. PEACOCK:  Very good point, Counsel.

25  We've agreed -- and feel free to chime in, Counsel --

ABC COURT REPORTERS                      214.303.0ABC   (0222)

Matthew Rihtar                                    August 3, 2017

Page 179

1    we've agreed that at some point after the deposition we

2    will attach exhibits of the pages that I just

3    referenced, which are pages 185, 186, 188, 189, 191,

4    and 143.  And those --

5                    MR. TRIMBLE:  And 140.

6                    MR. PEACOCK:  Okay.  And 140.  Well, let's

7    go over 140, then, if we're going to attach that as an

8    exhibit.

9            A.    Okay.

10           Q.    (BY MR. PEACOCK)  I'm looking at page 140,

11   which is Bates No. 381365.  Do you have that document

12   in front of you?

13           A.    Yes.

14           Q.    It appears that this is a summary of

15   alleged trademark usage by different companies.  Listed

16   on here, which ones did you verify that you claim that

17   they are using the mark in commerce?

18           A.    The very first one on the list titled "A

19   Insurance Depot of Louisiana, LLC."

20           Q.    And we talked about that one just now, so

21   I don't think we need to go over that again.  But the

22   others, you did not?

23           A.    Correct.

24           Q.    So going back to our discussion, 185 will

25   be Exhibit 6.  186 will be Exhibit 7 --

Matthew Rihtar                                    August 3, 2017

Page 180

1           THE REPORTER:  I think he made it a

2    collective exhibit.

3           MR. TRIMBLE:  Yeah.  I have it, literally,

4    one PDF.  It's the cover sheet of that and then each

5    page you just mentioned successively.  That's how I

6    could scroll through it like that, just one PDF.

7           MR. PEACOCK:  So one PDF will be

8    Exhibit 6, and that will contain these (indicating)

9    pages?

10          MR. TRIMBLE:  Yes.

11          MR. PEACOCK:  These that are listed on

12   Exhibit 5, plus 140?

13          MR. TRIMBLE:  Yes -- 143.

14          MR. PEACOCK:  Well, you're right, 143.

15   That is correct.  And 140.  Let's see.  I think that's

16   about it.  I pass the witness at this time.

17          MS. HYLAND:  Great.  You think you're

18   done.  You're not quite done yet.  Can we go off the

19   record for just a second?

20          (Discussion off the record.)

21                   EXAMINATION

22   BY MS. HYLAND:

23          Q.  All right.  Matt, just a few things I want

24   to go back to that were discussed earlier today.  The

25   first one is the Trouve contract with Mr. Prompun,

Matthew Rihtar                                    August 3, 2017

Page 181

1    which was Exhibit 3 --

2            A.    It's 2.

3            Q.    Oh, it's Exhibit 2.

4            A.    Insertion Order.

5            Q.    And just for the record, what was the date

6    on this agreement, again?

7            A.    It was signed -- it looks like final

8    execution was February 1 of 2010.

9            Q.    So going back to that period of time, what

10   types of ads or marketing activities would an affiliate

11   have been engaged in for Trouve?

12           A.    Generally, at that time, going back to

13   2010, typically, the only marketing affiliates would do

14   for Trouve were banner ads or e-mail campaigns.

15           Q.    So what's a banner ad?

16           A.    A banner ad is a piece of what we call

17   creative.  It's a little box that you can put on a

18   website or you can put in an article and put somewhere

19   online that is sort of like an advertisement to get

20   people to click and then from there goes to a landing

21   page.

22           Q.    And then you said the other type of

23   marketing an affiliate would do would be e-mail?

24           A.    E-mail.

25           Q.    And what type of e-mail marketing would

Matthew Rihtar                                    August 3, 2017

                                                    Page 182

 1   affiliates engage in?

 2        A.    Typically, e-mail with affiliates at that

 3   point in time was they would either have their own

 4   e-mail lists or they would buy e-mail lists, which was

 5   common practice.  And they would have an e-mail

 6   creative that was typically sent to them by the -- by

 7   the company.  They wouldn't, generally, create it

 8   themselves.  And then they would then send that out to

 9   those e-mail lists.

10        Q.    And did -- so these were the two prevalent

11   marketing activities of affiliates in 2010.  Obviously,

12   today, we've been talking about ads, and we've been

13   talking about organic websites, and we've been talking

14   about landing pages.  How is it that affiliates went

15   from those types of marketing efforts over to the types

16   of marketing efforts you've talked about today?

17        A.    You know, I think as technology certainly

18   progressed from 2010 to 2013, '14, and then beyond,

19   that was one component of it; as well as it was just

20   sort of standard industry practice that affiliates --

21   all they really knew and all they could really afford

22   was these other marketing pieces, these banner ads and

23   e-mails, and not paid search.

24        Q.    So when you talk about the technology

25   change, can you be a little more specific in terms of

Matthew Rihtar                                    August 3, 2017

Page 183

1    what type of technology became available that wasn't

2    available in 2010?

3            A.    I think it's the progression of -- and I

4    don't know -- we say "technology," I say "domain

5    knowledge and technology."  Affiliates didn't

6    have any -- really, outside of the norm for an

7    affiliate, to know much about paid search or really

8    delve into that realm.

9            Q.    So when Trouve hired Mr. Prompun in 2010,

10   was Trouve hiring him to do paid search, or was Trouve

11   hiring him to do banner ads and e-mails?

12           A.    It would very likely have been that it was

13   banner ads and e-mails.  And I think you even can see

14   in some of the references in this contract about

15   Trouve approving different pieces.  Those would have

16   been approving the banner ad and approving e-mail

17   content.

18           Q.    So looking at this Exhibit 2, do you see

19   anything here that helps confirm for you that this

20   agreement contemplated e-mails and banner ads, as

21   opposed to paid search?

22               MR. PEACOCK:  Objection, form.

23           A.    If you look at the definition, which is

24   Section 8 of the contract, they define -- the contract

25   defines advertisement as "any written or graphically

Matthew Rihtar                                    August 3, 2017

Page 184

1    rendered marketing materials provided for in an

2    Inversion Order (including but not limited to banners,

3    text or graphic links, pop-ups, emails and newsletters

4    or any other similarly designated advertising format)."

5    So I think the contract spells out what we're talking

6    about here.

7         Q.    (BY MS. HYLAND)  Did Bankrate or any of

8    its companies which it acquired ever provide content

9    for affiliates for paid search?

10        A.    Never.

11              MR. PEACOCK:  Objection, form.

12        A.    Never.

13        Q.    (BY MS. HYLAND)  Did Bankrate or any of

14   the entities it acquired, did they ever approve paid

15   search before it launched?  Let me rephrase that.

16   Affiliate-created paid search -- did Bankrate approve

17   affiliate-created paid search before it went online?

18        A.    No.

19        Q.    You and Mr. Peacock talked earlier about

20   Bankrate's process for handling complaints by third

21   parties that trademarks were being used in a way that

22   that third party found improper.  And you testified, I

23   believe, that there was a take-down policy in place; is

24   that right?

25        A.    That's correct.

Matthew Rihtar                                  August 3, 2017

Page 185

1          Q.   Can you explain why Bankrate had that kind
2     of policy, had a take-down policy?
3          A.   I think the reason that we had the policy
4     is because it was a business decision of the company
5     that it wasn't worth any type of back-and-forth.  It
6     wasn't worth any type of fight over a -- over a term or
7     keyword.  And not one -- any particular keyword was
8     overly important to the company, in terms of business
9     or traffic or revenue, that it mattered.  And so we
10    would always work with that particular notice-sender to
11    quickly remove it.
12         Q.   Did Bankrate ever believe that those uses
13    of trademarks were trademark infringement per se?
14              MR. PEACOCK:  Objection, form.
15         A.   No.  I think, as I testified before, the
16    company didn't feel that bidding on trademarks -- that
17    there was anything wrong with that.
18         Q.   (BY MS. HYLAND)  So the decision to take
19    them down wasn't a trademark infringement-related
20    decision, but it was a business decision.  Is that
21    fair?
22              MR. PEACOCK:  Objection, form.
23         A.   It was a business decision.
24         Q.   (BY MS. HYLAND)  Did Bankrate ever sell
25    car insurance?

Matthew Rihtar                                    August 3, 2017

Page 186

1          A.    Can you be more specific?

2          Q.    Did Bankrate ever write policies for car

3     insurance or act as an insurance broker for car

4     insurance?

5          A.    No.

6          Q.    Let me go back to Exhibit C, which was

7     never -- it was not an exhibit to the deposition.  It

8     was just this big document that he gave you.

9          A.    Oh, okay.  Here we go.

10         Q.    I'd like to go ahead and mark your copy as

11    Exhibit 7 to the deposition.

12              (Deposition Exhibit 7 was marked.)

13         Q.    So this was Exhibit C to the operative

14    Complaint.  And you walked through this earlier with

15    Mr. Peacock and went through all this content with him.

16    And one of the things that he asked you about on a lot

17    of these was whether the search results or whether the

18    ads linked to a certain page or where they went if you

19    were to have clicked on the ad.  Do you remember those

20    questions?

21         A.    Yes.

22         Q.    Did Bankrate maintain that type of data?

23              MR. PEACOCK:  Objection, form.

24         A.    No.  I think, in general, at specific --

25    specific to who created what ad, who created the

Matthew Rihtar                                    August 3, 2017

 1    content of the ad, where did the ad link, and what did

 2    the page -- the landing page say that the ad linked to,

 3    there was never any records of that type of thing kept.

 4    It was a lot of pages and a lot of ads being created,

 5    and that level of granularity was never kept.

 6            Q.    (BY MS. HYLAND)  So to look at a

 7    particular ad on a screenshot that was taken in 2014

 8    and to ask, if you had clicked on that ad, where would

 9    it have taken you, and who drafted the ad, and what did

10    the landing page look like when you got there, your

11    testimony is that data isn't something that was

12    routinely maintained by Bankrate; is that correct?

13            A.    That's correct.

14            Q.    Why wasn't it maintained by Bankrate?

15            A.    You know, I think there was -- that level

16    of granularity -- and just speaking in general terms --

17    with the amount of keywords, with the amount of ads,

18    with the amount of pages, and throughout the different

19    acquisitions as well, over time bringing things

20    together, that level of granularity of who did what

21    specifically on this date, created what ad that links

22    to what specific page, that level was never -- that

23    level of data granularity was never kept.

24            Q.    I would like to introduce this spreadsheet

25    as Exhibit 8.

Matthew Rihtar                                        August 3, 2017

Page 188

1                  (Deposition Exhibit 8 was marked.)

2          Q.    Do you recognize this spreadsheet?

3          A.    I do recognize the spreadsheet.

4          Q.    And this was Bates-numbered 382335?

5          A.    Correct.

6          Q.    I want to focus your attention on the top

7    of the first page here, where it says, "Name, Manager

8    account report; Type, Account performance report."  And

9    then it has the date range as July 1st of 2000 to

10   December 31st of 2014.  And then in Row 7, Columns F

11   and G and H and I and J are what I'd like to have you

12   just walk me through it.  Just tell me what this report

13   is, and tell me what the significance of those pieces

14   of data would be.

15                 MR. PEACOCK:  Objection, form.

16         A.    So this is a report, as you stated, dates

17   July 1, 2000 through December 31, 2014, where it looks

18   to be all of the Bankrate insurance division

19   owned-and-operated paid search accounts; listed by

20   year, as we go through the pages.  As you point out,

21   Row 7, walking you through it, the clicks, it looks

22   like a summary of all of these years.  You know, in

23   line -- so A, 7, is "Total," total clicks that are a

24   result of these ads, campaigns; "Impressions"; "Click

25   Through Rate"; "Conversions"; and "Conversion Rate."

Matthew Rihtar                                      August 3, 2017

Page 189

1          Q.   (BY MS. HYLAND)  Okay.  So is this

2    company-wide data for all of Bankrate?

3          A.    It is not.  It is for -- it is for -- if

4    you look at the client name, these are all only

5    insurance paid search.

6          Q.    When you say "only insurance paid search,"

7    you mean this is the entire insurance division?

8          A.    Insurance division, but not Bankrate.

9          Q.    But not Bankrate.  Okay.  Does this

10   include affiliates?

11         A.    This does not appear to include

12   affiliates, no.

13         Q.    So is it fair, then, to say that this

14   spreadsheet provides data across the entire insurance

15   division for clicks and impressions for all paid search

16   for that date range?

17         A.    That is correct.

18         Q.    Is this just Google?

19              MR. PEACOCK:  Objection, form.

20         A.    I believe this is all search engines, if I

21   recall correctly.

22         Q.   (BY MS. HYLAND)  So on "Impressions," when

23   this says -- I think it's always helpful if we have

24   commas -- is that 11 billion impressions?

25         A.    Yeah, I would say it's 11 billion.

Matthew Rihtar                                    August 3, 2017

Page 190

1          Q.    And then what is an impression?

2          A.    It is -- an impression is any time the

3    search engine generates the page off of a search.  So

4    if we search for car insurance, the page that loads is

5    an impression.

6          Q.    So is an impression an opportunity for

7    eyeballs to have seen it?

8          A.    That is correct.

9          Q.    And then a conversion -- we've got

10   7.5 million conversions.  What's the difference between

11   the impression and the conversion?

12         A.    A conversion is, basically, a lead.  So

13   it's a consumer that had seen the ad, clicked on the

14   ad, went through the form, clicked "Submit" on the form

15   and generated a lead.  That is the same -- that is a

16   conversion.

17         Q.    Okay.  So is it fair to say, then, that

18   there were 7.5 million leads generated internally by

19   Bankrate over that 14-year period?

20         A.    That is correct.

21         Q.    I'd like to enter this spreadsheet as

22   Exhibit 9.

23              (Deposition Exhibit 9 was marked.)

24         Q.    Do you recognize this spreadsheet?

25         A.    I do.

Matthew Rihtar                                            August 3, 2017

Page 191

1          Q.    Do you recognize it?

2          A.    Yes.

3          Q.    What is this spreadsheet?

4          A.    This is a spreadsheet with the same date

5    range as the report that we looked at before, July 1,

6    2000 through December 31, 2014, with all of the -- with

7    all of the different ad -- Bankrate ads that had the --

8    or campaigns with the term "Depot Auto Insurance."

9          Q.    So going back to what we just marked as

10   Exhibit 7 -- yeah, Exhibit 7 -- on page 12 of

11   Exhibit 7, the page -- at the top up here (indicating).

12         A.    Okay.

13         Q.    Is this bracketed ad an ad from the

14   campaign that you're -- that's referred to here in

15   Exhibit 9?

16               MR. PEACOCK:  Objection, form.

17         A.    Yes.

18               MR. PEACOCK:  What do you mean?  What

19   campaign are you talking about?

20               MS. HYLAND:  Well, he just testified that

21   Exhibit 9 is about the Depot Auto Insurance campaign.

22   If you have questions, you'll have an opportunity to

23   follow up.

24               MR. PEACOCK:  I understand.  I

25   understand.

Matthew Rihtar                                August 3, 2017

Page 192

```
 1          Q.   (BY MS. HYLAND)  Since, obviously, there's
 2   some confusion, what is a campaign?
 3          A.   A campaign is basically a -- a dedicated
 4   marketing effort to a specific keyword or product or
 5   something.
 6               MR. PEACOCK:  So, Counsel, I'm going to
 7   make an objection for the record.  It's my
 8   understanding under the rules that when you take a
 9   witness on direct like this, after I've asked my
10   questions, I believe you have to tailor your questions
11   to the topics that I addressed.  None of this has to do
12   with anything that I addressed today.
13               Plus, I think we're over the seven-hour
14   deposition time limit.  I mean, I don't mind if we
15   continue on a little bit longer; but, I mean, none of
16   this has to do with any of my questioning today.
17               MS. HYLAND:  Well, you asked the witness
18   about this ad on page 12, and this is the data on that
19   ad.
20               MR. PEACOCK:  Well, first off --
21               MS. HYLAND:  Am I not allowed to ask
22   him --
23               MR. PEACOCK:  First off, this had nothing
24   to do -- Exhibit 8 had nothing to do with my
25   questioning today.  I mean, if you want to ask him
```

Matthew Rihtar                                          August 3, 2017

                                                        Page 193

 1   about Exhibit C --

 2              MS. HYLAND:  I'm attempting to put your --

 3              MR. PEACOCK:  -- that is fine.  You can do

 4   so.  But, you know, number one, in regard --

 5              MS. HYLAND:  Aaron, you asked questions

 6   that I'm putting into context for the record.

 7              MR. PEACOCK:  In regard to the seven-hour

 8   deposition limit that we have under the federal rules,

 9   I don't mind going a little bit longer, because I want

10   you to get some of your questions in, too, but we have

11   to be mindful of the rules.

12              MS. HYLAND:  Well, the rules -- first of

13   all, the rules is seven hours of testimony.  We have

14   seven total hours, including lunch and breaks, at this

15   point.  So we're not possibly at seven hours.

16              Second of all, we are in control of

17   waiving that, I think, if we want to.  I don't think

18   you're bound by that, but even if --

19              MR. PEACOCK:  Waiving what?

20              MS. HYLAND:  He's our witness.  The time

21   limit is there to protect him.

22              MR. PEACOCK:  Well, if we have to argue

23   that to the judge, we have to argue that to the judge.

24   All I'm saying is -- I mean, we've been here since

25   9 o'clock.  It's now after 5:00.  And mind you, we did

Matthew Rihtar                                    August 3, 2017

Page 194

1    take some breaks.  The only break -- for the record,

2    the only break that I took was a one-hour lunch break.

3    I've been here sitting at this table the whole

4    afternoon.  We did take breaks, but that was at the

5    behest of the defendant.  And that's fine, and I agreed

6    to it.  But I would like to move on.

7             MS. HYLAND:  Aaron, Aaron --

8             MR. PEACOCK:  I'm -- you know, go ahead.

9             MS. HYLAND:  We'll get through this a

10   whole lot faster if --

11            MR. PEACOCK:  I'm saying, go ahead, but I

12   just want -- let's move on.  I mean, we're asking

13   questions that had nothing to do with my questioning.

14            MS. HYLAND:  It has everything to do with

15   your questioning.

16            MR. PEACOCK:  Okay.  Go ahead.

17            MS. HYLAND:  And I'm specifically now

18   putting the very question you asked into context.

19            MR. PEACOCK:  Go right ahead, then.

20            MS. HYLAND:  So you stopped me right in

21   the middle of talking about your exhibit to your

22   questions.

23            MR. PEACOCK:  Have at it.

24        Q.   (BY MS. HYLAND)  So before that, Matt, I

25   think you had just explained what a campaign is, and

Matthew Rihtar                                    August 3, 2017

Page 195

1    that Exhibit -- I think we marked this as Exhibit 9 --

2    refers to the campaign relating to the Depot Auto

3    Insurance that is reflected on page 12 of Exhibit 7; is

4    that correct?

5         A.    That is correct.

6         Q.    So when we're talking about -- and I

7    believe you identified this particular ad, earlier

8    today, as being an ad that was created by Bankrate; is

9    that correct?

10        A.    That is correct.

11        Q.    So this data in Exhibit 9 is the data on

12   that particular ad; is that correct?

13        A.    That is correct.

14        Q.    So on page 3 of this spreadsheet, at the

15   top there are numbers reflecting impressions and clicks

16   and costs and all that sort of thing.  Do you see that?

17        A.    I do.

18        Q.    Can you very briefly just walk through the

19   bolded data there and explain what that means within

20   the context of this particular ad?

21             MR. PEACOCK:  Objection, form.

22        A.    So that would be the total of this

23   campaign, which was the Depot Auto Insurance.  And from

24   this campaign, through the date range we talked about,

25   July 1, 2000 through December 31, 2014, there were

Matthew Rihtar                                        August 3, 2017

Page 196

1    67,000 impressions.  From that, there were 446 total

2    clicks on an ad.  The cost of those clicks was $1264.

3    And out of that, there were 73 conversions, which are

4    leads.

5              Q.   (BY MS. HYLAND)  Okay.  Going back to

6    Exhibit 7, let's look at page 19 of Exhibit 7.  I

7    believe your testimony earlier was that this is a page

8    that was created by Bankrate at some point; is that

9    correct?

10             A.   That's correct.

11             Q.   In reading this page, how would you

12   characterize the content of this page?  What is it

13   about?

14             MR. PEACOCK:  Objection, form.

15             A.   As I testified earlier, it's very generic.

16   It is -- it repeats itself.  It's clearly some sort of

17   a boilerplate.

18             Q.   (BY MS. HYLAND)  Well, let's look, for

19   example, at the second section here.  It says, "When

20   you are researching health insurance it is important to

21   identify the coverage you need and the budget.  Health

22   insurance depot provides web-based insurance to its

23   clients."  Does that make any real sense in light of

24   the initial paragraph that was talking about car

25   insurance?

Matthew Rihtar                                    August 3, 2017

 1              MR. PEACOCK:  Objection, form.

 2         A.   The first paragraph does talk about

 3    coverage -- insurance coverage for your vehicle.  There

 4    is a testimonial talking about auto insurance savings.

 5    And then there's a whole bunch of other different types

 6    of insurance:  "American, health, all."

 7         Q.   (BY MS. HYLAND)  So in the aggregate, does

 8    this page make sense?  Is it logical?

 9              MR. PEACOCK:  Objection, form.

10         A.   I don't -- you know, I don't think it

11    makes a lot of sense.  It seems to be very, very

12    generic.

13         Q.   (BY MS. HYLAND)  Why would there be a page

14    like this that doesn't make sense?  Why would Bankrate

15    have drafted a page that doesn't make sense?

16         A.    You know, I think that goes back to we

17    didn't -- this level of who created what page and what

18    content was generated and why, those types of things

19    generally weren't -- well, they weren't kept.  It would

20    have been for some sort of -- you know, for the purpose

21    of lead gen.

22         Q.   By "lead gen," you mean lead generation?

23         A.   Lead generation.

24         Q.   What is dynamic keyword insertion?

25         A.   Dynamic keyword insertion is a term

Matthew Rihtar                                    August 3, 2017

Page 198

1    primarily used in search engines, where the keyword

2    that a consumer searches on may be automatically

3    inserted into the headline of the ad in the listing.

4         Q.    And does the search engine company decide

5    to do that?  Like, how does that happen?

6              MR. PEACOCK:  Objection, form.

7         A.    The ad campaign can be set up so that --

8    so that it could trigger a dynamic keyword insertion.

9    So if that trigger is set up, anything searched very

10   well could automatically be inserted into the

11   advertisement.

12        Q.    (BY MS. HYLAND)  And is that a trigger

13   that's, like, a box you check with Google?

14        A.    It is a -- effectively, you put brackets

15   into the ad.

16        Q.    So do those brackets essentially create,

17   like, a fill in the blank?

18             MR. PEACOCK:  Objection, form.

19        A.    Correct.

20        Q.    (BY MS. HYLAND)  So we looked at quite a

21   few instances of the use of the term "Insurance Depot"

22   on Exhibit C, which is now Exhibit 7.  Was it possible

23   that the term "Insurance Depot" was used in some or all

24   of those ads because the creator of the ad might have

25   set up dynamic keyword insertion and somebody may

Matthew Rihtar                                    August 3, 2017

Page 199

1    have -- the consumer may have searched for "Insurance

2    Depot"?

3              A.   That is a very likely possibility.  And,

4    you know, in fact, I think on Exhibit 9 you can see

5    that some of these ads did have dynamic keyword

6    insertion.

7              Q.   Can you tell me what page?

8              A.   Yes.  On page --

9              Q.   Use the bottom-right Bates numbers.

10             A.   It's 382332.

11             Q.   And just tell me, again, what you were

12   referring to.

13             A.   So if you look at lines 127 through 138,

14   Column C, you can see the bracket, and you can see the

15   word "keyword."  That's dynamic keyword insertion.  So

16   the keyword searched would likely be input where that

17   term "keyword" is right now in this ad.

18             Q.   And what happens with this particular

19   campaign?  Did it get stopped in some way?

20             A.   So if you reference Column B in this

21   report, all of these -- all of these ads, every single

22   one of them, was removed or stopped.

23             Q.   What is broad matching?

24             A.   Broad matching is a search engine term,

25   again, where a -- where the search engine will -- where

ABC COURT REPORTERS                    214.303.0ABC    (0222)

Matthew Rihtar                                    August 3, 2017

Page 200

1    the search engine will display advertisements, but not

2    exactly as the consumer searched.  So by way of

3    example, if the consumer searched for low-carb diet,

4    ads that display maybe are Atkins or the like; or

5    really low-carb diet or other things that are not

6    exactly as the consumer searched, so it's broad, it

7    maybe brings in one or two of the keywords, but not

8    all.

9          Q.   And who makes the decision as to whether

10   broad matching is utilized?

11         A.   Broad matching, again, is set up when the

12   campaign is set up.

13              MR. PEACOCK:  Counsel, again, I'm going to

14   renew my objection.  None of this is stuff that I

15   covered.

16              MS. HYLAND:  If you give me one more

17   question, you'll see where I'm going.

18         Q.   (BY MS. HYLAND)  You talked about negative

19   matches with Mr. Peacock, earlier, in terms of asking

20   the affiliates to negative match certain terms.  Do you

21   remember that?

22         A.   Correct, yes.

23         Q.   Is negative matching necessary to prevent

24   certain keywords from showing up in dynamic keyword

25   insertion or broad matching?

Matthew Rihtar                                    August 3, 2017

Page 201

1           A.    Negative -- by negative matching a keyword

2     in your campaign, you are ensuring that keyword will

3     never display.

4           Q.    Right.  So when we were looking at the

5     bracketed portions on page -- well, it's on 382332 of

6     Exhibit 9, if someone had said, "Let's negative match

7     for "Insurance Depot" on those bracketed terms," would

8     that have meant that the term "Insurance Depot" would

9     never show up in those ads?

10          A.    That's correct.  An ad would have never

11    shown up.

12          Q.    We're on Exhibit 10.  I'd like to

13    introduce the expert report of Peter Kent as

14    Exhibit 10.

15                (Deposition Exhibit 10 was marked.)

16                MS. HYLAND:  I'd like to designate this as

17    attorneys' eyes only, and his testimony about it.

18                (Proceedings continued on page 202,

19    confidential excerpt.)

20

21

22

23

24

25

Matthew Rihtar                                        August 3, 2017

Page 202

1                    (Confidential excerpt follows, continued

2         from page 201, line 19.)

3              Q.    (BY MS. HYLAND)  Can you turn to pages 16

4         and 17 of Exhibit 10.

5              A.    Yes.

6              Q.    Do you recognize these pages?

7              A.    I do.

8              Q.    So on page 17, on paragraphs 47 and 48, do

9         you see that there are descriptions of listings?

10             A.    Yes.

11             Q.    Did you review the listings in the

12        Complaint and make an independent attempt to confirm

13        that these characterizations are accurate?

14                   MR. PEACOCK:  Counsel, excuse me.  What

15        page are you on?

16                   MS. HYLAND:  17.

17                   MR. PEACOCK:  17.  And this is Peter

18        Kent's expert report?

19                   MS. HYLAND:  Yes.

20                   MR. PEACOCK:  Thank you.

21             A.    I'm sorry.  Can you ask that again?

22                   (BY MS. HYLAND)  Yeah, sure.  There are

23        characterizations in paragraphs 47 and 48 that describe

24        what each of the references are, in terms of whether

25        they're an organic listing or whether they're an ad and

Matthew Rihtar                                    August 3, 2017

Page 203

1   who placed them.  And I'm asking you if you have

2   independently taken a look at these and made your own

3   conclusion that these characterizations are accurate?

4              MR. PEACOCK:  Objection, form.

5        A.   Yes.

6              MR. PEACOCK:  He's not a witness.  I mean,

7   he's not an expert witness.  But go ahead.

8              MS. HYLAND:  Well, he testified to this,

9   similarly, as part of Exhibit C.  So I'm just saying

10  this is a good summary of --

11             MR. PEACOCK:  I mean, if you want to ask

12  Mr. Peter Kent these questions about whether he

13  verified what's in his own report, that's fine.

14             MS. HYLAND:  He, obviously, did verify it.

15             MR. PEACOCK:  I'm not sure what your

16  30(b)(6) witness -- why he needs to verify what's in

17  the expert report.  Go ahead.  I mean, I'm going to

18  make the objection, but --

19             MS. HYLAND:  He's not verifying any

20  opinions.  He's just verifying the fact that the items

21  complained about in the Complaint are either organic

22  listings or ads and that they were placed by Sunti or

23  Maxim.

24             MR. PEACOCK:  I object, but go ahead.

25        A.   Yes.  The classifications of the ads look

Matthew Rihtar                                    August 3, 2017

Page 204

1    to be right.

2         Q.   (BY MS. HYLAND)  And based on these

3    classifications, is there any evidence that Sunti

4    Prompun engaged in any Google ads containing the term

5    "Insurance Depot"?

6              MR. PEACOCK:  Objection, form.

7         A.   No.

8         Q.   (BY MS. HYLAND)  Does it look, according

9    to your research and what's there, that Mr. Prompun

10   ever did Yahoo ads containing the term "Insurance

11   Depot"?

12             MR. PEACOCK:  Objection, form.  Same

13   objection I asserted a moment ago as well.

14        A.   No.

15             (End confidential excerpt.  Proceedings

16   continued on page 205.)

17

18

19

20

21

22

23

24

25

Matthew Rihtar                                        August 3, 2017

Page 205

1                    (Proceedings continued from page 204,

2      line 16.)

3                    MS. HYLAND:  This is going to be very

4      quick.  I'd like to introduce 0302002 as Exhibit 11,

5      and the pages after it.

6                    (Deposition Exhibit 11 was marked.)

7                    MS. HYLAND:  I'd like to introduce 0317175

8      to -176 as Exhibit 12.

9                    (Deposition Exhibit 12 was marked.)

10                   MS. HYLAND:  And we're not on attorneys'

11     eyes only anymore.  Okay.

12                   THE REPORTER:  Right; just anything

13     related to Exhibit 10.

14                   MS. HYLAND:  I'd like to introduce 317177

15     to -178 as Exhibit 13.

16                   (Deposition Exhibit 13 was marked.)

17                    MS. HYLAND:  Let's introduce 382616 to

18     382620 as Exhibit 14.

19                   (Deposition Exhibit 14 was marked.)

20                    MS. HYLAND:  Let's introduce 136171 to

21     136172 as Exhibit 15.

22                   (Deposition Exhibit 15 was marked.)

23                   MR. PEACOCK:  Are you going to be asking

24     questions about these exhibits?

25                   MS. HYLAND:  No.  I'm just going to have

Matthew Rihtar                                        August 3, 2017

 1    them as part of the record.

 2            MR. PEACOCK:  Counsel, are these documents

 3    that I questioned the witness about?

 4            MS. HYLAND:  Yes.

 5            MR. PEACOCK:  You know, if you want to pay

 6    for all these, that's fine.

 7            MR. TRIMBLE:  We're going to pay for ours.

 8    We have the right to enter any exhibit we'd like.

 9            MR. PEACOCK:  Counsel, can I finish,

10    please?  I didn't finish my remark.

11            MR. TRIMBLE:  Sure.

12            MR. PEACOCK:  You can remark as soon as I

13    get done.  As you know, 400,000 pages of documents were

14    served to plaintiff.  There are a lot of documents

15    here.  The search report itself is nearly 500 pages.

16            MS. HYLAND:  I'm not going to introduce

17    the search report.

18            MR. PEACOCK:  Okay.  The search report

19    itself is nearly 500 pages.

20            MS. HYLAND:  I appreciate that.

21            MR. PEACOCK:  If you -- plaintiff is

22    taking this deposition.  Plaintiff should be allowed to

23    conduct this deposition as I did.  What you're doing

24    now is you have no desire to ask him any questions

25    about these exhibits that you introduced.  You're just

Matthew Rihtar                                    August 3, 2017

Page 207

1    introducing them, because you just want to.

2              MS. HYLAND:  I'd like a complete record.

3              MR. PEACOCK:  And I provided the Bates

4    numbers.  I do -- I want it, for the record, that I do

5    not appreciate that I am the one taking this

6    deposition, and you're now going to clutter up the

7    transcript with --

8              MS. HYLAND:  It's on the record.  You've

9    made your objection very clear.

10             MR. PEACOCK:  Let me finish.  You're going

11   to clutter up -- or I shouldn't say clutter up -- but

12   you're going to create a lot of documents here which do

13   not need to be created.

14             MS. HYLAND:  This is the entire stack,

15   Aaron.  It's 1/16th of an inch.  It's probably

16   20 pages.

17             MR. PEACOCK:  Well, my -- I'm just -- for

18   the record, I object, because I should be allowed to

19   conduct this deposition as I see fit.

20             MS. HYLAND:  This is, like, $4 worth of

21   paper, Aaron.

22             MR. PEACOCK:  Well, all I'm doing is

23   stating it for the record.  If you disagree with me,

24   that's fine, but I wanted it stated for the record.

25             MS. HYLAND:  If you would like the $10, or

Matthew Rihtar                                    August 3, 2017

Page 208

1   whatever this is, I will give it to you in cash --

2              MR. PEACOCK:  Sounds good.

3              MS. HYLAND:  -- when we're done here --

4              MR. PEACOCK:  That's good.

5              MS. HYLAND:  -- to cover it.  Okay?

6              MR. PEACOCK:  Sounds great.  We have an

7   agreement.

8              (Pause.)

9              MS. HYLAND:  Thank you.  Let the record

10  reflect that I'm giving him $20 to cover this.

11             MR. PEACOCK:  Come on, Amanda, I don't

12  need $20.  Take your $20 back.  I mean, come on.  This

13  is getting ridiculous.

14             MS. HYLAND:  Well, either it's expensive

15  for you to pay for these pages or it's not.

16             MR. PEACOCK:  Amanda, for the record, we

17  have a witness here who has just gone on the record a

18  little while ago and says he doesn't -- Bankrate does

19  not care about the fact that they infringe; that once

20  they get notice --

21             MS. HYLAND:  That's not what he said.

22             MR. PEACOCK:  Let me finish.

23             MS. HYLAND:  That's not at all what he

24  said.

25             MR. PEACOCK:  Let me finish.

Matthew Rihtar                                    August 3, 2017

Page 209

1            MS. HYLAND:  You're completely

2    mischaracterizing his testimony.

3            MR. PEACOCK:  No.  You're throwing money

4    at me.  Let me --

5            MS. HYLAND:  You told me just a minute ago

6    you would accept it.

7            MR. PEACOCK:  You're throwing money at me,

8    which I think is unprofessional in a deposition like

9    this.

10            MR. TRIMBLE:  Aaron, you just said --

11            MS. HYLAND:  You just said that would

12    resolve the problem.

13            MR. PEACOCK:  Well, you and I can have a

14    discussion about that off the record.  But to throw

15    money at me like this in a deposition is --

16            MS. HYLAND:  Would you prefer a check

17    after the deposition?

18            MR. PEACOCK:  Come on, Amanda.  This is

19    unprofessional, and you know it.

20            MR. TRIMBLE:  Aaron, she offered it --

21            MS. HYLAND:  It is unprofessional for you

22    to sit here and tell me that you will not put the

23    documents you asked the witness about in the record.

24            MR. PEACOCK:  I have a right to conduct my

25    deposition as I see fit.

Matthew Rihtar                                    August 3, 2017

```
                                           Page 210
 1                MR. TRIMBLE:  And we get the right to do
 2    redirect as we see fit.
 3                MR. PEACOCK:  No, you do not.  You have to
 4    do it according to the rules.
 5                MR. TRIMBLE:  Okay.  Show me the rule.
 6                MS. HYLAND:  Show me what rule you're
 7    referring to that says I cannot introduce these
 8    exhibits.
 9                MR. PEACOCK:  I do not have my rule
10    book.
11                MR. TRIMBLE:  Okay.  Then your objection
12    is entered into the record.
13                MR. PEACOCK:  Are you going to --
14                MR. TRIMBLE:  No.  Your objection is
15    entered into the record.
16                MR. PEACOCK:  Are you going to say it's
17    overruled?
18                MR. TRIMBLE:  No.  Your objection is
19    entered into the record.
20                MS. HYLAND:  You made your objection.
21    It's duly noted.  I think I have a grand total of
22    something like 13 individual pages here that we're
23    arguing over, which is --
24                MR. TRIMBLE:  And you also have a plane to
25    catch.  We're trying to finish.
```

Matthew Rihtar                                    August 3, 2017

Page 211

1              MR. PEACOCK:  I do, so --

2              MR. TRIMBLE:  We're wasting time.

3              MS. HYLAND:  This is a stupid dispute.  We

4    should just do it.  And it's not --

5              MR. PEACOCK:  Okay.  Let's move one.

6              MS. HYLAND:  -- not worth it.

7              MR. PEACOCK:  Let's move on.  You take

8    your $20 back.  I do not need your $20.  I think it's

9    insulting to throw me $20 at the deposition.

10             MS. HYLAND:  But that is literally what

11   we're arguing about.

12             MR. TRIMBLE:  Aaron, we offered, and you

13   accepted.

14             MR. PEACOCK:  Right, because it's

15   insulting.

16             MR. TRIMBLE:  We offered, and you said we

17   have an agreement.

18             MR. PEACOCK:  Right.  Well, come on.  That

19   doesn't mean -- I mean, when two -- come on.  You know,

20   as a lawyer, when two parties make an agreement, it

21   doesn't mean that instantly money is thrown at the

22   other side.  Come on.  You guys know that.

23             MR. TRIMBLE:  Aaron, we aren't going to

24   see you again for how long?

25             MR. PEACOCK:  Come on, Seth.  Anyway,

Matthew Rihtar                                    August 3, 2017

                                                      Page 212

 1    let's continue on.  I just wanted it noted for the

 2    record that I thought that was unprofessional, and I

 3    was insulted by that.

 4              MR. TRIMBLE:  Okay.  It's noted.

 5              MR. PEACOCK:  But go ahead and continue.

 6              MS. HYLAND:  I think we were on

 7    Exhibit 15.  Exhibit -- I'm sorry.  Bates Nos. 136173

 8    to 136174 I'd like to introduce as Exhibit 16.

 9              (Deposition Exhibit 16 was marked.)

10              MS. HYLAND:  Bates No. 136175 to Bates

11    No. 136177 will be Exhibit 17.

12              (Deposition Exhibit 17 was marked.)

13              MS. HYLAND:  Bates No. 136181 to 136183

14    will be Exhibit 18.

15              (Deposition Exhibit 18 was marked.)

16              MS. HYLAND:  And Bates Nos. 304135 to

17    304137 will be Exhibit 19.

18              (Deposition Exhibit 19 was marked.)

19              MS. HYLAND:  And that's all I have.

20              MR. PEACOCK:  Before we go off the record,

21    I just want it noted that you and I, when we were off

22    the record, we did have a discussion about whether you

23    guys opposed plaintiff's motion for leave to file a

24    sur-reply, and you said that you'd get back to me about

25    that.  Just so we have a record of it, that it's on the

Matthew Rihtar                                      August 3, 2017

Page 213

1    record, I wanted to make the statement.

2             MR. TRIMBLE:  And that you also said that

3    you would end up e-mailing us and All Web Leads about

4    it?

5             MR. PEACOCK:  That's right.  I'll send you

6    guys an e-mail went I get back to the office.  I guess

7    it will be sometime Friday.  Is today Thursday?  So

8    I'll e-mail you guys tomorrow, Friday.  And then if you

9    guys can reply back to me no later than Monday,

10   preferably by noon, that way in the motion I can put

11   whether you-all oppose or not.  And like I also said,

12   I'll get with Jared from All Web Leads to see if All

13   Web Leads is opposed or not.  Other than that, I have

14   nothing further.

15            (Deposition Exhibit 6 was marked.)

16            WHEREUPON, the within proceedings were

17   concluded at the approximate hour of 5:29 p.m. on the

18   3rd day of August, 2017.

19            *      *      *      *      *

20

21

22

23

24

25

Matthew Rihtar                                          August 3, 2017

Page 214

1          I, MATTHEW RIHTAR, do hereby certify that

2   I have read the above and foregoing deposition and that

3   the same is a true and accurate transcription of my

4   testimony, except for attached amendments, if any.

5          Amendments attached    (  ) Yes    (  ) No

6

7

8

9          _____

10                    MATTHEW RIHTAR

11

12

13         The signature above of MATTHEW RIHTAR was

14   subscribed and sworn to before me in the county of

15   _____, state of Colorado, this _____ day of

16   _____, 2017.

17

18

19

20         _____
                    Notary Public
21                  My commission expires

22

23

24

25   Neutron Depot, et al. 8/3/17 (go)

Matthew Rihtar                                    August 3, 2017

Page 215

                    REPORTER'S CERTIFICATE

STATE OF COLORADO          )
                           )  ss.
CITY AND COUNTY OF DENVER )

          I, GAIL OBERMEYER, Registered Professional
Reporter and Notary Public ID 19994012647, State of
Colorado, do hereby certify that previous to the
commencement of the examination, the said MATTHEW
RIHTAR was duly sworn by me to testify to the truth in
relation to the matters in controversy between the
parties hereto; that the said deposition was taken in
machine shorthand by me at the time and place aforesaid
and was thereafter reduced to typewritten form; that
the foregoing is a true transcript of the questions
asked, testimony given, and proceedings had.

          I further certify that I am not employed
by, related to, nor of counsel for any of the parties
herein, nor otherwise interested in the outcome of this
litigation.

          IN WITNESS WHEREOF, I have affixed my
signature this 15th day of August, 2017.

          My commission expires May 10, 2019.


__X__ Reading and Signing was requested.

_____ Reading and Signing was waived.

_____ Reading and Signing is not required.